**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TREMONT LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| HALLIBURTON ENERGY SERVICES, | § | |
| INC., *et al.*, | § | CIVIL ACTION NO. H-08-1063 |
| | § | |
| Defendants, | § | |
| | § | |
| VS. | § | |
| | § | |
| NL INDUSTRIES, INC., | § | |
| | § | |
| Third-Party Defendant. | § | |

**MEMORANDUM AND OPINION**

This case involves allocating responsibility for environmental remediation.  The following motions are pending:

- Tremont LLC ("Tremont") seeks partial summary judgment that Halliburton Energy Services, Inc. ("HESI") and DII Industries, LLC ("DII") (collectively, "Halliburton") must indemnify Tremont for the costs and expenses it has incurred and will incur to remediate environmental contamination at three Texas locations where Gulf Nuclear, Inc. ("Gulf Nuclear" or "GNI") manufactured, stored, repaired, and disposed of radioactive materials (the "Gulf Nuclear Sites").  (Docket Entry No. 8; 2005 Case, Docket Entry No. 247).[1]  The motion includes a request for indemnification for

---

[1]  Tremont filed an identical motion for partial summary judgment in a related case pending before this court, Civil Action No. 05-4160 (the "2005 Case").  Tremont initially filed the same claim it asserts in this action (the "2008 Case") as a counterclaim in the 2005 Case, and sought guidance as to whether to pursue its claim

claims raised in a related civil case filed in this district by the Environmental Protection Agency (EPA) against Halliburton, NL Industries, Inc. ("NL"), and other entities.  (2005 Case, Docket Entry No. 252 at 1–2).  That case is referred to as the "EPA lawsuit."

• Halliburton has filed a third-party complaint against NL seeking indemnification or, alternatively, contribution under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).  NL moves to dismiss Halliburton's third-party complaint, or in the alternative, for summary judgment.  (Docket Entry No. 19).

• NL has filed a motion to stay discovery, (Docket Entry No. 26), and a separate motion for partial summary judgment, (Docket Entry No. 56).

• Halliburton seeks a continuance of both Tremont's motion for partial summary judgment, (Docket Entry No. 11), and of NL's motion for partial summary judgment, (Docket Entry No. 58).

• Halliburton moves for leave to file under seal certain exhibits to its surreply to Tremont's reply to Halliburton's supplemental response to Tremont's motion for partial summary judgment.  (Docket Entry No. 63).

---

in the 2005 Case or in the 2008 Case.  Because unrelated claims remained pending in the 2005 Case, and to avoid duplication and promote fairness and efficiency, this court severed Tremont's counterclaim in the 2005 Case, (2005 Case, Docket Entry No. 335), and consolidated the counterclaim from the 2005 Case with the 2008 Case, (Docket Entry No. 30).  Before Tremont's counterclaim from the 2005 Case was consolidated in the 2008 Case, the parties to the 2008 Case had filed various pleadings in both the 2005 Case and the 2008 Case.  Because of the severance and consolidation of the counterclaim from the 2005 Case, motions filed in the 2005 Case that related to the claims in the 2008 Case were denied as moot in the 2005 Case.  (2005 Case, Docket Entry No. 335 at 2).  Many of the substantive briefs relating to the pending motions in this case were filed in the 2005 Case, with notices filed in the 2008 Case referring to the filings in the 2005 Case.  References in this opinion to docket entries from the 2005 Case will use the following form: (2005 Case, Docket Entry No. __).  References to docket entries in the 2008 Case will use: (Docket Entry No. __).

- Tremont has filed a motion to supplement the summary judgment record, (Docket Entry No. 70), and a sealed motion for leave to file under seal its response to Halliburton's objection to Tremont's supplemental evidence and its memorandum in further support of the motion to supplement the summary judgment record, (Docket Entry No. 74).

- Halliburton has filed a motion for leave to supplement the summary judgment record. (Docket Entry No. 86).

This court held hearings and heard oral argument from counsel.  Based on the motions, the responses, and the replies; the present record; the arguments of counsel; and the applicable law, this court reaches the following conclusions:

- There is no genuine dispute of fact as to whether NL's potential liability for the Gulf Nuclear Sites stems solely from NL's former petroleum services business.

- Issue preclusion applies to the interpretation—made by an arbitration panel in an earlier arbitration—of the relevant contracts.  That interpretation places the responsibility for the Gulf Nuclear Sites on Halliburton.

- This court's own interpretation of the relevant contracts places the responsibility for the Gulf Nuclear Sites with Halliburton.

- NL transferred its petroleum services business to its subsidiary, NL Petroleum Services, Inc. ("NLPS"), in a 1988 restructuring, and then to New Baroid in a 1990 restructuring.  Under both the arbitrators' and this court's contract interpretation, both restructurings included the transfer of all historical liabilities associated with NL's petroleum services business, including historical liabilities arising from assets or operations that were not themselves transferred.  Because Halliburton is

3

undisputedly New Baroid's successor, Halliburton is responsible for historical liabilities associated with NL's former petroleum services business, including historical liabilities associated with assets or operations that NL sold before the 1988 restructuring became effective.

The result of these conclusions is that this court:

- grants Tremont's motion for partial summary judgment;

- denies Halliburton's request for a continuance of Tremont's motion for partial summary judgment;

- grants in part and denies in part NL's alternative motion for summary judgment based on issue preclusion, and denies NL's motion to dismiss as moot;

- denies NL's motion for partial summary judgment based on contract interpretation and motion to stay discovery as moot;

- denies Halliburton's request for a continuance to respond to NL's motion for partial summary judgment as moot;

- grants Halliburton's motion for leave to file exhibits under seal; grants Tremont's motion to supplement the summary judgment record; denies Tremont's motion for leave to file one of its responses under seal as moot; and denies Halliburton's motion for leave to supplement the summary judgment record.

The reasons are set out in detail below.  A status conference is set for **March 30, 2010, at 2:00 p.m.**, to discuss a schedule for resolving the remaining issues.

4

**Table of Contents**

I.      Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     The Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Motions to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      Issue Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    Tremont's Motion for Partial Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.      The Facts Relevant to Tremont's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                1.      The 1988 Restructuring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        a.      The 1988 Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        b.      The Formation Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                        c.      The Cross-Indemnification Agreement . . . . . . . . . . . . . . . . . . . . 21

                        d.      The Assumption Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                        e.      The Indebtedness Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                2.      The 1990 Restructuring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                3.      The Evidence in the Arbitration About the Transfer of NL's Former

                        Petroleum Services Business to Halliburton . . . . . . . . . . . . . . . . . . . . 28

                        a.      The Affidavits of J. Landis Martin, Steven L. Watson, William

                                Lindquist, and Harold C. Simmons . . . . . . . . . . . . . . . . . . . . . . 28

                        b.      The SEC Information Statement . . . . . . . . . . . . . . . . . . . . . . . . 32

                        c.      The New Baroid/Dresser/Halliburton Mergers . . . . . . . . . . . . . . 34

                        d.      Testimony in the Arbitration Proceeding . . . . . . . . . . . . . . . . . . 35

5

|     |     |                                                                               |
| --- | --- | ----------------------------------------------------------------------------- |
|     | i.   | The Arbitration Testimony of J. Landis Martin . . . . . . . . 35             |
|     | ii.  | The Arbitration Testimony of William Lindquist  . . . . . . 38              |
|     | iii. | The Arbitration Testimony of Steve Watson . . . . . . . . . . 40            |
|     | iv.  | The Arbitration Testimony of Harold Simmons  . . . . . . . 42               |
|     | v.   | The Arbitration Testimony of Ann Manix . . . . . . . . . . . 42             |
|     | vi.  | The Arbitration Testimony of John Karnes . . . . . . . . . . 43             |
|     | vii. | The Arbitration Testimony of John Deering  . . . . . . . . . 44             |
|     | viii.| The Arbitration Testimony of Joseph S. Compofelice  . . 45                  |

4.    The Sale of the McCullough Division to Western Atlas . . . . . . . . . . . . 48

5.    *Western Atlas v. NL Industries, Inc.*  . . . . . . . . . . . . . . . . . . . . . . . . . . 50

6.    The Sale of Oilfield Service Facilities to Exxon . . . . . . . . . . . . . . . . . . 51

7.    Tremont's Request for Indemnification from Halliburton for the Gulf Nuclear

      Site Liabilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

8.    The Arbitration Panel's Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

9.    The Evidence as to Whether Liabilities Associated with the Gulf Nuclear

      Sites Are Part of NL's Former Petroleum Services Business  . . . . . . . . . 61

      a.    The McCullough Division's Activities at the Gulf Nuclear Sites

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

      b.    Shipping Slips and Receiving Logs Showing Shipments of

            Radioactive Material from NL and Its Subsidiaries  . . . . . . . . . 64

      c.    Witness Statements and Testimony of Former Gulf Nuclear

            Employees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

6

d.      NL Annual Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

e.      NL Board Minutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

f.      The Public Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

g.      Halliburton's Discovery Responses . . . . . . . . . . . . . . . . . . . . . . . 85

h.      Use of Nuclear Materials in Petroleum Services Operations  . . . 87

i.      NL's Nuclear Division . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

j.      EPA Claims Linking NL to the Gulf Nuclear Sites . . . . . . . . . . . 93

k.      Affidavits and Declarations of Former NL Employees Stating that

        NL's Connection to the Gulf Nuclear Sites Was Through Its

        Petroleum Services Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

B.   Halliburton's Request for a Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

1.   Background and the Parties' Arguments . . . . . . . . . . . . . . . . . . . . . . . . 104

2.   Analysis of the Motion for Continuance . . . . . . . . . . . . . . . . . . . . . . . 111

C.   There Is No Dispute as to Any Fact Material to Determining Whether NL's

     Connection to the Gulf Nuclear Sites Was Only Through Its Former Petroleum

     Services Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

D.   Issue Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

1.   The Parties' Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

2.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

     a.      The Application of Issue Preclusion to an Arbitration Award

             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

     b.      Identity of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

7

c.      The Issue Was Actually Litigated in the Arbitration . . . . . . . . . 145

d.      The Arbitration Panel's Findings Were Necessary to Its Award

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

E.      Contract Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

IV.     NL's Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

A.      Conversion to a Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . 172

B.      Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

V.      NL's Motion for Partial Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

VI.     NL's Motion to Stay Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

## I.      Procedural Background

In the related 2005 Case, Halliburton sought to recover the money it spent investigating and remediating environmental contamination near the towns of Magnet Cove and Malvern Arkansas (the "Malvern Site").  The relevant background has been set out in previous opinions issued in the 2005 Case and is only summarized here.

Briefly, Halliburton filed the 2005 Case against the Tremont Parties—NL, Tremont, TRE Holding Corporation, and TRE Management Company—M-I, L.L.C., Milwhite Inc., and Georgia-Pacific Corporation, after entering into an Administrative Settlement Agreement in 2000 and a Consent Administrative Order in 2003 with the Arkansas Department of Environmental Quality ("ADEQ").  In April 2005, before the litigation over allocating responsibility for cleaning up the Malvern Site, TRE Management and Halliburton entered into a Cost Sharing, Cooperation, and Final Allocation Process Agreement (the "2005 Cost Sharing Agreement"). This 2005 Cost Sharing Agreement included a procedure to allow the parties to cooperate in funding the response and remediation costs for the Malvern Site by "allocating on an interim basis."  The 2005 Cost Sharing Agreement also set out a procedure for the parties to reach a "Final Allocation" of "their and others' respective shares of such past, present, and future costs, expenses, liabilities, settlements, recoveries, or unpaid shares relating to the [Malvern] Site . . . ."  The 2005 Cost Sharing Agreement defined "Final Allocation" as a "full, final, and binding apportionment among the Parties to the Agreement," by agreement or by arbitration, of defined categories of costs, including future costs.  Under the 2005 Cost Sharing Agreement, if mediation did not result in "Final Allocation," the parties were required to participate in binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association and the Federal Arbitration Act.

9

In late 2005, Halliburton filed the 2005 Case against the Tremont Parties as prior owners and operators of the Malvern Site when hazardous substances were released, or as successors-in-interest to owners or operators.  Halliburton also sued Georgia-Pacific, as a prior owner of the Malvern Site, and Milwhite, as a prior owner and operator of the Malvern Site.  Halliburton asserted cost-recovery and contribution claims under CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f)(3)(B), contribution claims under the Arkansas Remedial Action Trust Fund Act (RATFA), ARK. CODE ANN. § 8-7-520, and a right to recover response and remediation costs under a state common-law unjust enrichment cause of action.  Halliburton also sought a declaratory judgment that the defendants were liable for future response and remediation costs at the Malvern Site and that Tremont had to indemnify Halliburton for these costs under the contracts used to restructure the corporate predecessors-in-interest.  Georgia-Pacific and Milwhite counterclaimed against Halliburton and crossclaimed against each other and against their codefendants, the Tremont Parties, seeking contribution and indemnity.

In March 2006, after the 2005 Case and a related lawsuit in Arkansas had been filed, Halliburton and the Tremont Parties entered into an agreement expanding the entities consenting to arbitrate the allocation of response and remediation costs at the Malvern Site.  In this 2006 Arbitration Agreement, the parties agreed to "resolve through binding arbitration all claims between them related to the allocation of response and remediation costs incurred or to be incurred at the [Malvern] Site including the claims that have been asserted in the Texas Case or such claims that may be asserted in [a related] Arkansas Case."  The signatories to the 2006 Arbitration Agreement included HESI, DII, NL, Tremont, TRE Holding, and TRE Management.  The arbitration was to be conducted under the 2005 Cost Sharing Agreement.

The arbitration between Halliburton and the Tremont Parties was conducted in two phases

and resulted in two awards.[2]  Among the parties to the arbitration, the arbitration panel allocated all response costs at the Malvern Site to Halliburton.  This court confirmed the arbitration awards on March 31, 2008, and later entered final judgment under Federal Rule of Civil Procedure 54(b) on the claims resolved in the arbitration.  Halliburton appealed the order confirming the awards and the final judgment on the confirmation order.  The Fifth Circuit affirmed.

After this court confirmed the arbitration awards in the 2005 Case, Tremont filed the 2008 Case against Halliburton.[3]  In the 2008 Case, Tremont asserts a claim for breach of contract and for contractual indemnity, "seek[ing] to recover from Halliburton costs and expenses that Tremont has incurred and will incur to defend, indemnify, investigate and respond to a number of environmental sites and claims that derive from the former petroleum services business of NL."  (Docket Entry No. 1 at 2, 5–7).  The sites and claims for which Tremont seeks indemnity include the "Gulf Nuclear Sites" located in Odessa, Ector County, Texas; Webster, Harris County, Texas; and (Tavenor Street) Houston, Harris County, Texas; the Malone Service Company located in Galveston County, Texas; the Spinks Site located in Laurel, Mississippi; the Potosi and Fountain Farm Sites located in Washington County, Missouri; the ArChem-Thames Chelsea Superfund Site located in Houston, Texas; and the Olen Lee family toxic tort case located in Calcasieu Parish, Louisiana (collectively, the "Sites").  (*Id.* at 2).

In the 2008 Case, "Tremont also seeks a declaratory judgment that Halliburton is

---

[2]  The first phase was called the "contract phase" and focused on the meaning and interpretation of a 1990 plan of restructuring of NL's petroleum services business.  The contract phase resulted in an award referred to as the "Contract Award."  The second phase was called the "allocation phase" and involved allocating responsibility for the environmental liabilities at the Malvern Site among the parties to the arbitration.  The allocation phase resulted in an award referred to as the "Allocation Award."

[3]  As noted earlier, Tremont sought identical relief through a counterclaim in the 2005 Case, but the counterclaim was ultimately severed and consolidated with the claims in the 2008 Case.

contractually liable to Tremont to indemnify and hold Tremont harmless against all costs and expenses arising out of or otherwise attributable to NL's former petroleum services business . . . , except those [liabilities] specifically retained in the 1990 Plan of Restructuring . . . ." (*Id.*; *see also id.* at 7–8). Tremont alleges that because the arbitration panel found that Halliburton is contractually liable to indemnify Tremont for all costs and expenses arising out of NL's former petroleum services business, issue preclusion prevents Halliburton from relitigating that issue here.[4] (*Id.* at 2). Tremont also asserts a contribution claim under CERCLA. (*Id.* at 8–9).

Halliburton filed a third-party complaint against NL, asserting that as the former owner of the Sites, NL is contractually and statutorily obligated to indemnify Halliburton for all liabilities associated with the Sites. (Docket Entry No. 13). Halliburton asserts a claim for breach of contract, claiming that as part of the 1988 restructuring, NL agreed to indemnify NLPS and its successors for liability associated with operations not transferred to NLPS in that restructuring. (*Id.* at 6–7). Halliburton argues that many of the obligations arising from the Sites are attributable to operations not transferred to NLPS in 1988. (*Id.* at 7). Halliburton also seeks a declaratory judgment that NL is obligated to indemnify Halliburton for expenses arising out of businesses that NL transferred before the 1988 restructuring. (*Id.* at 8). In the alternative, Halliburton asserts a claim for contribution and cost recovery under CERCLA. (*Id.* at 8–9).

Tremont has moved for partial summary judgment that Halliburton is responsible for all costs and expenses that Tremont has incurred in connection with the Gulf Nuclear Sites. Tremont argues that it is entitled to judgment based on the relevant contracts and based on issue preclusion. NL

---

[4]   Tremont's summary judgment brief argues that summary judgment is appropriate based on both res judicata (claim preclusion) and collateral estoppel (issue preclusion). During the hearing on Tremont's motion, however, Tremont's counsel clarified that only issue preclusion, not claim preclusion, applies.

asserts that the third-party complaint against it should be dismissed based on issue preclusion and also seeks partial summary judgment based on contractual interpretation.

These motions, and the parties' arguments and responses, are considered below.

## II.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.'" *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)), *petition for cert. filed*, 77 U.S.L.W. 3657 (U.S. May 22, 2009) (No. 08-1438). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive

a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant

must identify specific evidence in the record and articulate how that evidence supports that party's

claim.  *See Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007) (citation omitted).  "This burden

will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations,

by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540

(quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all

reasonable inferences in the light most favorable to the nonmoving party.  *Deville v. Marcantel*, 567

F.3d 156, 163–64 (5th Cir. 2009) (per curiam) (citing *Hockman v. Westward Commc'ns, LLC*, 407

F.3d 317, 325 (5th Cir. 2004)).

### B.    Motions to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be

granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court confirmed that

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain

statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).

*Twombly* abrogated the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46

(1957), that "a complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

him to relief."  *See Twombly*, 550 U.S. at 562–63 ("*Conley's* 'no set of facts' language . . . is best

forgotten as an incomplete, negative gloss on an accepted pleading standard . . . .").  To withstand

14

a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1974).

In considering a Rule 12(b)(6) motion to dismiss, a court generally must limit itself to the pleadings, with an exception.  In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss.  The Fifth Circuit made it clear that such consideration is limited "to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins*, 224 F.3d at 498–99). When other "matters outside the pleadings" are submitted in support of or in opposition to a Rule 12(b)(6) motion to dismiss, Rule 12(b) grants courts discretion to accept and consider those materials, but does not require them to do so.  *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999); *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988).  A court exercises this discretion by determining whether the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate decision.  *Isquith*, 847 F.2d at 193 n.3 (quoting 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (1969)).  If the court decides to consider such material, then the court must treat the Rule 12(b)(6) motion as a motion for summary judgment under Rule 56.  FED. R. CIV. P. 12(d). If the court accepts matters outside the pleading and converts the motion to dismiss into one for summary judgment, the court must give the parties notice of the changed status of the motion and a "'reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.'"

15

*Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 38 (2d Cir. 1990) (quoting former FED.

R. CIV. P. 12(b)).

### C.      Issue Preclusion

The Fifth Circuit has set out the following elements for applying issue preclusion, or

collateral estoppel:

> Collateral estoppel precludes a party from litigating an issue already
> raised in an earlier action between the same parties only if: (1) the
> issue at stake is identical to the one involved in the earlier action; (2)
> the issue was actually litigated in the prior action; and (3) the
> determination of the issue in the prior action was a necessary part of
> the judgment in that action.

*Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004) (footnotes and citation

omitted).  "Collateral estoppel does not preclude litigation of an issue unless both the facts and the

legal standard used to assess them are the same in both proceedings."  *Copeland v. Merrill Lynch*

*& Co., Inc.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (citation omitted).  Issue preclusion may apply even

if the claims and the subject matter of the suits differ.  *Next Level Commc'ns LP v. DSC Commc'ns*

*Corp.*, 179 F.3d 244, 250 (5th Cir. 1999) (citation omitted).  In addition, "'[u]nlike claim preclusion,

the doctrine of issue preclusion may not always require complete identity of the parties.'"  *Id.*

(alteration in original) (quoting *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1273 (5th Cir. 1990)).

## III.     Tremont's Motion for Partial Summary Judgment

### A.      The Facts Relevant to Tremont's Motion

Tremont's motion seeks to resolve liability for the Gulf Nuclear Sites, which include three

locations—Odessa, Webster, and Houston (on Tavenor Street), Texas—at which Gulf Nuclear

manufactured, stored, repaired, and disposed of radioactive materials.  Liability turns on whether

the transfer of certain liabilities and indemnification obligations under the 1988 restructuring of NL

and the 1990 restructuring of (Old) Baroid Corporation included the liabilities associated with the Gulf Nuclear Sites.  The relevant facts include the restructuring contracts and related documents, evidence that was presented to the arbitration panel, and evidence as to whether NL's connection to the Gulf Nuclear Sites was solely through its former petroleum services business.  Although this court ultimately concludes that extrinsic evidence is not necessary because the relevant agreements are unambiguous, the evidence presented to the arbitration panel is included in the factual background because it is relevant to understanding the scope of the arbitration proceedings, which is relevant to the issue preclusion analysis.

### 1. The 1988 Restructuring

#### a. The 1988 Plan

In 1988, NL entered a series of transactions under a restructuring plan (the "1988 Plan"). (*See* 2005 Case, Docket Entry No. 247, Ex. I[5]).[6]  Through the 1988 Plan and related agreements, NL spun off its petroleum services business and transferred it to NLPS, which later became Baroid Corporation ("Old Baroid").[7]  NL retained its chemical business.  According to an August 12, 1988

---

[5] Halliburton objects to this document as incomplete.  (2005 Case, Docket Entry No. 273 at 1).  Halliburton does not explain what is missing from the document.  In addition to the lack of support for the objection, Tremont points out that this exhibit is the same 10-page document that Halliburton labeled as the 1988 Plan of Restructuring and submitted as Exhibit 6 during the contract phase of the arbitration.  Tremont also notes that Halliburton submitted the same document to this court in seeking to vacate the arbitration awards.  (2005 Case, Docket Entry No. 280 at 1–2).  Halliburton's objection is overruled.

[6] The exhibits associated with Tremont's motion for partial summary judgment span several docket entries.  For ease of reference, this opinion will refer to the docket entry number for Tremont's motion (as filed in the 2005 Case) (Docket Entry No. 247), followed by the exhibit letter, even if the exhibit is actually filed at a later docket entry.

[7] On July 3, 1986, an entity known as NL Investments, Inc. was incorporated.  (2005 Case, Docket Entry No. 247, Ex. F).  NL Investments, Inc. changed its name to NL Petroleum Services, Inc. on April 11, 1988. (*Id.*, Ex. G).  On November 11, 1988, NL Petroleum Services, Inc. changed its name to Baroid Corporation. (*Id.*, Ex. H).

17

memorandum from J.L. Martin, then President and Chief Executive Officer of NL, to NL's Board

of Directors, the 1988 restructuring sought to separate the two businesses.  (*See id.*, Ex. N).[8]  The

---

[8]  Halliburton objects to Exhibit N as not properly authenticated because it is not attached to an affidavit meeting the requirements of Rule 56(e), as hearsay, and as irrelevant.  (2005 Case, Docket Entry No. 273 at 2).  Tremont points out that this is the same document it submitted as Exhibit 30 in the contract phase of the arbitration, and the same document that Halliburton filed in this court in connection with the arbitration record.  (2005 Case, Docket Entry No. 280 at 3).  Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a); *see also In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (quoting FED. R. EVID. 901(a)).  "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (internal citation and quotation marks omitted).  "Rule 901 is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'"  *Id.* (citation omitted); *see also United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) ("[T]his court does not require conclusive proof of authenticity before allowing the admission of disputed evidence . . . .  [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." (omission in original) (citation and quotation marks omitted)).  When Tremont filed the exhibits in support of its summary judgment motion, Tremont submitted the affidavit of J. Mark Hollingsworth, Vice President and General Counsel of Tremont.  Hollingsworth swore that he had personal knowledge of Tremont's business, that he had reviewed the exhibits produced in the arbitration between Tremont and Halliburton, and that all the documents submitted with Tremont's summary judgment motion were true and correct copies of documents in its possession and control.  (2005 Case, Docket Entry No. 247-2).  This is sufficient to authenticate the documents attached to Hollingsworth's affidavit.  Although Halliburton argues that some of the documents attached to the Hollingsworth affidavit relate to business entities other than Tremont, given the complex corporate transactions surrounding the restructurings, this blanket assertion is not enough to show a lack of authenticity.

Tremont also argues that Halliburton waived any objection to this document by filing it with the court.  This court agrees with Halliburton that because it only filed the document to present a complete record of the arbitration exhibits, it did not waive objections by filing the document.  There also was not a waiver by failing to object during the arbitration hearings because those proceedings may not have strictly adhered to the Federal Rules of Evidence.  (*See* Docket Entry No. 247, Ex. D at 30 (the Allocation Award from the arbitration, in which the arbitrators stated that "[a]rbitration is not, however, similarly restricted by strict adherence to those rules [of civil procedure and evidence that apply in state and federal courts]")).  However, because the Hollingsworth affidavit properly authenticates the document, Halliburton's authentication objection is overruled.

The hearsay objection is also overruled.  To the extent the document is offered to show what the arbitration panel heard, the document is not offered to prove the truth of its contents.  *See* FED. R. EVID. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").  To the extent the document is submitted to prove the truth of the statements, it would be relevant only if the contracts were ambiguous and extrinsic evidence was required.  As discussed below, however, resort to extrinsic evidence is not required because the contracts are not ambiguous on the issues resolved in this opinion.

Halliburton does not explain the basis for its argument that this document is irrelevant.  The document

18

memorandum recommended that NLPS become a "separate, publicly-traded company, comprised of [NL's] existing petroleum services business . . . .  NLPS would assume the . . . environmental liabilities unique to the petroleum services business."  (*Id.*, Ex. N at 7).

As Tremont points out, the 1988 Plan was an unsigned outline of the restructuring that relied on the related agreements to set out the specifics.  (2005 Case, Docket Entry No. 252 at 8).  Several documents were executed in connection with the 1988 restructuring in addition to the 1988 Plan. The documents included an Amended and Restated Formation Agreement (the "Formation Agreement"), an Amended and Restated Cross-Indemnification Agreement (the "Cross-Indemnification Agreement"), a General Assignment and Assumption Agreement and Bill of Sale (the "Assumption Agreement"), and an Amended and Restated Outstanding Indebtedness Agreement (the "Indebtedness Agreement").

### b.     The Formation Agreement

In the Formation Agreement, dated September 16, 1988 and effective as of December 31, 1987, NL agreed to transfer to NLPS "all of its properties, assets and rights of any kind, whether tangible or intangible, real or personal[,] related to its petroleum services business or Titanium Metals Corporation of America ('TMCA') (collectively, the 'Assets') . . . ."  (2005 Case, Docket Entry No. 247, Ex. J, § 1.1).[9]  The Formation Agreement states that the transfer from NL to NLPS

_____

is relevant to understanding what evidence was presented to the arbitration panel, which is relevant to issue preclusion.  The relevance objection is overruled.

[9] Halliburton objects to this document as incomplete.  (2005 Case, Docket Entry No. 273 at 2).  Halliburton does not explain what is missing.  Tremont points out that this exhibit is the same document that Halliburton labeled as the Amended and Restated Formation Agreement and submitted as Exhibit 7 during the contract phase of the arbitration, and that Halliburton also submitted the same document in this court to complete the arbitration record in connection with its request to vacate the arbitration awards.  (2005 Case, Docket Entry No. 280 at 2).  Because Halliburton has not explained what is missing, Halliburton's objection is overruled.

Tremont separately submitted Schedule 1.1(a) to the Formation Agreement as Exhibit NN, even though that Schedule is included within Exhibit J.  Halliburton objects to Exhibit NN as not properly

excluded the assets on an "Excluded Assets Schedule" and "all goodwill and going concern value of NL that [wa]s not associated with TMCA or the petroleum services operations of NL." (*Id.*, Ex. J, § 1.2). The Excluded Assets Schedule includes a subheading entitled "Section 1.2," apparently referring to Section 1.2 of the Formation Agreement. (*Id.*, Ex. J at 6). The Schedule lists: shares of the capital stock of NL Chemicals, Inc. ("NLC") and its subsidiaries, Enenco, Inc., and Schraubenfabrik Newstadt Goetz & Cie. GmbH; a note receivable from NLC; and surplus property. (*Id.*, Ex. J at 6).

In the Formation Agreement, NLPS agreed "to assume, pay, discharge or perform when due *all liabilities and obligations, known or unknown, of NL, associated with its petroleum services business . . .*, including without limitation those liabilities listed on the attached Liabilities Schedule, but excluding" specifically named liabilities. (*Id.*, Ex. J, § 1.3 (emphasis added)). Among the liabilities expressly excluded from the transfer to NLPS were "any and all liabilities of NL specified in the Amended and Restated Outstanding Indebtedness Agreement between NLPS and NL dated September 16, 1988 . . . except as provided in the Indebtedness Agreement," (*id.*, Ex. J, § 1.4(a)), "any claims of liability *at sites or facilities or with respect to operations not transferred to NLPS pursuant to this Agreement*, including claims arising out of or relating to the offsite deposit, placement or disposal by NL of any materials of any character whatsoever generated at the sites or operations not transferred to NLPS pursuant to this Agreement," (2005 Case, Docket Entry No. 247, Ex. J, § 1.4(c) (emphasis added)), and "any claims relating to products the manufacture of which, or accounts receivable relating thereto, not transferred to NLPS pursuant to this Agreement," (*id.*, Ex. J, § 1.4(d)).

---

authenticated. (2005 Case, Docket Entry No. 273 at 11). The exhibit is authenticated by Hollingsworth's affidavit. Halliburton's objection to Exhibit NN is overruled.

20

Under the Formation Agreement, NL was required to "transfer and deliver to NLPS good and valid title to the Assets to the extent such Assets are transferable on the Effective Date without violation of any applicable laws or agreements and in conformity with any required third-party or governmental consents or other approvals for transfer."  (*Id.*, Ex. J, § 3.1).  NLPS agreed "to assume and fully pay, perform and discharge each and all of the Assumed Liabilities in accordance with their terms."  (*Id.*, Ex. J, § 3.1).

The Formation Agreement recognized that other agreements would be executed to transfer the assets and liabilities:

> The transfer of the Assets and the assumption of the Assumed Liabilities shall be effected by the execution and delivery of a General Assignment and Assumption Agreement and Bill of Sale, an Assignment of Intangibles, Rights and Proceeds, a Patent Assignment, a Copyright Assignment, a Patent Quitclaim Assignment, Trademark Assignment, and Assumption of Liabilities substantially in the forms of the documents attached hereto as Exhibit A, Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F and Exhibit G respectively, together with such deeds or other instruments as may be required to transfer all interest in the Assets to NLPS and for NLPS to assume all of the Assumed Liabilities.

(*Id.*, Ex. J, § 3.1).  The Formation Agreement also required execution of the Cross-Indemnification Agreement and the Indebtedness Agreement.  (*Id.*, Ex. J, § 3.4).

### c.     The Cross-Indemnification Agreement

The Cross-Indemnification Agreement was dated September 16, 1988 and effective as of December 31, 1987.  NL and NLC agreed "to indemnify and hold NLPS harmless from, against and in respect of all indebtedness, obligations or liabilities of NLPS, of any kind and nature, whether accrued, absolute, contingent, asserted, unasserted, due to become due, known, unknown and

whenever arising, which are *not expressly assumed by NLPS pursuant to the Formation*,[10] and costs

and expenses related thereto." (2005 Case, Docket Entry No. 247, Ex. K, § 1.1 (emphasis added)).[11]

NL and NLC also agreed to "indemnify and hold NLPS and each of its directors, officers, and

employees harmless from and with respect to any and all claims, liabilities, losses, damages, costs,

and expenses, including attorneys' fees, from or related to . . . (a) *all liabilities not expressly*

*assumed by NLPS in connection with the Formation Agreement*; [and] (b) claims of liability at sites

or facilities or *with respect to operations not transferred to NLPS pursuant to the Formation*,

including claims arising out of or relating to the offsite deposit placement or disposal by NL or NLC

on or prior to the date of this Agreement of any materials of any character whatsoever generated at

the sites or by operations *not transferred to NLPS pursuant to the Formation*." (*Id.*, Ex. K, §

1.2(a)–(b) (emphasis added)).  NLPS agreed "to indemnify and hold the NL Parties [(NL and NLC)]

harmless from, against and in respect of, the failure of NLPS to pay or otherwise perform when due

the liabilities, obligations or commitments of NL assumed by NLPS pursuant to the Formation."

(*Id.*, Ex. K, § 2.1).

---

[10]  "Formation" was defined in this Cross-Indemnification Agreement to be the "formation of NLPS," in which "NL and NLPS entered into . . . [the Formation Agreement] and various related agreements whereby NL transferred to NLPS all of its domestic and foreign petroleum services and equipment operations and its other businesses except for its shares of NLC and certain of its obligations." (2005 Case, Docket Entry No. 247, Ex. K at 1).

[11]  Halliburton objects to Exhibit K, arguing that it is not a complete copy and that it is not properly authenticated under Federal Rule of Evidence 901 because it is not attached to an affidavit meeting the requirements of Federal Rule of Civil Procedure 56(e).  (2005 Case, Docket Entry No. 273 at 2).  Tremont responds that this document is the same Cross-Indemnification Agreement identified by Tremont as Exhibit 32 in the contract phase of the arbitration and filed in this court by Halliburton to complete the arbitration record.  (2005 Case, Docket Entry No. 280 at 2).  As discussed in connection with an earlier similar objection, the Hollingsworth affidavit properly authenticates the exhibits submitted in support of Tremont's motion for summary judgment.  Although Halliburton had not earlier waived its objection, its failure to explain what is missing from this document and the fact that Hollingsworth's affidavit properly authenticates it leads this court to overrule Halliburton's objections.

In addition, NLPS agreed to:

> indemnify and hold the NL Parties, their affiliates, and each of their directors, officers, and employees harmless from and with respect to any and all claims, liabilities, losses, damages, costs, and expenses, including attorneys' fees, from or related to . . . (a) all liabilities of NL assumed by NLPS pursuant to the Formation Agreement; [and] (b) claims of liability at sites or facilities or with respect to operations transferred to NLPS pursuant to the Formation, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever on such sites or facilities.

(*Id.*, Ex. K, § 2.2(a)–(b)).

### d.     The Assumption Agreement

The Assumption Agreement was dated April 11, 1988 and effective as of December 31, 1987.  Under that Agreement, NL conveyed all its assets to NLPS, including NL's right, title, and interest in contracts to which it was a party, related to its petroleum services business.  (*Id.*, Ex. L at 1–2).  The transferred assets included "all real property (including all property affixed thereto) now or heretofore used primarily in NL's petroleum services business including without limitation the real property set forth in Exhibit A."  (*Id.*, Ex. L at 1).  Exhibit A to the Assumption Agreement lists certain real properties, labeled by city, state, and division.  A number of the properties on Exhibit A are labeled as part of the "MCC" Division, (*see* 2005 Case, Docket Entry No. 247, Ex. L at 5–6), which Tremont represented during the hearing on its motion stands for NL's McCullough Division (the "McCullough Division" or "NL McCullough").  As discussed in more detail later, the McCullough Division has been linked to waste shipments to the Gulf Nuclear Sites.[12]

---

[12]  Halliburton states in its brief that NL sold the McCullough Division to Western Atlas International, Inc. ("Western Atlas") before the 1988 restructuring, and that this sale included properties owned or leased in Laurel, Mississippi; Hobbs, New Mexico; Oklahoma City, Oklahoma; Beaumont, Texas; Houston, Texas; Levalland, Texas; Midland, Texas; Odessa, Texas; Mills, Wyoming; and Casper, Wyoming.  (2005 Case, Docket Entry No. 274 at 7 (citing 2005 Case, Docket Entry No. 247, Ex. HH, § 2(a), sched. 2(a))).  At the hearing on Tremont's motion for partial summary judgment, Tremont argued that all these properties are

NLPS agreed "to perform the obligations of NL under the contracts, leases and other agreements or undertakings that [we]re included among" the assets transferred; "to pay, discharge or perform when due all of the Assumed Liabilities set forth on the Assumed Liabilities Schedule attached to the Formation Agreement"; and "to conduct, in a diligent and proper manner, any litigation arising from the Assumed Liabilities." (*Id.*, Ex. L at 3). But the Assumption Agreement provides that NLPS did not "assume and shall not be liable for any of the Excluded Liabilities," as defined in the Formation Agreement. (*Id.*, Ex. L at 3).

### e.      The Indebtedness Agreement

The parties also executed the Indebtedness Agreement, dated September 16, 1988 and effective as of December 31, 1987. That Agreement notes that "NL transferred to NLPS all of its domestic and foreign petroleum services business, except for certain of NL's obligations . . . and certain other properties of NL." (*Id.*, Ex. M at 1). NLPS agreed to "assume and unconditionally guarantee to NL: . . . (b) the performance of discharge by NLPS on behalf of NL of any and all obligations, covenants and agreements of NL contained in the documents and instruments described on the Debt Schedule"; and "(c) the performance or discharge by NLPS on behalf of NL of any and all other indebtedness and obligations of NL which are attributable to NL's petroleum services business." (*Id.*, Ex. M, § 1(b)–(c)).

### 2.      The 1990 Restructuring

The 1990 restructuring of NL's former petroleum services business was effectuated through a 1990 Plan of Restructuring (the "1990 Plan"), effective as of August 31, 1990. Under the 1990

---

listed on the schedule of assets transferred to NLPS under the Assumption Agreement. Most of these properties do appear on Exhibit A of the Assumption Agreement, but Levalland, Texas and Mills, Wyoming do not appear on that Exhibit, and not all the assets listed on that Exhibit from the other locations are listed as part of the McCullough Division. (*See* 2005 Case, Docket Entry No. 247, Ex. L at 5–6).

Plan, Old Baroid (formerly NLPS) was to retain the bentonite and titanium businesses and their associated liabilities. A company called New Baroid Corporation ("New Baroid") was to receive the "Petroleum Services Business"—a defined term—and its liabilities. The 1990 Plan states that "[NL] has heretofore indirectly owned and operated its petroleum services operations (the 'Petroleum Services Business') principally through its subsidiaries . . . ." (*Id.*, Ex. A at 1). The 1990 Plan explains that its purpose was for Old Baroid to "*separate* the Petroleum Services Business and the Titanium and Bentonite Businesses *into two publicly-traded companies*." (2005 Case, Docket Entry No. 247, Ex. A at 1 (emphasis added)).

Under the 1990 Plan, the parties agreed to the following arrangement:

> [Old Baroid] and New Baroid shall execute a General Assignment and Assumption Agreement whereby (i) [Old Baroid] assigns to New Baroid all of its right, title and interest in all of [Old Baroid's] properties, assets and rights, of any kind, whether tangible or intangible, real or personal, which are attributable to the Petroleum Services Business (the "Petroleum Services Assets") and the Bentonite Business (the "Bentonite Assets"); and (ii) New Baroid assumes and agrees to discharge all indebtedness, liabilities, obligations, claims, covenants, losses, damages, costs, penalties and expenses, of any kind and nature, whether accrued, absolute or contingent, asserted or unasserted, known or unknown, and whether existing as of the date of this Plan or arising thereafter (collectively, "Obligations"), of [Old Baroid] arising out of, or which are otherwise attributable to, the past, present or future ownership or operations of the Petroleum Services Business (the "Petroleum Services Obligations"); and (iii) [Old Baroid] endorses in blank and delivers to New Baroid certificates representing all of the outstanding capital stock of all of its direct subsidiaries engaged in the Petroleum Services Business, including without limitation the Petroleum Services Subsidiaries.[13]

(*Id.*, Ex. A, § 1(a)).

---

[13] Under this section, Baroid Drilling Fluids, Inc. ("BDFI"), which was included in the definition of Petroleum Services Subsidiaries in the 1990 Plan, was transferred to New Baroid.

In addition, New Baroid and BDFI, a Petroleum Services Subsidiary, agreed to execute a General Assignment and Assumption Agreement. New Baroid would assign to BDFI all of its right, title, and interest in all of the Petroleum Services Assets and the Bentonite Assets (with a few exceptions not relevant here), and BDFI agreed to discharge all "Obligations" of New Baroid arising out of or otherwise attributable to the past, present, or future ownership of the Petroleum Services Assets. (*Id.*, Ex. A, § 1(b)). BDFI was then to transfer the Bentonite Assets to a wholly owned subsidiary, Bentonite Corporation ("BC"), which would assume all "Obligations" arising out of the Bentonite Business. (*Id.*, Ex. A, § 1(c)). BDFI would endorse in blank and deliver to New Baroid a certificate representing all the outstanding capital stock of BC. (*Id.*, Ex. A, § 1(f)). New Baroid would then endorse in blank and deliver to Old Baroid a certificate representing all the outstanding capital stock of BC. (*Id.*, Ex. A, § 1(g)). Old Baroid would then transfer to BC all its assets, other than the capital stock of New Baroid and BC, and BC would assume all "Obligations" arising out of the ownership or operation of those assets. (*See* 2005 Case, Docket Entry No. 247, Ex. A, § 1(h)). Old Baroid agreed to effect the merger of its wholly owned subsidiary, Tremont Corporation, into Old Baroid, and to change Old Baroid's name to Tremont Corporation. (*Id.*, Ex. A, § 1(k)). New Baroid agreed to change its name to Baroid Corporation. (*Id.*, Ex. A, § 1(l)).

The 1990 Plan contains an Exhibit A listing various assets and obligations. The 1990 Plan states that none of the assets or obligations on that Exhibit would constitute Petroleum Services Assets or Petroleum Services Obligations. (*Id.*, Ex. A, § 2). The 1990 Plan also contains an Exhibit B and states that all the assets on that Exhibit would constitute Petroleum Services Assets.[14] (*Id.*,

---

[14] Exhibit B appears to be a nonexclusive list of Petroleum Services Assets because the 1990 Plan specifies that while Exhibits A and B govern the identification of Petroleum Services Assets and Obligations, they are not meant to limit section 1 of the 1990 Plan, which provides a broader definition of Petroleum Services Assets. (*See* 2005 Case, Docket Entry No. 247, Ex. A, § 2).

Ex. A, § 2).  The 1990 Plan further provides that as of the effective dates of the various transactions, "New Baroid shall be deemed to have acquired complete, sole and beneficial ownership of all of the Petroleum Services Assets, including without limitation, the Petroleum Services Subsidiaries, together with all of the rights, powers and privileges of [Old Baroid] incident thereto, and shall be deemed to have assumed all of the Petroleum Services Obligations." (*Id.*, Ex. A, § 3).  Old Baroid would "likewise be deemed to have acquired complete, sole and beneficial ownership of all of the outstanding capital stock of BC together with all of the rights, power and privileges of New Baroid incident thereto." (2005 Case, Docket Entry No. 247, Ex. A, § 3).

The 1990 Plan describes the indemnity obligations assumed by both Old Baroid and New Baroid.  Old Baroid would indemnify and hold New Baroid harmless from all Obligations attributable to Old Baroid's "past, present or future operations, other than those Obligations which constitute Petroleum Services Obligations." (*Id.*, Ex. A, § 11).  Specifically, Old Baroid agreed to indemnify New Baroid for "all Obligations arising out of, or which are otherwise attributable to, sites or facilities or with respect to operations not attributable to the Petroleum Services Business, including claims arising out of or relating to the offsite deposit, placement or disposal by [Old Baroid] or the Titanium or Bentonite Businesses of any materials of any character whatsoever generated at such sites or by such operations." (*Id.*, Ex. A, § 11(i)).  New Baroid agreed to indemnify Old Baroid for Petroleum Services Obligations.  (*Id.*, Ex. A, § 12).  Specifically, New Baroid agreed to indemnify Old Baroid for "all Obligations arising out of, or which are otherwise attributable to, sites or facilities or with respect to operations attributable to the Petroleum Services Business, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever generated at such sites or by such operations." (*Id.*, Ex. A, §

27

12(i)).

### 3.   The Evidence in the Arbitration About the Transfer of NL's Former Petroleum Services Business to Halliburton

Tremont argues that "Petroleum Services Business" in the 1990 Plan encompassed all of NL's historical petroleum services business.  As Tremont notes, the 1990 Plan states that "The Company [Old Baroid] has *heretofore* indirectly owned and operated its petroleum services operations (the 'Petroleum Services Business') principally through its subsidiaries . . . ." (*Id.*, Ex. A at 1 (emphasis added)).  Tremont points to testimony from the arbitration by John Karnes, the drafter of the 1990 Plan, stating: "'I think petroleum services business is defined as all of the activities that took place up to this time that were petroleum services operations,'" and that "'heretofore backs and whatever forward up to this time petroleum services operations, that is petroleum services business.'"[15]  (2005 Case, Docket Entry No. 252 at 13 n.2).

### a.   The Affidavits of J. Landis Martin, Steven L. Watson, William Lindquist, and Harold C. Simmons

J. Landis Martin, a current Halliburton board member and a member of Halliburton's audit committee, was involved in the 1990 restructuring and was the chairman of New Baroid at the time of the 1990 Plan.  He executed an affidavit in October 2005.  The affidavit was included in the evidence submitted to the arbitration panel.  The affidavit states: "The goal or purpose of the restructuring was to separate Baroid Corporation's petroleum services business, including the historical operations of NL Industries, Inc., from Baroid Corporation's titanium metals business, the

---

[15]  Tremont does not state whether this testimony was given in the arbitration hearing or during a deposition, and has not pointed to an exhibit with evidence of these statements.

Titanium Metals Corporation ('TIMET')." (2005 Case, Docket Entry No. 247, Ex. O, ¶ 6).[16] Martin also states that "the revised intent and purpose of the 1990 Plan of Restructuring of Baroid Corporation was to transfer TIMET and Baroid's bentonite business to a new separate entity, and leave with Baroid Corporation all other businesses and liabilities, including all of Baroid's petroleum services businesses and liabilities." (*Id.*, Ex. O, ¶ 11). Martin explains that "[a]t no point, in any planning or implementation of the 1990 Plan of Restructuring of Baroid Corporation, did we ever contemplate or intend that old Baroid Corporation would retain any historical environmental liabilities of the petroleum services business of NL Industries, Inc." (*Id.*, Ex. O, ¶ 13). Instead, Martin states that "[t]he intent and purpose of the 1990 Plan of Restructuring . . . was to have New Baroid Corporation (which I understand is now controlled by Halliburton), take responsibility for all liabilities associated with the past, present and future operations of the petroleum services business of NL Industries, Inc., including the historical barite mining liabilities of the petroleum services business and all environmental liabilities associated therewith." (*Id.*, Ex. O, ¶ 19).

In a 2007 affidavit that was also submitted to the arbitration panel, Martin explains his understanding that historical obligations associated with the Petroleum Services Business transferred to New Baroid, including obligations relating to leases that had been terminated even before the 1988 restructuring. Martin states:

---

[16] Halliburton objects to paragraphs 10, 13, 17, 18, 19, 20, 21, 22, and 29 of Exhibit O, arguing that "they contain conclusory allegations, statements of legal conclusions, and/or constitute reargument of Defendant's own case or denial of Plaintiffs' case, all of which are not competent summary judgment evidence." (2005 Case, Docket Entry No. 273 at 2–3). Tremont responds that it used the affidavit in the contract phase of the arbitration, that Halliburton filed it in this case as part of the arbitration record, and that Halliburton has waived any objections. (2005 Case, Docket Entry No. 280 at 3–4). Tremont's waiver argument is not persuasive, but Halliburton's objections are overruled for other reasons. The statements in Martin's affidavit are not mere denials of Halliburton's claim, but explain Martin's understanding of the 1990 restructuring. Halliburton also argues that the statements in Martin's affidavit are irrelevant, but the statements are relevant to show what evidence was before the arbitration panel. Halliburton's objections to Exhibit O are overruled.

With regard to leases that were terminated prior to the 1988 Restructuring, it was my understanding that any liability relating to such leases, or liability deriving out of any operations or disposal on such formerly leased property, was transferred to New Baroid Corporation—even if the lease was terminated prior to 1988.  To clarify, if a parcel of leased property was used in the NL petroleum services business in the 1940s at Magnet Cove for mining operations or disposal, and the lease for such property was terminated by NL in 1965, any liability for any petroleum related operations or contractual liabilities in the leases were to be transferred to New Baroid Corporation via the 1988 and 1990 Plans of Restructuring.

(*Id.*, Ex. P, ¶ 3).[17]

---

[17] Halliburton objects to Exhibit P, arguing that it is not properly sworn because the first page does not match up with the second page containing Martin's signature. (2005 Case, Docket Entry No. 273 at 3). Tremont points out that the first two lines on page 2 match the text at the end of page 1 and contends that this was merely a typographical error. (2005 Case, Docket Entry No. 280 at 4). Tremont also points out that it submitted this same affidavit in the arbitration and that Halliburton submitted it to this court in filing the arbitration record, and argues that any objection to the affidavit is therefore waived. (2005 Case, Docket Entry No. 280 at 4). The waiver argument is not persuasive, but Halliburton's objections fail for other reasons.

Although the pages do not match up, it appears that the first two lines on page 2 match the end of the text on page 1. There is no basis to find that Martin did not approve the full affidavit when he signed it. Halliburton has not cited any authority for excluding an affidavit on the basis of a typographical error. This objection is overruled.

Halliburton also objects to Exhibit P as a "sham affidavit to the extent that it contradicts any previous testimony by Mr. Martin offered during the Arbitration." (2005 Case, Docket Entry No. 273 at 3). The rule against sham affidavits gives the court discretion, at the summary judgment stage, to disregard affidavits "that are inconsistent with prior deposition testimony [when] the affiant does not account for the inconsistency." *Holden v. Illinois Tool Works, Inc.*, No. H-06-3958, 2007 WL 4591752, at *1 (S.D. Tex. Dec. 27, 2007) (citations omitted). Halliburton has not pointed to specific testimony Martin gave in the arbitration that is contradicted by his later affidavit. This objection is overruled.

Halliburton also objects to Exhibit P on the ground that it constitutes reargument of Tremont's case or denial of Halliburton's case. The affidavit sets out Martin's understanding of NL's restructurings, based on his personal knowledge. This objection is overruled.

Halliburton also objects to paragraphs 3 and 4 of the affidavit, arguing that they are legal conclusions, and hearsay. These paragraphs reflect Martin's understanding about liability transferred under the restructurings and are not simply legal conclusions. These paragraphs also are not hearsay at the summary judgment stage. Federal Rule of Civil Procedure 56(e) contemplates the use of affidavits in summary judgment proceedings, although affidavits ordinarily are not admissible at trial. *See* FED. R. CIV. P. 56(c); *see also* 10B CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738, at 330–33 (3d ed. 1998) ("[E]x parte affidavits, which are not admissible at trial, are appropriate on a summary-judgment hearing to the extent they contain admissible information." (footnote omitted)). Moreover, because the affidavit is relevant to show the evidence heard by the arbitrators, the affidavit is not offered for its truth and is not hearsay. The hearsay objection is overruled.

Finally, Halliburton's objection that paragraphs 3 and 4 of the affidavit violate the best evidence rule

30

Martin explains that he had the same understanding about historical liabilities arising from property sold before the 1988 restructuring:

> My understanding with regard to owned property that was sold prior to 1988 is the same. That is, if the property was used in the historical operations of NL's petroleum services business—and even if no longer owned by 1988—all liability with regard to that property that derived from historical petroleum services operations or disposal was to be transferred and assumed by New Baroid Corporation.

(*Id.*, Ex. P, ¶ 4).

Tremont points to similar testimony by other witnesses in the arbitration that the 1990 restructuring was intended to separate the Petroleum Services Business from the titanium and bentonite businesses, including separating their historical liabilities and obligations. (*See* 2005 Case, Docket Entry No. 247, Ex. Q,[18] ¶ 6 (affidavit of Steven L. Watson, dated July 26, 2007, describing

---

is overruled. Halliburton argues that the written agreements are the best evidence and that Martin's affidavit seeks to vary their terms. "The best-evidence doctrine, the heart of which is [Federal] Rule [of Evidence] 1002, exists to promote accurate fact-finding." 31 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 7182, at 366 (2000). Under Federal Rule of Evidence 1002, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." FED. R. EVID. 1002. The paragraphs that Halliburton objects to address Martin's understanding about the effect of the restructurings, not the contents of the contracts. The best evidence rule does not apply to evidence not offered to prove the contents of a writing. *See, e.g., Harris Corp. v. Ericsson Inc.*, 194 F. Supp. 2d 533, 540 & n.8 (N.D. Tex. 2002) (overruling best-evidence objection to documents offered to demonstrate the parties' intent and not to prove any specific term or content of a writing); 5 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 1002.02, at 1002-2 (9th ed. 2006) ("If the contents are not sought to be proved, the Best Evidence Rule is inapplicable . . . ."). The best evidence rule is distinguishable from the parol evidence rule, which "states that, where a contract is in writing, evidence of prior or contemporaneous agreements may in certain circumstances be inadmissible to add to or alter the terms of the writing." 31 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 7183, at 377 (2000). "Thus, the parol-evidence rule does not address the primacy of an original to prove the contents of a writing, whether it be a contract or any other type of writing. Instead, the parol-evidence rule is an aspect of the substantive law of contracts that determines the terms of a contract." *Id.* Halliburton's objection based on the best evidence rule is overruled.

[18] Halliburton objects to Exhibit Q, arguing that it is a sham affidavit to the extent it contradicts previous testimony from Watson in the arbitration, that it constitutes reargument of Tremont's case, that it is irrelevant, and that paragraphs 2, 3, 4, 5, and 6 seek to vary the terms of the 1988 and 1990 written agreements and are conclusory. (2005 Case, Docket Entry No. 273 at 3–4). Tremont responds that Halliburton waived its

his understanding that "New Baroid Corporation was responsible for all claims relating to the historical petroleum services business of NL begun in 1926, and not just the current assets owned in 1988"); *id.*, Ex. R, ¶ 6 (affidavit of William Lindquist, dated July 26, 2007, stating the same); *id.*, Ex. S, ¶ 5 (affidavit of Harold C. Simmons, dated July 26, 2007, stating the same)).[19]

### b.    The SEC Information Statement

Tremont also points to the cover letter accompanying Baroid Corporation's Securities and Exchange Commission Information Statement in October 1990.  The letter explains the 1990 transactions, as follows:

> The Board of Directors of [Old] Baroid Corporation (the 'Company') has unanimously approved the separation of the Company's petroleum services businesses and its titanium metals and bentonite mining businesses into two publicly-traded companies.  In connection with the separation, you are receiving, for each share of Company Common Stock which you now own, one share of common stock in a newly formed company, which will operate the petroleum services businesses and will bear the name "Baroid Corporation."  You will continue to own stock in the Company, which will conduct the

---

objections by not objecting to the affidavit when Tremont offered it in the arbitration and by filing the affidavit with this court to complete the arbitration record.  (2005 Case, Docket Entry No. 280 at 4).  Tremont's waiver argument is not persuasive.  However, Halliburton has not pointed to any testimony from the arbitration that is contrary to Watson's affidavit.  Halliburton's objection that Exhibit Q is a sham affidavit is overruled.  The affidavit contains Watson's understanding of the restructurings and does not constitute reargument of Tremont's case.  The affidavit is relevant because it shows what the arbitration panel considered, which is relevant to issue preclusion.  The affidavit reflects Watson's understanding of the 1990 restructuring and does not seek to vary the terms of the restructuring documents.  Even if the affidavit did seek to vary the terms of the restructuring documents, this court would not consider it for that purpose because as discussed below, this court finds that the contracts are not ambiguous on the issues resolved in this opinion and that consideration of extrinsic evidence of contractual intent is not appropriate.  Halliburton objects to Exhibits R and S for the same reasons it objects to Exhibit Q.  The objections to Exhibits R and S are overruled for the same reasons the objections to Exhibit Q are overruled.

[19]    Tremont asserts that "[t]he members of the Board, including Ann Manix, Edward Hucheson, Frank B. Wright, Harold Simmons, Glenn Simmons, Kenneth Kotara, Michael Snetzer, Patrick Murray, Susan Alderton, Steven Watson, William Lindquist, and Thomas Stafford, have all confirmed [Landis] Martin's understanding as he explained the transaction to them in sworn affidavits . . . ."  (2005 Case, Docket Entry No. 252 at 14 n.3).

> titanium metals and bentonite mining business, and will change its
> name to "Tremont Corporation."

(*Id.*, Ex. T at 1).[20]  The Information Statement continues: "[Old Baroid] has contributed to New

Baroid all of [Old Baroid's] assets attributable to its petroleum services businesses, including all of

the stock of its petroleum services operating subsidiaries, and New Baroid has assumed all of [Old

Baroid's] liabilities attributable thereto."  (*Id.*, Ex. T at 2).  The Information Statement also states

that "New Baroid was incorporated in 1990 and is the successor to the NL petroleum services

business begun in 1926."  (*Id.*, Ex. T at 5).

Tremont also points out that the Form 10 filed with the SEC about the 1990 transactions

clarifies that all liabilities Old Baroid assumed in its indemnification agreement with NL were

assumed by New Baroid in the 1990 restructuring.  (*See* 2005 Case, Docket Entry No. 252 at 16).

A draft of the Form 10 states that "New Baroid assumed *certain of* the [Old Baroid's] obligations

---

[20]  Halliburton objects to Exhibit T as not properly authenticated because it is not attached to an affidavit meeting the requirements of Federal Rule of Civil Procedure 56(c), as hearsay, and as incomplete.  (2005 Case, Docket Entry No. 273 at 4–5).  Tremont argues that Halliburton has waived its objections to this document because Tremont used the complete Information Statement as an exhibit in the arbitration and Halliburton submitted it in this court in filing parts of the arbitration record.  (2005 Case, Docket Entry No. 280 at 6).  Exhibit T is attached to Hollingsworth's affidavit, which states that the document is a true and correct copy.  This is sufficient to authenticate the document.  The excerpt from the SEC Information Statement is not hearsay to the extent it is offered to show what evidence the arbitrators considered, which is relevant to issue preclusion, because it is not offered to prove the truth of the statements in the document.  To the extent the document is submitted to prove the truth of the statements, it would be relevant only if the contracts were ambiguous and extrinsic evidence was appropriate.  As discussed below, however, it is not appropriate to consider extrinsic evidence because the contracts are not ambiguous on the issues resolved in this opinion.

The fact that the exhibit appears to be an excerpt from the SEC Information Statement rather than a complete copy is not improper.  Halliburton has not argued that the fact that the entire document was not submitted is misleading or that other parts of the document are relevant to deciding Tremont's motion.  Halliburton could have made these arguments because the entire document was submitted in the arbitration.  Halliburton's objections to Exhibit T are overruled.

Halliburton made identical objections to Exhibit U.  Those objections are overruled for the same reasons.  Halliburton made similar objections to Exhibit V, although it did not object to that exhibit on the ground it was incomplete.  The objections to Exhibit V are also overruled.

under the NL/Company Indemnification Agreement in connection with the Distribution." (2005

Case, Docket Entry No. 247, Ex. U at 3 (emphasis added)). The SEC told New Baroid that this

language was vague and needed clarification. (*See id.*, Ex. V at 3 ("The 'certain of the company's

obligations' referred to in the penultimate sentence of the first full paragraph on page 71 should be

explained.")). The revised Form 10 states that New Baroid would take on all petroleum services

obligations that Old Baroid had assumed under the Cross-Indemnification Agreement. (*See id.*, Ex.

U at 5 ("New Baroid assumed *all of* [Old Baroid's] obligations under the Indemnification Agreement

attributable to [Old Baroid's] petroleum services business." (emphasis added))).

New Baroid's listing application to the New York Stock Exchange similarly explains the

1990 transactions, as follows:

> Effective August 31, 1990, [New Baroid] and [Old] Baroid entered
> into a Plan of Restructuring . . . pursuant to which, among other
> things, (i) [Old] Baroid will contribute to [New Baroid] all of [Old]
> Baroid's assets attributable to its petroleum services businesses,
> including all of the stock of its petroleum services operating
> subsidiaries, and [New Baroid] will assume all of [Old] Baroid's
> liabilities attributable thereto . . . .

(*Id.*, Ex. W at 1).[21]

### c.       The New Baroid/Dresser/Halliburton Mergers

A subsidiary of Dresser Industries, Inc. ("Dresser") merged with New Baroid in 1993 and

1994. (*See* 2005 Case, Docket Entry No. 274, Ex. M). Dresser assumed all New Baroid's

obligations in 1997. (*See* 2005 Case, Docket Entry No. 247, Ex. B; *id.*, Ex. Y at 2). Halliburton is

the successor-in-interest to New Baroid, (*see id.*, Ex. Z at 1; *id.*, Ex. Y at 3). Halliburton asserts that

---

[21] Halliburton objects to Exhibit W, arguing that it is not properly authenticated because it is not attached to
an affidavit meeting the requirements of Federal Rule of Civil Procedure 56(e). (2005 Case, Docket Entry
No. 273 at 6). The exhibit is attached to Hollingsworth's affidavit, which states that all exhibits are true and
correct copies. Halliburton's objection is overruled.

in the New Baroid/Dresser merger, New Baroid failed to disclose liabilities related to the McCullough Division or the Gulf Nuclear Sites, despite a representation that there were no undisclosed material liabilities.  (*See* 2005 Case, Docket Entry No. 274 at 13–14.)  Halliburton also argues that around the time of the Dresser/Baroid merger, NL agreed to indemnify New Baroid for losses arising from a lawsuit captioned *Western Atlas v. NL*, evidencing NL's understanding that it, not Halliburton was responsible for historical liabilities arising from the former petroleum services business assets or operations not transferred in 1988.  (*Id.* at 12–13).

### d.      Testimony in the Arbitration Proceeding

Tremont has submitted testimony from the arbitration proceeding that obligations and liabilities associated with NL's former petroleum services business, including historical liabilities, were transferred from NL to Old Baroid, from Old Baroid to New Baroid, from New Baroid to Dresser, and from Dresser to HESI.

### i.      The Arbitration Testimony of J. Landis Martin

Martin testified as follows:

> Q      There's been some dispute in this case that I can tell you
> about.  Essentially the Halliburton side has said that just
> current liabilities were being moved forward.  Do you have an
> understanding as to whether -- is that correct?  Was it
> supposed to be just current liabilities or was it all the
> historical -- what was going to happen in your mind, in your
> discussions with Mr. Simmons and the executive team, as to
> the historical environmental liabilities of the petroleum
> service business?
>
> A      Both the -- all the historical liabilities would go with Baroid
> Corporation, the ones relating to the Baroid -- the oil field
> services business.
>
> Q      Is there any doubt about that in your mind?  Is that something
> --

A     No.

Q     That was clear to everyone?

A     I thought I made it clear to everyone, yes.  It certainly was
      clear to me.

(2005 Case, Docket Entry No. 247, Ex. AA, Testimony of J. Landis Martin at 11:3–21).[22]  Martin

---

[22]  Halliburton objects to Exhibits AA, BB, CC, DD, and EE, excerpts of testimony from the arbitration hearings, as not properly authenticated, hearsay, containing conclusory statements, varying the 1988 and 1990 written agreements, and irrelevant.  (*See* 2005 Case, Docket Entry No. 273 at 6–8).  Tremont responds that Hollingsworth's affidavit authenticates the documents, that they are not hearsay because the testimony was taken under oath with all parties present in an arbitration proceeding that resulted in an award confirmed by this court and on appeal, and that Halliburton waived its objections by filing these documents with this court. (2005 Case, Docket Entry No. 280 at 8).  As with Halliburton's earlier similar objections, Hollingsworth's affidavit adequately authenticates the submitted documents.  The arbitration testimony is not necessarily hearsay at this summary judgment stage.  As one court has explained:

> It is well settled that although Rule 56(e) expressly lists only affidavits, pleadings, depositions, answers to interrogatories and admissions, a court may also consider certified transcripts of prior testimony in deciding a motion for summary judgment.  *See, e.g.*, *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n.12 (5th Cir. 1993); *Airlie Found*[.] *v. United States*, 826 F. Supp. 537 (D.D.C. 1993); *In re Hale*, 155 B.R. 730, 737 n.5 (Bankr. S.D. Ohio 1993); *see also Beyene v. Coleman Security Serv., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).  Moreover, it is particularly appropriate for the court to take judicial notice of its own records of prior related litigation when deciding summary judgment motions.  *In re Dooley*, 116 B.R. 573, 576–77 (Bankr. S.D. Ohio 1990).

> Second, the transcripts are not "hearsay" merely because they consist of statements made by a witness in a prior proceeding, any more than an affidavit or a deposition offered in support of a motion for summary judgment is inherently hearsay.  If WFB wanted to create a material fact issue as to any statement made by a witness in the criminal trial, it could have offered the deposition or affidavit of that witness explaining or qualifying the prior testimony, or other evidence rebutting the testimony. WFB has advanced no evidence rebutting particular statements made by the criminal trial witnesses.  This Court will not strike the certified criminal trial transcripts as hearsay simply because WFB was not present for cross-examination at the criminal trial.

*Ricupero v. Wuliger, Fadel & Beyer*, No. 1:91CV0589, 1994 WL 483871, at *4 (N.D. Ohio Aug. 26, 1994); *but see Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004) (testimony given in another

36

further testified:

> Q    In connection with your discussions with Mr. Simmons and
>      your intent, did you have discussions with Mr. Simmons
>      about what was going to happen to the historical
>      environmental liabilities that were created under NL with
>      regard to petroleum service business that was part of NL
>      historically from 1926 till the time of the 1988 transaction

---

case "was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay and was neither reaffirmed in an affidavit by [the witness] stating, for example, that he would give the same testimony at a trial of Patterson's claims, nor supported by any showing that that prior testimony would be admissible under FED. R. EVID. 804(b)(1) if offered by Patterson at trial.").

Considering the testimony from the arbitration seems particularly appropriate here because the arbitration was part of this same case (before the new claims were severed and consolidated into the 2008 Case), the same parties were involved, the parties were represented by the same counsel, and the same contracts and issues were considered. There is no basis to doubt the trustworthiness of the testimony. *See* 30 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 6325, at 49 (1997) ("'[I]t would be generally agreed today that [lack of cross-examination] is the main justification for the exclusion of hearsay rule.'" (quoting 2 MCCORMICK ON EVIDENCE 95 (John W. Strong ed., 1992))). In addition, to the extent the testimony is offered to show the evidence that the arbitration panel heard, which is relevant to issue preclusion, it is not offered for its truth. *See* FED. R. EVID. 801(c).

Halliburton specifically argues that a portion of Exhibit AA that discusses the affidavit of Robert Leidich is hearsay. That portion is not hearsay to the extent considered not for the truth of the statements in Leidich's affidavit, but to show Martin's reaction to those statements. In addition, the portion Halliburton argues is hearsay is not relied upon by Tremont. And even if the document was submitted to prove the truth of the statement Halliburton objects to, it would be relevant only if the contracts were ambiguous and extrinsic evidence was appropriate. As discussed below, however, it is not appropriate to consider extrinsic evidence because the contracts are not ambiguous on the issues resolved in this opinion.

Halliburton also specifically argues that a portion of Exhibit EE—page 15, lines 6–11—in which Ann Manix describes what Martin told her about the transfer of NL's petroleum services business, is hearsay. Tremont relies on its general arguments that the testimony in Exhibits AA–EE is not hearsay because "it was testimony taken under oath with all parties present in an arbitration proceeding confirmed by the court" and that Halliburton waived its objections by filing the documents with the court to complete the arbitration record. (2005 Case, Docket Entry No. 280 at 8). Tremont's waiver argument is not persuasive. But Tremont does not appear to rely on the part of Manix's testimony to which Halliburton objects. In addition, the portion that Halliburton objects to is not considered for its truth because such extrinsic evidence is not appropriately considered in interpreting unambiguous contracts. The evidence is relevant to show the evidence the arbitrators considered, which is in turn relevant to issue preclusion.

The argument that the testimony seeks to vary the terms of the restructuring documents is not a proper evidentiary objection. *Cf.* 31 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 7183, at 377 (2000) ("[T]he parol-evidence rule is an aspect of the substantive law of contracts that determines the terms of a contract."). In addition, this court does not need to consider the testimony to interpret the contracts because they are unambiguous. The objection to "certain conclusory statements" is also overruled. Halliburton has not pointed to any specific conclusory statements in the testimony.

Halliburton's objections to Exhibits AA–EE are overruled.

and then what happened thereafter?

> A    Well, as I said before, when we spun off Baroid Corporation, we intended to put the petroleum services assets and liabilities, you know, all of them in that company, and we had originally intended to spin TIMET out and keep all those assets there.  So what we wanted to do in creating a new company that was going to be spun off in the reverse transaction was putting all the historical petroleum service assets and liabilities.

(*Id.*, Ex. AA, Testimony of J. Landis Martin at 16:15–17:7).  Martin also testified that he discussed this understanding with Simmons, the board members, and the employees and attorneys involved in the deal.  (*Id.*, Ex. AA, Testimony of J. Landis Martin at 17:8–18:5).  Martin further testified that Dresser understood that it was receiving the historical liabilities of NL's petroleum services business as part of the merger with (New) Baroid.  (*Id.*, Ex. AA, Testimony of J. Landis Martin at 36:19–37:3).[23]

## ii.    The Arbitration Testimony of William Lindquist

William Lindquist, an executive involved in the 1988 and 1990 restructurings, explained the transfer of the historical environmental liabilities, as follows:

---

[23]  Halliburton asserts that Martin testified in the arbitration that New Baroid was the successor only to the obligations that Old Baroid (NLPS) assumed in the 1988 restructuring.  (2005 Case, Docket Entry No. 274 at 11–12).  The arbitration testimony that Halliburton points to simply confirms the uncontested proposition that in the 1990 restructuring, New Baroid was to take on the contractual indemnification obligations Old Baroid assumed in the 1988 restructuring.  (*See* 2005 Case, Docket Entry No. 274, Ex. H, Testimony of J. Landis Martin at 28:23–29:10).  This testimony does not address whether Old Baroid assumed historical liabilities associated with the petroleum services business in the 1988 restructuring, whether New Baroid assumed any additional obligations in the 1990 restructuring, or whether obligations associated with the McCullough Division were transferred to New Baroid in the 1990 restructuring.

Halliburton also argues that Martin testified that the parties' intent under the 1990 Plan was in general to transfer all liabilities to New Baroid, but that there were certain exceptions to this general transfer.  (2005 Case, Docket Entry No. 274 at 19; *see also id.*, Ex. H, Testimony of J. Landis Martin at 88:4–10).  As Halliburton points out, Martin's testimony does not address the exception in the 1988 restructuring documents for NLPS's nonassumption of liability associated with facilities or operations that were not transferred to it. (*See* 2005 Case, Docket Entry No. 274 at 19).

Q.      [D]id you and the rest of the people understand that NL's petroleum services business had historical environmental liabilities from the time it was formed in 1926 going forward to what was then that present day?

A.      I did.

Q.      In your involvement with the 1988 transaction, did you have an understanding as to what was supposed to happen with all of those historical petroleum services business obligations from 1926 to the then present time?

A.      Yeah. The goal was to spin off the historical business of the petroleum services, so it included both the historical assets of petroleum services businesses as well as the liabilities.

Q.      Were you ever involved in any decision or did you ever hear any discussion where anybody told you that historical environmental liabilities of the barite mining business were supposed to stay on the NL side of the equation?

A.      No.

Q.      Did you hear that with regard to anything else in terms of environmental liabilities that related to the historical petroleum services business?

A.      No.  Any liabilities that were historically related to the petroleum services business went to the [Old] Baroid side of the spinoff.

Q.      Was the exact opposite true, and that is with regard to the chemical business, was the chemical business and all of its liabilities to be retained by the NL side?

A.      That's correct.  It's a spinoff, and what you particularly do is you separate the two lines of businesses.

Q.      Is it true -- was it your understanding that the company that was then called [Old] Baroid, would today be called Tremont, was going to give NL a contractual indemnification for all of those historical petroleum services liabilities?

A.      Yes.

39

Q.    And is that your understanding as to the way the transaction was carried out?

A.    Yes.

Q.    Did anybody tell you anything to the contrary?

A.    No.

(*Id.*, Ex. BB, Testimony of William Lindquist at 84:13–86:14).  Lindquist further testified:

Q.    Okay. And you said that when New Baroid was formed, that the assets were to go to Tremont and the liabilities were to go to New Baroid.  Do you remember that?

A.    I don't.  I think what I said was the historical -- the petroleum services historical assets and liabilities went to petroleum services, went to New Baroid, and the historical assets and liabilities of Bentonite went to old -- stayed with Old Baroid as well as the TIMET stock and then the surplus properties.

(*Id.*, Ex. BB, Testimony of William Lindquist at 185:20–186:6).

### iii.    The Arbitration Testimony of Steve Watson

Steve Watson, a senior executive involved in the 1988 and 1990 restructurings, testified similarly:

Q    [W]hat was the discussion about what was supposed to happen with the historical liabilities of the petroleum service business in the 1988 transaction?

A    Okay.  The separation was to completely separate these businesses and both of them had been in the business for a very long period of time.  Probably close to 100 years.

Both petroleum service -- I'm not sure if it's 100, but it was a very long period of history.

The chemical business, the titanium dioxide business had been in business for almost 100 years now.

So there was [sic] long, long histories with these businesses

40

in their respective markets.

The concept was is [sic] that it's a separation, and everything to do with petroleum service went this way, and everything to do with the chemicals business went this way.

And most -- what I started saying was some of it was fairly easy because some of these businesses, and there are sub-businesses to some of this, like petroleum service had many subsidiaries.  So those were pretty easy because they were already captured inside of another corporation that was a subsidiary.

And then there was other stuff that wasn't and it was maybe in the wrong company or it was up at the parent company where there were other miscellaneous businesses in there that were not strictly petroleum service or chemicals.  And those would have to all get sorted out, but the clearer distinction was the two big businesses, petroleum services and chemicals, that that was the dividing line.   Whatever happened for the prior 100 years on one went this way and whatever happened and the other one went the other way.  And that was the -- that was the determination.

(2005 Case, Docket Entry No. 247, Ex. CC, Testimony of Steve Watson at 262:11–264:3).  Watson

testified that his understanding of the transactions came from discussions he had with Simmons and

Martin.  He testified that the board approved the 1988 restructuring based on that understanding.

(*See id.*, Ex. CC, Testimony of Steven Watson at 264:11–14).

With respect to the 1990 transactions, Watson testified:

Q       [D]id you have an understanding based upon your conversations with Mr. Simmons, Mr. Martin and the other people of the team as to what was going to happen to the historical liabilities of that petroleum service business other than the bentonite and the titanium assets?

A       Yeah.  It was intended from the very beginning, the first conversations which were back when we didn't know we needed bentonite.  We didn't know any of this stuff.  We were just going to separate the two businesses, that we would

41

do exactly the same thing we did in 1988.

That petroleum service business and everything that was with it, assets, any assets to do with it, past, present, future, any liabilities, the business, the whole thing, the historic business, the trademarks, the good will, the name, I mean there's trademarks and name that are valuable, anything to do with that and if it wouldn't have been for this trade or business, five-year thing, it would have been just, well, this is easy, you just take TIMET and move it over here and whatever is left is petroleum service.  It would have been very easy.

But because we had to do it in this reverse spin-off, everything got turned upside down, and effectively you had to identify the petroleum service to be moved over, but the concept -- to answer I think what your question is is the intention was exactly the same thing was supposed to happen in 1990 as happened in 1988 was all of the petroleum service business, assets, liabilities, known, unknown, contingent, future, past, whatever went over there.  None of it would go over to the Titanium Metal Corporation side.

(*Id.*, Ex. CC, Testimony of Steve Watson at 274:21–276:11).

### iv.     The Arbitration Testimony of Harold Simmons

Harold Simmons, the Chairman of NL and Tremont, testified similarly.  He stated that he would not have considered the 1990 restructuring if it involved retaining the environmental liabilities for the Tremont side.  He testified that no one ever told him that the historical mining environmental liabilities of NL's petroleum services business were to stay on the Old Baroid side of the equation.  (*Id.*, Ex. DD, Testimony of Harold Simmons at 103:9–15).

### v.      The Arbitration Testimony of Ann Manix

Ann Manix, a member of New Baroid's board, similarly testified that New Baroid was receiving the historical liabilities associated with the petroleum services business:

Q.     Prior to the time that you get to the board meeting, did you have an understanding from your conversations with Mr.

42

> Martin as to what was going to happen with the historical
> liabilities of NL's petroleum services business?
>
> A.    We would keep them, and I was going to go on the board of
> New Baroid, so I was listening from that angle.  We would
> keep the liabilities, we would keep the petroleum services
> business but we would not have the Titanium Metals
> business.
>
> Q.    Just for clarity, the "we" being?
>
> A.    New Baroid.

(*Id.*, Ex. EE, Testimony of Ann Manix at 15:12–24).  However, as Halliburton points out, Manix's

testimony shows that she only had a general understanding of the parties' intentions, even about the

1990 restructuring.  (*See* 2005 Case, Docket Entry No. 274, Ex. Q, Testimony of Ann Manix at

50:18–51:6).

### vi.    The Arbitration Testimony of John Karnes

John Karnes, an outside lawyer who worked on the 1990 restructuring, testified in his

deposition submitted in the arbitration that "[a]ll of the petroleum services related liabilities and

obligations [went] along with those assets to the new -- New Baroid petroleum services company."

(2005 Case, Docket Entry No. 247, Ex. FF, Deposition of John Karnes at 32:19–21).[24]  He had no

---

[24]  Halliburton objects to Exhibit FF as not properly authenticated, containing inadmissable hearsay, and as
containing statements that are prejudicial and/or irrelevant. (2005 Case, Docket Entry No. 273 at 9).  Tremont
responds that the exhibit is not hearsay because it contains testimony taken under oath with all parties present,
and that Tremont previously filed this document with this court. (2005 Case, Docket Entry No. 280 at 8–9).
The exhibit is properly authenticated by Hollingsworth's affidavit.  The portion of the exhibit objected to as
hearsay involves Karnes's explanation of what senior attorneys told him about the transactions and what he
was not told about the restructurings.  To the extent the testimony is offered to show what the arbitrators
heard or to prove the effect of the senior attorneys' statements on Karnes, it is not hearsay because it is not
offered for its truth.  To the extent the testimony is submitted to prove the truth of the statements, it would
be relevant only if the contracts were ambiguous and extrinsic evidence was required.  As discussed below,
however, it is not appropriate to consider extrinsic evidence because the contracts are not ambiguous on the
issues resolved in this opinion.  The testimony is relevant to understanding what evidence was heard by the
arbitrators, which is relevant to issue preclusion but does not implicate hearsay.  Halliburton has not explained

43

doubt that New Baroid was taking all the historical liabilities of the barite petroleum service business.  (*Id.*, Ex. FF, Deposition of John Karnes at 33:8–16).  Although Karnes was a junior associate at the time of the transactions, he testified that "the explanation [he] received from . . . more senior attorneys both in Kirkland and in . . . Bob Leidich's group and all the directions [he] got were consistent with this -- this clean break."  (*Id.*, Ex. FF, Deposition of John Karnes at 43:16–20).  Karnes testified that "the deal was exactly what the New York Stock Exchange application says," and that "New Baroid was getting all of the petroleum services assets and assuming all of the petroleum services liabilities."  (*Id.*, Ex. FF, Deposition of John Karnes at 44:22–25).

Karnes also testified that based on conversations with senior attorneys working on the restructuring, he understood that the indemnification agreement would give "full indemnities to NL with regard to its petroleum services business started in 1926."  (*Id.*, Ex. FF, Deposition of John Karnes at 58:19–59:4).  Karnes repeated that the restructuring was intended to produce a clean separation of two businesses.

> "I think consistent with what people were calling the clean break, all assets -- and much of the documentation actually speaks to this -- past, present and future and all liabilities related to that business past, present and future were to be -- were to go over so you would have two separate companies that were as pure as possible, if you will, bentonite, titanium and -- petroleum services."

(*Id.*, Ex. FF, Deposition of John Karnes at 103:21–104:3).

### vii.    The Arbitration Testimony of John Deering

John Deering, Halliburton's lead in-house attorney in this case and its Rule 30(b)(6) witness

---

why this testimony is unfairly prejudicial so as to require exclusion under Rule 403 of the Federal Rules of Evidence.

on contract issues in the arbitration, gave a deposition submitted in the arbitration. Deering stated that without knowing specific facts he could not speak definitively, but that he had no reason to believe that a historical liability associated with NL's petroleum services business—assuming it was not on Exhibit A of the 1990 Plan—would not have passed to Halliburton through the restructurings. (2005 Case, Docket Entry No. 247, Ex. GG, Testimony of John Deering at 70:24–71:15).[25]

### viii.    The Arbitration Testimony of Joseph S. Compofelice

Halliburton has submitted testimony given in the arbitration by Joseph S. Compofelice, Vice President and Chief Financial Officer of New Baroid. His testimony contradicts what other witnesses stated in the excerpts from the arbitration transcript Tremont submitted. Compofelice testified that the intent of the 1990 Plan was to spin off a "clean petroleum services security that represented only the current operations of the petroleum services activities of Tremont . . . ." (2005 Case, Docket Entry No. 274, Ex. R, Testimony of Joseph Compofelice at 27:24–28:5). Compofelice testified that by "clean petroleum services security," he meant "[a] business that represented the current operations and did not include potential liabilities associated with discontinued operations." (Id., Ex. R, Testimony of Joseph Compofelice at 28:13–20).

Compofelice described his recollection of the intent of the 1990 restructuring: "[A]ll liabilities not associated with the current operations that I mentioned were left behind in Old Baroid, what is now called Tremont . . . ." (Id., Ex. R, Testimony of Joseph Compofelice at 30:3–6). Compofelice testified that he told investors during a road-show presentation before the completion

---

[25] Halliburton objects to Exhibit GG as irrelevant. (2005 Case, Docket Entry No. 273 at 9). Tremont responds that Deering is Halliburton's lead in-house attorney for this case and was Halliburton's Rule 30(b)(6) witness on contract issues in the arbitration. (2005 Case, Docket Entry No. 280 at 9). The testimony is relevant to show the extent of the evidence that the arbitrators considered, which is relevant to issue preclusion. The objection is overruled.

of the 1990 restructuring that "one of the unique things about New Baroid . . . [was] that it represented just the current operations of Baroid Drilling Fluids, Sperry-Sun and other ongoing active operations of -- of Baroid."  (*Id.*, Ex. R, Testimony of Joseph Compofelice at 37:18–22).[26]

Compofelice admitted in his deposition that his recollection was inconsistent with the final documents executing the 1990 restructuring.[27]  (*See* 2005 Case, Docket Entry No. 279, Ex. C, Testimony of Joseph Compofelice at 114:4–21).  Compofelice further testified:

> Q:      And I want I don't want to insult you, but is it possible that
>          over the last 17 years -- I know you've been a busy man,

---

[26]  Halliburton points out that Compofelice was the Baroid officer who signed the Baroid/Dresser merger agreement.  (*See* 2005 Case, Docket Entry No. 274, Ex. M at 92).  Halliburton argues that the fact that liabilities associated with the McCullough Division were not disclosed in connection with the Baroid/Dresser merger is consistent with Compofelice's understanding that historical liabilities were not assumed by New Baroid in the 1990 restructuring.  Halliburton argues that Compofelice's testimony is consistent with its argument that NLPS did not receive those liabilities in the 1988 restructuring.  (*See* 2005 Case, Docket Entry No. 274 at 21).

[27]  Halliburton asserts that this part of Compofelice's testimony should be disregarded because in eliciting that testimony, Tremont's counsel read the following sentence from the August 31, 1990 SEC Information Statement: "'New Baroid has assumed <u>all</u> of the company's liabilities attributable to the Company's petroleum services business.'"  (2005 Case, Docket Entry No. 300-1 at 4 (quoting *id.*, Ex. I at 000283)).  Halliburton points out that another page of the same Information Statement states that "'New Baroid has agreed to indemnify [Old Baroid] for <u>certain</u> liabilities related to New Baroid's petroleum services operations . . . .'"  (*Id.*(quoting *id.*, Ex. I at 000228, para. 2)).  Notably, immediately following the statement that New Baroid agreed to indemnify Old Baroid for certain liabilities related to New Baroid's petroleum services operations, the Information Statement states: "In accordance with the terms of the [illegible] Plan of Restructuring, New Baroid will be the responsible party if [Old Baroid] is found to have any liability arising with respect to [certain waste disposal] sites."  (*Id.*, Ex. I at 000228, para. 2).  In addition, Halliburton's quotation of the SEC Information Statement appears innacurate.  The page in the Information Statement that Halliburton points to as having been read to Compofelice in eliciting the disputed arbitration testimony actually discusses the assumption by Old Baroid of indemnification obligations under the Cross-Indemnification Agreement executed in conjunction with the 1988 restructuring.  The Information Statement states that "New Baroid assumed all of [Old Baroid's] obligations *under the Indemnification Agreement* attributable to [Old Baroid's] petroleum services business."  (*Id.*, Ex. I at 000283 (emphasis added)).  This sentence is narrower than the sentence Halliburton cites in its brief.  This sentence is not inconsistent with another Information Statement sentence stating that New Baroid assumed certain obligations associated with the petroleum services business.  Instead of pointing to the place in the arbitration transcript in which the Tremont Parties' counsel allegedly tried to confuse Compofelice, Halliburton points to the SEC Information Statement.  Halliburton's argument does not provide a basis to conclude that the part of the Information Statement read to Compofelice was misleading.

46

you've been involved in a lot of businesses, a lot of different transactions. Is it possible that the document on page 78 that I just showed you reflects a better recollection of what the party [sic] to that transaction meant than what your present recollection is?

MS. MARTINEZ: Objection. Form.

A.    And this is a long time ago. And of course anybody could be wrong. But from being on the road show, going back to my original testimony, that's what stands out. When I spoke to the substance of the transaction -- when I spoke -- what I recall the intent of the parties, it was no more complicated than that general recollection, that, you know, the nonoperating assets and liabilities, legacy costs, leave those behind in Tremont.

Part of the reason why that stands out in my mind is, in creating more value for all shareholders and maximizing value, a stock like New Baroid is going to trade against the yardsticks in its business, its peer group comps. And that's what we were trying to -- to earn.

Something like Tremont, the stub, so to speak, as we called it, there isn't any sense of what that would trade for. It wasn't going to trade for a -- a meaningful multiple. And so all other things being equal, being fair to all shareholders, you want to put the value in the things that are going to trade for meaningful multiples and the things that don't have value leave behind in the step. That's kind of how things like this are designed. And so that's why it just sticks out. It was the intent in my mind. And if I were asked to design a transaction like this today, to maximize value for all shareholders, that's exactly how you would design it today.

(2005 Case, Docket Entry No. 300-1, Ex. J, Deposition of Joseph Compofelice at 114:23–116:9).[28]

---

[28] In addition to arguing that this court should disregard Compofelice's recollection about whether historical liabilities were transferred, Tremont argues in its reply brief that this court should disregard the testimony of Robert Leidich because he admitted in his deposition in the arbitration that he was on the outside of the legal work on the 1990 restructuring. (See 2005 Case, Docket Entry No. 279 at 9 (citing id., Ex. D)). Halliburton has not submitted Leidich's testimony in opposition to Tremont's motion.

### 4.      The Sale of the McCullough Division to Western Atlas

Tremont argues that NL's potential liability for the Gulf Nuclear Sites derives from the

McCullough Division.  (2005 Case, Docket Entry No. 252 at 33).  The parties dispute whether

liabilities associated with the McCullough Division transferred to NLPS in the 1988 restructuring

because NL may have sold that division before the 1988 restructuring became effective.

On December 4, 1987, Western Atlas and NL (and some of NL's subsidiaries) entered into

an asset purchase agreement (the "Western Atlas Agreement"), in which NL sold the McCullough

Division to Western Atlas.[29]  (2005 Case, Docket Entry No. 247, Ex. HH).[30]  The Western Atlas

Agreement provides in relevant part:

> Consummation of the purchase and sale of the Assets and the other
> transactions provided for in this Agreement shall take place . . . *on
> December 31, 1987, commencing at 11:00 a.m., local time on such
> date provided such date follows expiration of the waiting period, if
> applicable, under the Hart-Scott Rodino Antitrust Improvements Act
> of 1976, or the receipt of any and all other material, requisite
> governmental permits, approvals and consents, or at such other date
> or time or other place as [Western Atlas] and the NL Parties may
> mutually agree upon in writing* (such actual date of transfer is
> referred to as the "Transfer Date"), and all transactions provided for
> in this Agreement to occur on and as of the Transfer Date shall be
> deemed to have occurred simultaneously and to *be effective as of
> midnight on the Transfer Date*.

---

[29]   Exhibit A to the Western Atlas Agreement is absent from the copy of the agreement submitted by
Tremont.  According to the Agreement recitals, Exhibit A describes and identifies the business that NL and
certain of its subsidiaries had engaged in through the McCullough Division.  (*See* 2005 Case, Docket Entry
No. 247, Ex. HH at 1).

[30]   Halliburton objects to Exhibit HH as not being a complete copy.  (2005 Case, Docket Entry No. 273 at 9).
Tremont responds that the exhibit was filed in two parts because it is so long.  (2005 Case, Docket Entry No.
280 at 9).  Halliburton did not respond to this in its reply.  It appears that the entirety of the main agreement
was submitted.  Halliburton's objection is overruled.  *See Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199
(5th Cir. 1981) (The "general complaint that the reports are incomplete and inaccurate are matters going to
the weight of this evidence and not its admissibility.").

(*Id.*, Ex. HH, § 13(a) (emphasis added)).

Under the Western Atlas Agreement, NL retained historical liabilities associated with the

McCullough Division:

> 7. <u>Non-Assumed Liabilities</u>. Except for the liabilities specified in Section 6, [Western Atlas] is not assuming and shall not be liable to the NL Parties or any other person with respect to any debt, liability or obligation of the NL Parties or Shaffer (whether known, unknown, absolute, accrued, contingent or otherwise) including, without limitation, the following, collectively, the "Non-Assumed Liabilities":
>
> . . . .
>
> (f) <u>Litigation</u>. Any litigation, arbitration or regulatory, administrative or governmental proceeding or investigation, whether pending, threatened or hereafter instituted, to the extent it is in respect of the business and affairs of the Division *on or prior to the Transfer Date*;
>
> (g) <u>Violation of and Compliance with Laws</u>. Any violation of, alleged violation by the Division, or the Division's failure to comply with, any foreign, federal, state or local statute, law, ordinance, rule, regulation, order or decree in respect of the business and affairs of the Division *on or prior to the Transfer Date* or in respect of the transfer of the Assets to [Western Atlas]; and
>
> . . . .
>
> (i) <u>Environmental Matters</u>. Any debt, liability or obligation of the Division (including without limitation any cleanup or restoration responsibility or liability with respect to real property) in connection with the use, consumption, generation, treatment, storage or disposition of hazardous materials or wastes (including without limitation nuclear materials and wastes) on or before the Transfer Date or any other environmentally related claim *to the extent arising on or before the Transfer Date*.

(*Id.*, Ex. HH, § 7(f), (g), and (i) (emphasis added)).

### 5.    *Western Atlas v. NL Industries, Inc.*

In 1991, Western Atlas sued NL and several other NL-related entities, including New Baroid. In an internal NL memorandum dated December 13, 1991, Lourdes T. Hernandez[31] sent the petition and first amended petition in that case to Anthony Lannie, Vice President and General Counsel of Baroid Corporation.  (2005 Case, Docket Entry No. 274, Ex. I).  An unsigned, handwritten note attached to the letter and bearing the same date states: "Per Lourdes, this is for information only – she is to send note saying NL will handle for Baroid."  (*Id.*, Ex. I).  In a January 18, 1994 letter to David B. Garten, Vice President and General Counsel of NL, Lannie stated that he was "writing to confirm [Baroid's] understanding regarding the various active matters as to which [Baroid] is either indemnified or is indemnifying [NL] pursuant to the various agreements among Baroid, NL, and Tremont Corporation."  (*Id.*, Ex. A-2 at 1).  *Western Atlas v. NL* is among the matters listed under the category "Matters as to which NL is Indemnifying Baroid."[32]  (*Id.*, Ex. A-2 at 2).  Garten signed the letter, indicating his agreement with the description of the various indemnifications.  (*Id.*, Ex. A-2 at 3).  A July 12, 1995 letter from Garten to James E. Brasher, Vice President of Western Atlas, states that NL settled the lawsuit for $1,600,000.  (*Id.*, Ex. J at 1).[33]

---

[31]  Hernandez's role at NL is not identified in the memorandum.

[32]  As Halliburton points out, this letter also acknowledges that NL was indemnifying New Baroid in response to a demand letter sent to Schaffer de México, S.A. de C.V., Division McCullough.  (2005 Case, Docket Entry No. 274, Ex. A-2 at 2).  The Western Atlas Agreement identifies Schaffer de México, S.A. de C.V. as a wholly owned Mexican subsidiary of NL that was included in the McCullough Division.  (2005 Case, Docket Entry No. 247, Ex. HH at 1).

[33]  Halliburton has submitted a document entitled "Supplemental Evidence in Response to Tremont LLC's Motion for Partial Summary Judgment."  (2005 Case, Docket Entry No. 328).  In this submission, Halliburton asserts that a new document production by Tremont contained documents that Halliburton intends to rely on in opposition to Tremont's motion for partial summary judgment.  (*Id.* at 1–2)  Because Tremont marked its entire document production as "confidential," Halliburton gave notice that it intended to rely on certain of those documents and to present them at the hearing on Tremont's motion.  (*Id.* at 2).  At the hearing, Halliburton submitted a "Supplemental Response to Tremont LLC's Motion for Partial Summary Judgment"

6.      **The Sale of Oilfield Service Facilities to Exxon**

On October 2, 1987, NL and Exxon Corporation executed an asset purchase agreement.  NL

sold Exxon assets used in the NL Treating Chemicals Division.  (*See* 2005 Case, Docket Entry No.

274, Ex. K).  The agreement had a closing date of "November 20, 1987, or ten working days

following expiration or early termination of all applicable waiting periods under the Hart-Scott-

Rodino Antitrust Improvements Act of 1976, whichever occurs last." (*Id.*, Ex. K, § 1.5).  There is

no evidence in the record of the actual closing date.

In the section on indemnification, NL agreed to:

> indemnify, defend and hold [Exxon] or its designees harmless from
> and against any and all claims, damages, obligations, liabilities or
> losses . . . that [Exxon] or its designees shall incur or suffer after the
> Closing Date which arise out of and result from any liability or
> obligation of [NL] or its affiliates (other than Assumed Liabilities) or
> breach of any representation or warranty or failure by [NL] to
> perform any of the covenants or agreements of [NL] in this
> Agreement, or in any schedule or exhibit to this Agreement.

(*Id.*, Ex. K, § 8.1(a)).  NL also agreed to:

> indemnify, defend and hold [Exxon] and its designees harmless from
> and against any claim of a third party . . . against [Exxon] or its

_____

and attached the documents referenced in its supplemental evidence filing as exhibits in an envelope labeled
"in camera."  The supplemental response asserts that the attached documents show that NL has indemnified
and/or defended New Baroid in other disputes, which Halliburton asserts shows that the parties understood
that NL owed indemnification obligations to New Baroid with respect to properties transferred before 1988.
        At the hearing, Tremont stipulated that it would not contest for purposes of its motion for partial
summary judgment that NL has previously paid for certain matters related to NL's former petroleum services
business.  Despite this stipulation, Halliburton's counsel tendered the supplemental response to this court,
stating that any privilege had been waived by production in this litigation.  Tremont's counsel stated that the
documents had been produced pursuant to a confidentiality agreement, but there was a dispute as to whether
Tremont or Halliburton held the privilege with respect to the documents.  Halliburton stated that it would
have no objection to Tremont submitting a letter explaining its privilege objections.  This court agreed to
maintain the supplemental submission under seal.  Given Tremont's stipulation at the hearing, however, the
documents attached to the supplemental response do not add to the summary judgment evidence and
considering them would not change the analysis of the preclusive effect of the arbitrators' decision or this
court's contract interpretation.

designees or against the Purchased Assets . . . which arises out of and results from any condition, event or activity relating to the business of the Division *existing or occurring on or prior to the Closing Date*. Said claims of third parties include, without limitation, those arising from environmental and industrial health events occurring on or prior to the Closing Date, and resulting from: (A) any emission, dispersal, discharge, release, leak, escape, or concentration of any solid, liquid or gaseous material or effluent or pollutant from the Purchased Assets on or prior to the Closing Date; (B) *any generation, storage or disposal of waste material on the real property conveyed, or elsewhere, prior to Closing*; and (C) illness, disease, bodily injury or disability, including death, at any time resulting therefrom, arising out of or in the course of employment, or incidental thereto, or arising out of operation of the Purchased Assets by [NL] or its affiliates on or prior to the Closing Date; whether or not on the Closing Date any such claim, damage, obligation, liability, or loss is fixed, accrued, absolute, contingent or otherwise, and whether known or unknown, asserted or unasserted, due or to become due.

(*Id.*, Ex. K, § 8.1(b) (emphasis added)).[34]

### 7.    Tremont's Request for Indemnification from Halliburton for the Gulf Nuclear Site Liabilities

On July 6, 2007, NL demanded that Tremont provide a defense and indemnity for liabilities

---

[34] Halliburton has submitted a December 4, 2003 memorandum from NL to Halliburton discussing liability for the Malone Service Superfund Site. (2005 Case, Docket Entry No. 274, Ex. L). With respect to one facility, the letter states: "NL sold this facility to Exxon in late 1987. The US EPA has incorrectly assigned this volume to Nalco. It should be assigned to NL. Based on the information I have reviewed, Halliburton did not acquire this facility, and Halliburton does not have responsibility for this volume." (*Id.*, Ex. L at 2). Halliburton asserts that this shows that NL has acknowledged that Halliburton is not responsible for liabilities arising from property NL sold before 1988. (2005 Case, Docket Entry No. 274 at 13). Tremont objected at the hearing to this exhibit because it states that it is "for settlement purposes only" and is therefore inadmissible under Federal Rule of Evidence 408. *See* FED. R. EVID. 408(a)(2) (prohibiting introduction of statements made in compromise negotiations, "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction"). This objection is sustained. However, even if this court were to consider this memorandum, it would not change the reasoning or outcome. As previously discussed, Tremont has stipulated that it would not contest that NL has previously provided indemnity for certain liabilities related to its former petroleum services business. Given this stipulation, this memorandum does not add to the summary judgment evidence. The fact that NL may have agreed—in the context of settlement discussions—to assume responsibility for liabilities associated with a property that NL transferred before the 1988 restructuring does not change the preclusive effect of the arbitrators' decision or the interpretation of the contracts.

associated with the Gulf Nuclear Sites, explaining that "the potential liability for these Sites relates to NL's former petroleum services business." (2005 Case, Docket Entry No. 247, Ex. KK).[35]  On the same date, Tremont demanded that Halliburton provide a defense and indemnity for the Gulf Nuclear Sites, explaining that "the potential liability for these Sites relates to NL Industries, Inc.'s former petroleum services business." (*Id.*, Ex. LL).  Halliburton's senior vice-president responded

---

[35]  Halliburton objects to Exhibit KK on the grounds that it is not properly authenticated, is hearsay, is conclusory, contains legal conclusions on the interpretation of the restructuring documents, and is not based on personal knowledge. (2005 Case, Docket Entry No. 273 at 10–11). Tremont responds that the document is properly authenticated by Hollingsworth's affidavit. (2005 Case, Docket Entry No. 273 at 10). Tremont does not address Halliburton's additional objections.

As with Halliburton's similar objections to other exhibits, Hollingsworth's affidavit properly authenticates the documents attached to Tremont's motion. This exhibit is a letter addressed to Hollingsworth at Tremont; Hollingsworth has sufficient knowledge to authenticate this document. The letter is not hearsay because it constitutes a verbal act. *See* 31A FEDERAL PRACTICE AND PROCEDURE, EVIDENCE RULES, QUICK REFERENCE GUIDE 281 (West 2009) ("One common type of nonhearsay statement is usually referred to as a 'verbal act' or 'operative fact': a statement the making of which has substantive legal significance."). Halliburton's objections that the letter is conclusory and contains legal conclusions about the restructuring documents is not persuasive. The letter tenders the defense of the Gulf Nuclear Sites to Tremont; it does not contain any legal conclusions and does not mention the restructuring documents. Halliburton's objection that "there is no evidence that the maker of the statements contained in the letter has personal knowledge that such statements are true and correct" is puzzling. The body of the letter states:

> NL Industries, Inc. ("NL") hereby tenders to Tremont, LLC ("Tremont") for defense, indemnification and hold harmless the Gulf Nuclear Superfund Sites in Texas including Gulf Nuclear Odessa, Webster and Trevenor [sic], as the potential liability for these Sites relates to NL's former petroleum services business. Please confirm in writing your acceptance of this tender within fifteen (15) days from the date of this letter. If you require further information, please let me know.

(2005 Case, Docket Entry No. 247, Ex. KK). The only statement in the letter that could be interpreted as being true or false is that the liability for the Gulf Nuclear Sites related to NL's former petroleum services business. Halliburton has not cited authority for the proposition that there must be evidence that the author of a letter knew that every statement in the letter was true and correct as a predicate to admissibility.

The letter, written by NL's associate general counsel, is relevant to show that NL tendered the defense to Tremont and NL's asserted reason for doing so, regardless of whether that reason is "true and correct." Halliburton's objections are overruled.

Halliburton objects to Exhibits LL and PP for the same reasons it objects to Exhibit KK. Exhibit LL is Tremont's July 6, 2007 tender letter to Halliburton for the Gulf Nuclear Sites. Exhibit PP is Tremont's November 12, 2007 tender letter to Halliburton for the Gulf Nuclear Sites. Halliburton's objections to Exhibits LL and PP are overruled for the same reasons its objections to Exhibit KK are overruled.

to Tremont's request for indemnification on July 20, 2007, stating that based on Halliburton's investigation, "NL's potential liability relating to Gulf Nuclear arose from the activities of NL's former division, NL McCullough." (*Id.*, Ex. MM at 1). Halliburton asserted that "the assets of NL McCullough were sold by NL to Western Atlas . . . in 1987, prior to the 1988 Amended and Restated Formation Agreement." (*Id.*, Ex. MM at 1). Halliburton argued that the Formation Agreement excluded certain liabilities from the transfer to NLPS, including "'any claims of liability at sites or facilities or with respect to operations not transferred to NLPS pursuant to this agreement, including claims arising out of or relating to the offsite deposit, placement or disposal by NL of any materials of any character whatsoever generated at sites or operations not transferred to NLPS pursuant to this Agreement.'" (*Id.*, Ex. MM at 1). Halliburton concluded that "[s]ince the operations of NL McCullough were not transferred to NLPS pursuant to the Formation Agreement, and since the potential liability [Tremont] ha[d] tendered to Halliburton for indemnity is the result of NL McCullough's offsite deposit, placement or disposal practices, [Halliburton did] not agree that this liability was transferred to NLPS pursuant to the 1988 Formation Agreement." (*Id.*, Ex. MM at 2).

On November 9, 2007, the EPA brought the EPA lawsuit against HESI, DII, and NL, among others, under CERCLA. The EPA sought costs it incurred in conducting removal actions as a result of releases and threatened releases of hazardous substances from the Gulf Nuclear Sites. The EPA complaint alleges that HESI succeeded to all the liabilities at the Gulf Nuclear Sites of several companies, including Baroid, and that DII succeeded to all Dresser's liabilities at the Gulf Nuclear Sites. (2005 Case, Docket Entry No. 247, Ex. OO, ¶¶ 6, 16). The complaint further alleges that "NL McCullough was a division of NL Industries, Inc.," and that NL or HESI is responsible for NL's liabilities at the Gulf Nuclear Sites. (*Id.*, Ex. OO, ¶¶ 18, 19). The complaint alleges that

54

"Halliburton, DII, and NL sent radioactive wastes, including americium, cesium, radium, cobalt, zinc, tritium, scandium, gadolinium, iridium, and/or iodine, directly to the Odessa Site for storage and/or processing prior to disposal"; that they sent radioactive wastes "directly to the Webster Site[,] and certain of those wastes were transferred to the Odessa Site for processing and/or storage prior to disposal"; and that "[t]he practice at the Odessa Site was to compact and repack many of the radioactive wastes prior to offsite disposal." (*Id.*, Ex. OO, ¶¶ 60–62).

Tremont tendered the defense of the EPA lawsuit to Halliburton in a November 12, 2007 letter.[36] (*See id.*, Ex. PP). Halliburton refused. Halliburton argued that under the Cross-Indemnification Agreement, NLPS agreed to indemnify NL only for liabilities, obligations, or commitments assumed by NLPS under the Formation Agreement. (*Id.*, Ex. QQ at 2). Halliburton noted that the Formation Agreement provided that NLPS would not assume liabilities associated with sites, facilities, or operations not transferred to NLPS under that Agreement, "'including claims arising out of or relating to the offsite deposit, placement or disposal by NL of any materials of any character whatsoever generated at sites or operations not transferred to NLPS pursuant to this Agreement.'" (*Id.*, Ex. QQ at 2). As it had in rejecting Tremont's previous demand for defense and indemnification, Halliburton stated that NL's potential liability for the Gulf Nuclear Sites arose out of the operations of the McCullough Division, and that NL had transferred all facilities and operations associated with that Division to Western Atlas in December 1987, almost one year before the Formation Agreement was executed. (2005 Case, Docket Entry No. 247, Ex. QQ at 2). Halliburton again asserted that because of the Western Atlas transfer, the McCullough Division

---

[36] Although Tremont is not named in the EPA's complaint, NL had previously tendered to Tremont the defense and indemnification for the Gulf Nuclear Sites. (*See* 2005 Case, Docket Entry No. 247, Ex. KK). NL is named as a defendant in the EPA's complaint. NL presumably invoked Tremont's indemnification obligation, leading to Tremont's demand for indemnification from Halliburton.

could not have been transferred from NL to NLPS in 1988.  (*Id.*, Ex. QQ at 2).[37]

Tremont and NL entered into a joint defense agreement with Halliburton.  Tremont and NL agreed that Halliburton's lawyers could represent the interests of both Halliburton and NL in the EPA lawsuit.  (*Id.*, Ex. TT).  The parties reserved their indemnification claims relating to the Gulf Nuclear Sites.  (*See id.*, Ex. TT, ¶ 4).  Tremont represents that it is not seeking reimbursement for past fees that it agreed to cover under the joint defense agreement.  Tremont instead asks this court to find that Halliburton is responsible for NL's liabilities arising from the Gulf Nuclear Sites so that Tremont can avoid incurring additional costs and expenses from those Sites.  (2005 Case, Docket Entry No. 252 at 40).

## 8.    The Arbitration Panel's Decision

Halliburton argued in the arbitration that it was not liable for NL's petroleum services activities at the Malvern Site because some of the relevant leases had terminated before the restructurings, making them "surplus real property" excluded from the 1990 transfer to New Baroid. The arbitration panel rejected that argument.  The panel stated that "the clear intent of both plans of restructuring [was] to 1) spin-off the pre-existing petroleum services business of the transferors in 1988 and 1990, respectively, and 2) transfer responsibility for all historical liabilities associated

---

[37]  Tremont has submitted the notice of the EPA lawsuit and waiver of service of summons, sent from the EPA to NL as Exhibit RR, and NL's letter to the EPA enclosing the executed waiver of service of summons as Exhibit SS.  Halliburton objects to both of these exhibits on the grounds that they are not properly authenticated, that they constitute hearsay, and that they are not relevant.  (2005 Case, Docket Entry No. 273 at 12–13).  Tremont has not responded to the objections with respect to Exhibit RR.  With respect to Exhibit SS, Tremont argues that Hollingsworth's affidavit properly authenticates the document and that the hearsay objection is without merit.  (2005 Case, Docket Entry No. 280 at 12).  Exhibits RR and SS are properly authenticated by Hollingsworth's affidavit.  As discussed in connection with Halliburton's objections to other exhibits, Hollingsworth's affidavit is sufficient to authenticate documents within Tremont's possession and control.  Exhibits RR and SS are not hearsay because they are verbal acts having independent legal significance.  The exhibits are relevant to provide background regarding the EPA lawsuit, which is relevant Tremont's request for indemnity.  Halliburton's objections to Exhibits RR and SS are overruled.

with the operations of that business."  (2005 Case, Docket Entry No. 247, Ex. D at 19).

      The panel found:

> [T]he conclusion is inescapable that the leased properties and licenses
> of NL, and subsequently "Old" Baroid, were indeed an integral part
> of the petroleum services business of NL, and the resultant liabilities
> and obligations were assumed by NLPS and New Baroid,
> respectively, as a result of the plans of restructuring.  Those plans
> included not only the transfer of the assets and operations of the
> transferors' petroleum services business, but also the associated past
> and future liabilities and obligations.

(*Id.*, Ex. D at 19).  The panel explained:

> Whether leases had expired or were terminated prior to 1988 is not
> determinative of whether the historical liabilities associated with the
> leased property were assumed by NLPS, and later New Baroid. . . .
> [I]ndemnification for such historical liability is not dependent upon
> the actual transfer or assignment of a lease covering leased property
> which had been used as part of the operations of the petroleum
> services business of NL prior to 1988.

(*Id.*, Ex. D at 20).  The relevant heading in the final arbitration award states: "A Finding Of

Responsibility For Indemnification For Historical Liabilities Associated With Leased Properties

Does Not Require Proof That Leases And License Agreements Were Actually Assigned Or

Transferred To Anyone As Part Of The 1988 And 1990 Restructurings."  (*Id.*, Ex. D at 20).

      The panel described Halliburton's argument as follows:

> *The Halliburton Parties insist that a determination of their
> responsibility for the leased properties is dependent upon proof that
> such properties were actually transferred to NL as part of the 1988
> restructuring.*  The Halliburton Parties rely upon the September 1988,
> Amended and Restated Formation Agreement . . . , executed between
> the parties as part of the 1988 restructuring.   In particular, the
> Halliburton Parties point to the following provision of the Formation
> Agreement:
>
> > "1.4  Liabilities Not Assumed.  The parties agree that
> > NLPS will not assume or be liable for any of the

following liabilities or obligations . . . :

> (c)  Any claims of liability at sites or facilities or with respect to operations not transferred to NLPS pursuant to this Agreement, . . . "

> *In the absence of proof that leased properties were actually transferred or assigned to NL in 1988, the Halliburton Parties claim that any obligation of HESI, as the successor to New Baroid, to indemnify NL and Tremont does not extend to any claims of liabilities at sites or facilities or with respect to operations associated with the leased properties.*

(*Id.*, Ex. D at 20 (emphasis added) (second and third omissions in original) (footnote and internal arbitration record citations omitted)).  Halliburton advanced this same argument in rejecting Tremont's demand for indemnification for the Gulf Nuclear Sites.

The arbitration panel rejected Halliburton's argument:

> As stated above, the Panel disagrees.  An assumption of indemnification obligations and successor liability for historical liabilities associated with the transferred petroleum services business *is not dependent upon an actual physical transfer or assignment of an associated lease, or real estate for that matter*.  This is made clear by an examination of the other relevant contract terms.

(*Id.*, Ex. D at 20–21 (emphasis added)).

The panel pointed out that in the Formation Agreement, NLPS agreed "'**to assume, pay, discharge or perform when due all liabilities and obligations, known or unknown, of NL, associated with its petroleum services business** . . . '"; that in the Cross-Indemnification Agreement NLPS agreed to indemnify and hold NL harmless from "'**[c]laims of liability at sites of facilities or with respect to the operations (i.e., petroleum services business)**[38] **transferred**

---

[38]  This parenthetical explanation was added by the arbitration panel and does not appear in the text of the Cross-Indemnification Agreement.  (*See* 2005 Case, Docket Entry No. 247, Ex. K, § 2.2(b)).

**to NLPS pursuant to the Formation, including claims arising out of or relating to the deposit,**

**placement or disposal of any material of any character whatsoever on such sites or Facilities;**

**. . .** '''; and that in the Indebtedness Agreement NLPS agreed "'to assume and unconditionally

guarantee to NL . . . the performance or discharge by NLPS on behalf of NL of **any and all other**

**indebtedness and obligations of NL which are attributable to NL's petroleum services**

**business**.'''   (2005 Case, Docket Entry No. 247, Ex. D at 21–22 (first and second omissions in

original) (citations omitted)).   Considering the language from the relevant contracts, the panel

concluded:

> In the Panel's view, there is *no question that NL effectively transferred all assets and operations, existing and historical liabilities, associated with its petroleum services business to NLPS in 1988.  The assumption by NLPS of liabilities and obligations associated with that petroleum services business was truly comprehensive*.  There is nothing to suggest that such historical liabilities and obligations, even those related to expired or canceled leases on leased properties associated with the petroleum services business, were not transferred to and assumed by NLPS.  On the contrary, the opposite conclusion is unavoidable.

(*Id.*, Ex. D at 22 (emphasis added)).

The panel found that "[t]he same conclusion [wa]s also warranted as a result of the 1990

Restructuring."  (*Id.*, Ex. D at 22).  The panel elaborated:

> After the 1988 Restructuring, NLPS changed its name to Baroid Corporation (i.e., "Old Baroid") and subsequently transferred all of the petroleum services business to New Baroid under the 1990 Plan. Under that Plan, Old Baroid not only assigned to, and New Baroid assumed, all of Old Baroid's "properties, assets and rights, of any kind, whether tangible or intangible, real or personal, which [were] attributable to the Petroleum Services Business (the "Petroleum Services Assets") . . . ," but New Baroid also assumed and agreed:
>
> > 'to discharge all indebtedness, liabilities, obligations, claims, covenants, losses, damages, costs, penalties

and expenses, **of any kind and nature**, whether accrued, absolute or contingent, **asserted or unasserted**, and whether existing as of the date of this Plan **or arising thereafter** (collectively, "Obligations"), of [old Baroid] **arising out of, or which are otherwise attributable to, the past, present or future ownership or operations of the Petroleum Services Business . . .'"**

As part of the Plan, Old Baroid's subsidiary Baroid Drilling Fluids, Inc. ("BDFI"), assumed and agreed "to discharge all Obligations of New Baroid **arising out of, or which [were] otherwise attributable to, the past, present or future ownership or operations of such Petroleum Services Assets."**

According to the recorded Certificate of Assistant Secretary of Halliburton Energy Services, Inc., BDFI was dissolved on October 30, 1997, and effective November 1, 1997, the assets of BDFI became part of the Baroid Division of Dresser Industries Inc., which merged with Halliburton N.C. Inc., effective September 28, 1998. The surviving company was Dresser Industries, Inc. ("DII") and effective January 31, 1999, the assets of Dresser Energy Group of Dresser Industries Inc. (including its Baroid Division), were contributed to HESI.

As a consequence of these transactions, the Panel has determined that HESI has succeeded to, and is responsible for, indemnity obligations owed by New Baroid to Old Baroid and Old Baroid successors in connection with the petroleum services business, including those obligations assumed by BDFI.

(*Id.*, Ex. D at 22–23 (alterations and omissions in original) (internal arbitration record citations omitted)).

The panel reached a similar conclusion in rejecting Halliburton's argument that licenses and leasehold interests were not "property, assets, or rights" and therefore excluded from the definition of Petroleum Services Assets under the 1990 Plan.  The panel stated:

In keeping with the Panel's findings above, however, even if expired leases and license agreements did not constitute "property, assets and rights, of any kind," transferred under the Plan, one cannot conclude

> that historical liabilities and obligations associated with such instruments were not undertaken and assumed by New Baroid and BDFI, or that they did not agree to indemnify Old Baroid and its affiliates for such liabilities.

(*Id.*, Ex. D at 24).  The panel noted that "although BDFI agreed to assume and discharge all 'Obligations' of New Baroid related to the 'Petroleum Services Assets,' New Baroid separately agreed to the comprehensive assumption and discharge of Old Baroid's 'Obligations' of virtually any conceivable kind related to 'past, present or future ownership or operations of the Petroleum Services Business.'"  (*Id.*, Ex. D at 24).  The panel also noted that "[t]he assumption and discharge obligations of New Baroid . . . , defined as 'Petroleum Services Obligations,' were also the subject of New Baroid's indemnification of Old Baroid under the [1990] Plan," and concluded that based on the indemnification language in that Plan, "it [wa]s irrefutable that New Baroid indemnified Old Baroid for historical liabilities arising out of or otherwise attributable to past, present or future ownership or operations of the petroleum services business."  (2005 Case, Docket Entry No. 247, Ex. D at 25).  The panel concluded that "[l]iabilities or obligations associated with expired leases or license agreements would constitute such 'Obligations,' and trigger HESI's successor indemnification obligations."  (*Id.*, Ex. D at 25).

This court confirmed the panel's awards and entered judgment on the claims resolved in the arbitration.  (*See* 2005 Case, Docket Entry Nos. 239, 277).  The Fifth Circuit affirmed.  *See Halliburton Energy Servs., Inc. v. NL Indus. Inc.*, 306 F. App'x 843 (5th Cir. 2009) (unpublished) (per curiam).

### 9.    The Evidence as to Whether Liabilities Associated with the Gulf Nuclear Sites Are Part of NL's Former Petroleum Services Business

A threshold issue is whether NL's sole involvement with the Gulf Nuclear Sites was through

its former petroleum services business.  This court granted the parties additional time to conduct discovery on this issue, which is critical to resolving Tremont's motion.  If NL's liabilities associated with the Gulf Nuclear Sites stem solely from its former petroleum services business, this court can decide Tremont's motion based on the application of issue preclusion and contract interpretation.  If, however, the liabilities associated with the Gulf Nuclear Sites can be traced to any of NL's business operations other than its petroleum services business, Tremont's motion must be denied because even if this court were to decide the legal disputes over issue preclusion and contract interpretation in Tremont's favor, that would not entitle Tremont to full indemnity for the Gulf Nuclear Site liabilities.

The parties have presented evidence on this issue.  That evidence is set out and analyzed below.

### a.     The McCullough Division's Activities at the Gulf Nuclear Sites

Tremont has submitted EPA documents and waste manifests showing that the McCullough Division shipped wastes for disposal or recycling to Gulf Nuclear.  (*See* 2005 Case, Docket Entry No. 247, Ex. II).[39]  Tremont contends that these documents show that NL used the Gulf Nuclear

---

[39]  Halliburton objects to Exhibit II as not properly authenticated and as hearsay.  (2005 Case, Docket Entry No. 273 at 9–10).  Tremont responds that the exhibit is authenticated by Hollingsworth's affidavit and that Halliburton's hearsay objection is meritless.  (2005 Case, Docket Entry No. 280 at 9).  Halliburton argues that as vice president and general counsel of Tremont, Hollingsworth would have no knowledge as to whether the NL McCullough waste manifests are what they purport to be.  (2005 Case, Docket Entry No. 300-1 at 10).  Hollingsworth's affidavit asserts that each of the documents attached to Tremont's motion are true and correct copies of documents in the possession and control of Tremont.  This authenticates the documents.  The waste manifests are also authenticated as ancient documents.  Their condition does not create any suspicion concerning authenticity, it is reasonable to believe that Tremont would have these documents either by virtue of the corporate restructurings or by virtue of document production (many of the documents appear to have litigation control numbers), and the documents appear to have been in existence for more than 20 years.  *See* FED. R. EVID. 901(b)(8) (describing authentication of ancient documents as including "[e]vidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered").  The documents may also be authenticated through production in litigation.  *See MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.*, No. 4:04-CV-445-Y, 2006 WL 680513, at *5 (N.D.

Sites to dispose of or recycle wastes generated by NL's petroleum services business.  (2005 Case, Docket Entry No. 252 at 34).[40]  Tremont has also submitted a May 25, 2007 letter from the U.S. Department of Justice Environmental and Natural Resources Division discussing a proposed settlement for the Gulf Nuclear Sites with potentially responsible parties.[41]  (2005 Case, Docket Entry No. 247, Ex. JJ).[42]  That letter states that "the United States has obtained information from

---

Tex. Mar. 14, 2006) ("MGE does not dispute that it produced these bills during discovery; thus, its argument that the exhibit is not properly authenticated is meritless.").  The documents also fall under the hearsay exception for ancient documents.  See FED. R. EVID. 803(16).  Halliburton's objections to Exhibit II are overruled.

[40]  In the first supplement to its motion, Tremont asserts that it compared shipping locations listed in the shipping tickets/waste manifests/nexus documents provided by the EPA with the properties transferred to Western Atlas and that there is a 99% correlation between the location of generation and the properties that were part of the McCullough Division sold to Western Atlas.  (Docket Entry No. 41 at 47).  Tremont states that the EPA documents are attached as Exhibit 5 to its supplement.  But that exhibit appears to be documents relating to NL McCullough shipments that were not previously identified by the EPA.  Tremont had submitted shipping tickets from the EPA as Exhibit II to its motion.  The appendix to its motion states that the documents attached as Exhibit II are "EPA Documents and Waste Manifests of NL McCullough Division."

Assuming that the documents attached as Exhibit II are what Tremont used for comparison purposes, some of the shipping tickets appear to list shipping locations other than those on the list of property transferred to Western Atlas (besides the one exception that Tremont recognizes for Fairview, Illinois).  For example, several of the shipping tickets list shipment locations in Mills, Wyoming or Monahans, Texas, but there is no indication that properties in those cities were transferred to Western Atlas.

Even if the correlation were as high as Tremont claims, Tremont does not explain how this evidence would show that liabilities associated with the Gulf Nuclear Sites were part of NL's petroleum services operations that were ultimately transferred to Halliburton.  Tremont appears to argue that the correlation between the shipping tickets and the properties transferred to Western Atlas shows that only the McCullough Division was involved in the Gulf Nuclear Sites.  Presumably, Tremont is arguing that because it has presented evidence that the McCullough Division was part of NL's petroleum services business, NL's only connection to the Gulf Nuclear Sites was through its petroleum services business.  Tremont has not made this explicit, however.

[41]  The terms "potentially responsible parties" and "PRPs" refer to "covered persons" under section 107(a) of CERCLA.  The statute identifies four categories of "covered persons" who may be liable for cleanup costs associated with the release or threatened release of hazardous substances.  See 42 U.S.C. § 9607.

[42]  Halliburton objects to Exhibit JJ on the grounds that it is not properly authenticated and is hearsay.  (2005 Case, Docket Entry No. 273 at 10).  Tremont responds that Exhibit JJ is authenticated by Hollingsworth's affidavit and that the hearsay objection is meritless.  (2005 Case, Docket Entry No. 280 at 9–10).  Neither party has raised the issue, but this letter is also marked as an offer of compromise, raising an issue of admissibility under Federal Rule of Evidence 408.

GNI records and witnesses['] statements to establish that NL McCullough had a significant connection with the GNI facilities at Webster and Odessa." (*Id.*, Ex. JJ at 1). The letter states that "[t]he United States is continuing to research activities at the Tavenor facility" in Houston. (*Id.*, Ex. JJ at 1).

### b. Shipping Slips and Receiving Logs Showing Shipments of Radioactive Material from NL and Its Subsidiaries

In addition to the EPA documents and waste manifests of the McCullough Division that Tremont submitted, Halliburton has submitted shipping slips and receiving logs for Gulf Nuclear. (*See* Docket Entry No. 50, Ex. 18). Halliburton asserts that these documents create a fact question as to whether NL's operations other than petroleum services were involved in shipping waste to Gulf Nuclear. (*See* Docket Entry No. 50 at 5). As Halliburton points out, Gulf Nuclear's records show shipments received from "NL Industries," "N.L. MWD," "NL McCullough," and "NL Tech" in 1980 and 1985. (*See* Docket Entry No. 41, Ex. 14 at 5–9).[43]

Tremont responds that the shipping slips and receiving logs Halliburton submitted as Exhibit

---

This document is properly authenticated by Hollingsworth's affidavit, which states that all the attached documents are true and correct copies of documents in Tremont's possession. The letter is not hearsay to the extent it is submitted to show the EPA's theories about the Gulf Nuclear Sites rather than the truth of the assertions in the letter. *See* FED. R. EVID. 801(c). The document is not inadmissible under Evidence Rule 408 because it is a letter from the EPA that is not being offered against the EPA, and because it is not being offered to prove liability or invalidity of a claim but rather to show that the EPA made claims that NL McCullough was involved in the Gulf Nuclear Sites. *See* FED. R. EVID. 408(a)(2) (prohibiting introduction of statements made in compromise negotiations, "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction"); *see also* FED. R. EVID. 408(b) ("This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)."). The objections to Exhibit JJ are overruled.

[43] Because the exhibits associated with Tremont's Supplementation Related to the Gulf Nuclear Sites as Allowed by the Minute Entry of September 30, 2008 are both numerous and lengthy, they span several docket entries. For ease of reference, this opinion will cite to those exhibits by referring to the main docket entry for the brief, (Docket Entry No. 41), and the exhibit number, even if the exhibit is filed at a later docket entry.

18 to its supplemental response demonstrate that the connection between NL and the Gulf Nuclear

Sites stems only from NL's former petroleum services business.  (Docket Entry No. 52 at 3).

Tremont points out that the shipper's address in the shipping slip in page 1 of Halliburton's

supplemental Exhibit 18 is 3000 North Belt, Houston, Texas.  (*Id.*).  This is the "North Belt facility,"

which Tremont asserts was the headquarters of NL's petroleum services business.  (*Id.*).  Tremont

states that the North Belt facility was transferred to Halliburton as a result of the restructurings and

mergers that began in 1988.  (*Id.*).  Tremont submitted a recent photograph of the entrance to the

facility at the North Belt address, showing a sign with Halliburton's name.  (*Id.*, Ex. A).[44]

Tremont points out that page 2 of Halliburton's supplemental Exhibit 18 is a memorandum

of a bill of lading.  (Docket Entry No. 52 at 3).  Tremont notes that the shipping address appears to

have previously stated "NL McCullough," but this has been crossed out and "System Tech." has

been inserted in its place.  (*Id.*).  Tremont asserts that the receiving party's address is the truck

entrance for the North Belt facility that Halliburton acquired as a result of the restructurings.[45]  (*See*

*id.* at 4; *see also id.*, Ex. B).[46]  Tremont argues that this shows that System Tech. was located at the

---

[44]  Because the exhibits associated with Tremont's reply are numerous and lengthy, they span more than one docket entry.  For ease of reference, this opinion cites to these exhibits by citing to the docket entry number for the reply, (Docket Entry No. 52), and the exhibit letter, even if the exhibit itself is filed at a later docket entry.

[45]  Tremont also argues that this shipping slip only shows a shipment from Gulf Nuclear to System Tech., which could show a business relationship but not a shipment of waste to Gulf Nuclear.  (Docket Entry No. 52 at 4 n.1).

[46]  Halliburton objects to Exhibits A and B, arguing that the photographs are irrelevant to whether the shipments to or from the North Belt facility were related solely to NL's petroleum services business because the same address was also previously used for Tremont's operations.  (Docket Entry No. 62 at 2).  Halliburton submits a letter dated December 13, 1990 from Tremont Corporation to the New York Stock Exchange, which lists the address of the North Belt facility as Tremont Corporation's address in the letterhead.  (*Id.*, Ex. A at 1).  This letter does not make the photographs Tremont submitted irrelevant.  The photographs Tremont submitted showing that Halliburton, the successor to NL's petroleum services business, now operates at the facility that sent shipments to, or received shipments from, the Gulf Nuclear Sites, is relevant to whether the

headquarters of NL's former petroleum services business.  (Docket Entry No. 52 at 4).  Tremont asserts that page 3 of Exhibit 18 is the packaging slip that accompanied the memorandum of bill of lading, and notes that the shipping address is also the truck entrance for the North Belt facility.  (*Id.*).  Similarly, Tremont argues that page 4 of Exhibit 18 (a certificate of leak test), and page 5 of Exhibit 18 (a source certification certificate), both show the customer as System Tech. at the address that is now the truck entrance for Halliburton's North Belt facility.  (*Id.*).

With respect to page 6 of Halliburton's supplemental Exhibit 18 (a receiving log), Tremont points out that the entry for NL lists the materials received as "camera castings," which Tremont asserts were used in the petroleum services business to "view down into oil wells."  (*Id.* at 4–5).  Tremont submitted a statement by Paul Nixon, a former Gulf Nuclear employee, explaining that Gulf Nuclear's "radiography lab manufactured primary 'pigtails,' which are a type of sealed source that connects to a cable with the camera attached."  (Docket Entry No. 41, Ex. 11 at 3).  It is not clear from Nixon's statement that the "pigtails" were used specifically in oil wells.  Halliburton points to the deposition of Elick Acree, the former president of Gulf Nuclear, who testified that camera castings were used in the radiography field, not the oil service field.  (*See* Docket Entry No. 62, Ex. D, Deposition of Elick Acree at 442:12–443:11).  Acree testified as follows:

> Q.     . . . I saw camera castings listed on one of these documents. What's that?
>
> A.     What?
>
> Q.     Camera casting.  Do you know what that is?

---

shipments involved NL's prior petroleum services business.  *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Halliburton's objection is overruled.

A.    Yes.  Uranium camera casting, yes.

Q.    Did GNI accept those for disposal?

A.    Probably.  Yes.  If it's there, I did not.  I was looking more at the address.  I did not catch uranium casting in my search there.

Q.    But in general.

A.    In general, that would be okay.

Q.    What were camera castings used for?

A.    Shielding of iridium-192 sources.

Q.    Were they used in deep-well viewing or what were they used for?

A.    I don't know of an application as far as a shielding in a wire line tool or anything like that.  If you said uranium casting for shielding, I would think of those radiography sources.

Q.    But it was something that you used in the petroleum services?

A.    In the radiography field.  Not in the oil service field, but the radiography field.

(*Id.*, Ex. D, Deposition of Elick Acree at 442:12–443:11).  Halliburton argues that the fact that NL sent camera castings to Gulf Nuclear on at least one occasion, (*see id.*, Ex. E (receiving log for Gulf Nuclear stating that NL sent camera castings as waste)), is evidence that NL has a connection to Gulf Nuclear outside its petroleum services business, (Docket Entry No. 62 at 10).

The excerpt from Acree's deposition shows only his understanding that camera castings were used in the radiography field.  The excerpt does not discuss whether radiography could be a subset of petroleum services operations.  At least one plausible reading of Acree's testimony is that although he did not know of an independent use of camera castings in the oil services field, he

67

CASE HEADER

thought they could be used for radiography purposes within that field. Acree's testimony does not

address whether NL used camera castings in any part of its business other than its petroleum services

business. His testimony does not create an issue of material fact.[47]

With respect to page 7 of Halliburton's supplemental Exhibit 18, Tremont argues that the

only NL entities named on this receiving log are NL MWD ("measurement-while-drilling") and NL

---

[47]  A portion of Gulf Nuclear's 1983 annual report, submitted in connection with NL's motion for partial summary judgment, indicates that camera castings were used in radiography in connection with petroleum or oil field businesses. The annual report states:

> **Radiography.** The Company is also a manufacturer of radiation sources employed by industry for application in radiography. Radiography is a nondestructive testing process in which exposures of the internal structures of objects are revealed on specialized film by use of radiation, such as x-rays or gamma rays. Among other uses, *the Company's sources are employed in the radiographic inspection of welds on pipelines* to detect flaws and weaknesses, an inspection required by law to be made periodically. *These sources are also used in the inspection of refineries' forgings, pipes and fittings to detect fractures and other flaws.* In addition, the Company's sources are employed by radiographers to detect flaws in, among other things, ships, power reactors, buildings, bridges, pressure vessels, valves and aircraft engines.
>
> *The radiography capsules and accompanying connective devices are contained in and used with shields referred to within the radiography industry as "cameras."* The company has the manufacturing capability to construct sources employing capsule and connector designs for most cameras currently being marketed. As a complement to its manufacture of radiography sources, the Company manufactures cameras of its own design. In addition to cameras for sources, the Company manufactures other equipment for the safe use of the radioisotope sources.

(Docket Entry No. 64, Ex. 6 at 6 (emphasis added)). Although this annual report was submitted in connection with NL's motion for summary judgment and not with Tremont's motion, this court can consider it as summary judgment evidence. *See* FED. R. CIV. P. 56(c)(2) ("The judgment sought should be rendered if the pleadings, *the discovery and disclosure materials on file*, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." (emphasis added)).

The quoted portion of the annual report further confirms the conclusion that Acree's reference to camera castings used in the radiography field is insufficient to create a genuine issue of material fact. In addition, Tremont points out that the EPA has never indicated that it is seeking recovery based on radiography in the underlying EPA lawsuit, and that the EPA has stipulated that it is not making a claim for "radiography." (Docket Entry No. 80 at 9).

McCullough, both part of NL's historical petroleum services business. (Docket Entry No. 52 at 5). With respect to page 8 of Halliburton's supplemental Exhibit 18 (a receiving log stating that NL shipped depleted uranium), Tremont points out that depleted uranium was used in the petroleum services business, that the radioactive material identified in the NL McCullough/Gulf Nuclear shipping tickets/nexus documents includes depleted uranium, and that depleted uranium has been used by wireline logging companies such as NL McCullough. (*Id.* at 6 (citing Docket Entry No. 41, Ex. 38 (Stephen Prensky, *Recent Advances in Well Logging and Formation Evaluation*, WORLDOIL.COM – ONLINE MAGAZINE, Mar. 2008))).

Halliburton responds that the fact that depleted uranium may have been used by wireline logging companies does not mean that it is not used for other purposes. (Docket Entry No. 62 at 8). Halliburton points out that depleted uranium was used by NL's nuclear division. (*Id.* at 8 (citing *id.*, Ex. C at 15 (NL's 1972 annual report, noting that NL's nuclear division handled depleted uranium); *id.*, Ex. F)).[48] Halliburton asserts that the depleted uranium listed in the receiving log as being received from NL creates a fact issue as to whether the depleted uranium came from NL's petroleum

---

[48] Exhibits F and G have been submitted with Halliburton's motion for leave to file the exhibits under seal. (Docket Entry No. 63). Halliburton has asked that these exhibits be filed under seal because Tremont designated these documents as "Confidential Information" under the parties' Confidentiality Agreement. This court will not file material under seal based only on the parties' agreement because there is a presumptive right of public access to judicial records. *See Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (noting that a "judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal" and may not simply "rubber stamp a stipulation to seal the record"); *see also Sec. & Exchange Comm'n v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("In exercising its discretion to seal judicial records, the court must balance the public's common law right of access against the interests favoring nondisclosure."). Tremont has not had an opportunity to make a good-cause showing to maintain these documents under seal. Accordingly, Halliburton's motion for leave to file these exhibits under seal is temporarily granted. This court has considered, but refrained in this opinion from discussing the contents of, the exhibits filed under seal. However, **the seal on the exhibits and on Halliburton's motion for leave will be lifted seven days after this opinion is filed unless Tremont moves within that time to maintain them under seal**.

services   business   or   whether   it   came   from   one   of   NL's   other   divisions.[49]

---

[49]   In a later supplement to its motion for partial summary judgment, Tremont asserts that the alleged connection between NL and the Gulf Nuclear Sites involving depleted uranium was through a January 7, 1985 shipping ticket for the disposal of a depleted uranium sinker bar.  (Docket Entry No. 67 at 3).  Tremont submits a shipping ticket showing depleted uranium shipped from NL McCullough to Gulf Nuclear.  (*Id.*, Ex. C).  Tremont previously submitted this shipping ticket with its original brief.  (*See* 2005 Case, Docket Entry No. 247, Ex. II at 2).  The shipping ticket was written by "Slade."  (Docket Entry No. 67, Ex. C).  Tremont notes that George Slade was an NL employee when the shipping ticket issued and is now a HESI employee. (Docket Entry No. 67 at 3; *see also id.*, Ex. D).  Tremont argues that there is no evidence that Halliburton has hired any non-petroleum services employees of NL; Slade was a former NL petroleum services employee; and in a telephone call between Tremont's counsel and Slade (during which Halliburton's counsel was present), Slade confirmed that he was unaware of any connection between any of NL's non-petroleum services businesses and the Gulf Nuclear Sites.  (Docket Entry No. 63 at 3–4).

Tremont submitted an affidavit from Slade in the EPA lawsuit.  In the affidavit, Slade states that when he worked for NL from 1972 or 1973 through 1986, he was based out of the North Belt facility. (Docket Entry No. 68, Ex. C, ¶ 5).  Slade states that all his job responsibilities at NL were related to the oil and gas industry.  (*Id.*, Ex. C, ¶ 5).  Slade states that after 1986, he was laid off for 18 months and then rehired by NL's subsidiary, Sperry-Sun.  (*Id.*, Ex. C, ¶ 5).  Slade also states that although the NL McCullough shipping ticket he wrote shows that a sinker bar was sent to Gulf Nuclear, he is confused by the ticket because NL used sinker bars to help the logging tool sink to the bottom of a well, and that by the time NL used the sinker bars, they had already lost their radioactivity.  (*Id.*, Ex. C, ¶ 3).

Halliburton "objects to Tremont's misstatement regarding the import of George Slade's declaration." (Docket Entry No. 69 at 10).  Halliburton argues that a statement in Tremont's brief that Slade confirms that there is no non-petroleum services business connection between NL and the Gulf Nuclear Sites "is a mischaracterization of Mr. Slade's actual testimony[,] which fails to eliminate any connection between NL's non 'petroleum services' operations and the Gulf Nuclear Sites."  (*Id.*).  Although Halliburton characterizes this as an evidentiary objection, it is in fact a legal argument opposing Tremont's brief.  This court understands Tremont's statement in its brief to argue that Slade is another witness who is unaware of any connection between NL's non-petroleum services business and the Gulf Nuclear Sites.

However, even accepting Tremont's argument that HESI's employment of Slade means that the shipping ticket does not provide evidence of any involvement by NL's non-petroleum services operations, that shipping ticket is not the only evidence Halliburton has submitted showing NL's connection to the transfer of depleted uranium to the Gulf Nuclear Sites.  In Halliburton's surreply to Tremont's reply in response to Halliburton's supplemental response to Tremont's motion for partial summary judgment, Halliburton argues that page 8 of its supplemental Exhibit 18, coupled with evidence that NL's nuclear division used depleted uranium, creates a fact issue as to whether the depleted uranium identified in supplemental Exhibit 18 was used by NL in connection with its nuclear division or other divisions not part of NL's petroleum services operations.  (Docket Entry No. 62 at 8).  Page 8 of Halliburton's supplemental Exhibit 18 is a receiving log, presumably for one of the Gulf Nuclear Sites (Halliburton's counsel's affidavit states that Exhibit 18 contains true and correct copies of shipping records made to and/or from the Gulf Nuclear Sites).  The log lists NL as a shipper of depleted uranium.  (Docket Entry No. 50, Ex. 18 at 8).  This is a different shipping record than the shipping slip Slade wrote.  Tremont's supplemental response does not address the receiving log at page 8 of Halliburton's supplemental Exhibit 18.  But as discussed later in this opinion, this receiving log does not create a factual dispute as to whether NL's only connection to the Gulf Nuclear Sites was through its petroleum services business.

Halliburton also points out that the shipping ticket written by Slade is dated 1985, before the 1988

(Docket Entry No. 62 at 8).

Finally, with respect to page 9 of Halliburton's supplemental Exhibit 18 (a receiving log listing NL Tech as a customer), Tremont points out that NL Tech's address is now the truck entrance for Halliburton's North Belt facility.  (Docket Entry No. 52 at 6).

In response to Tremont's arguments, Halliburton argues that its ultimate ownership of the

---

restructuring, and lists N.L. McCullough Q.A. as the shipper.  (Docket Entry No. 69 at 16).  According to Halliburton, because NL sold the McCullough Division to Western Atlas before the 1988 restructuring, the liabilities associated with that division did not transfer to Halliburton.  (*Id.* at 16, 17).  This argument is addressed later in this opinion because it does not relate to the factual issue of whether NL's non-petroleum business had any connection with the Gulf Nuclear Sites.

Halliburton also argues that because Slade disclaims knowing why a uranium sinker bar would have been sent to Gulf Nuclear when "NL's use of sinker bars was not for radioactive purposes, but for weighting purposes," (Docket Entry No. 68, Ex. C, ¶ 3), his declaration raises a question as to where the uranium sinker bar originated "since a sinker bar from the 'petroleum services business' would not be radioactive and would not have been sent to Gulf Nuclear for disposal," (Docket Entry No. 69 at 17).  However, the fact that Slade does not remember the reason for shipping a particular item nearly 25 years earlier, particularly in view of the fact that Halliburton has not presented evidence connecting NL's non-petroleum services business to the Gulf Nuclear Sites, is not sufficient to create a fact issue.

This conclusion is supported by Gulf Nuclear's 1983 annual report, which NL submitted with its motion for summary judgment.  The report explains the use of depleted uranium in sinker bars in the petroleum or oil field business:

> The Company [Gulf Nuclear] has designed and commenced manufacture of a *"sinker bar", made of depleted uranium*, an extremely dense and heavy material, *for use in high pressure oil and gas wells.*  Sinker bars are weights which are *employed to pull the wire line tools used in well logging down through fluids in oil and gas wells* to the depths at which well logs and other tests are to be made.  The Company's sinker bars have been successfully tested and production models are *now in use by a major logging and perforation company.  As a result of the recession in the oil field supply and service industry, the demand for the Company's sinker bars has been significantly reduced.*

(Docket Entry No. 64, Ex. 6 at 7 (emphasis added)).

Tremont has also submitted a patent obtained by Acree and assigned to Gulf Nuclear for a "Method of Forming Encapsulated Depleted Uranium Oil Field Tubular Member."  (*See* Docket Entry No. 71, Ex. D).  The Acree patent states that "[t]he present invention relates generally to oil field tubular members, and more particularly to an encapsulated depleted uranium weighted sinker bar or drill collar and a method of making same."  (*Id.*, Ex. D at 5).  Halliburton objects to the patent as an untimely submission.  This court will consider it because Tremont's supplement makes clear that it learned about this patent in Acree's deposition in the EPA lawsuit.  The deposition was not taken until after Tremont had filed its motion.  (*See* Docket Entry No. 71 at 6).

71

North Belt facility does not establish as a matter of law that the cesium and americium listed on Exhibit 18's shipping slips and receiving logs had no connection to NL other than through its petroleum services business.  (Docket Entry No. 62 at 7).  Halliburton asserts that its supplemental Exhibit 18 creates a fact issue as to whether NL used its North Belt facility in connection with its nuclear division or with its other non-petroleum services divisions.  (*Id.*).

To rebut this argument, Tremont has submitted the sworn declaration of Mark Morrison, formerly NL's Radiation Services Officer in Texas.  Morrison states that the North Belt facility was used only for NL's petroleum services business:

> Beginning in June 1986, I was employed by the petroleum services business of NL Industries, Inc. ("NL") as the Radiation Safety Officer for NL for the State of Texas.  At all times, I worked at the headquarters of NL's petroleum services located at 3000 North Beltway located in Houston, Texas.  To the best of my knowledge, the only operations at the 3000 North Belt facility were petroleum services business operations.  To the best of my knowledge, no non-petroleum services business operations of NL were conducted at the 3000 North Belt facility.

(Docket Entry No. 68, Ex. B, ¶ 2).[50]  Morrison also states that he is not aware of any NL

---

[50]  Halliburton has objected to all the evidence submitted with Tremont's second, third, and fourth supplements to its motion for partial summary judgment, (Docket Entry Nos. 67, 68, 71).  (*See* Docket Entry Nos. 69, 72, 73).  Halliburton argues that the evidence is untimely filed because the local rules provide twenty days for a response to a motion before it is submitted to the court, the federal rules require an affidavit supporting a motion to be served with the motion, and the local rules require evidence to be filed with a motion or response.  (*See* Docket Entry No. 69 at 4).  Halliburton contends that "[r]ead together, these rules require Tremont to seek leave of court to file the supplemental evidence."  (*Id.*).

Tremont moved to supplement the record, seeking leave to file its previous supplements and to file an additional supplement.  (Docket Entry No. 70).  Tremont points out that the supplemental evidence it has submitted is new information that became available in discovery in the EPA lawsuit, that Halliburton has the same counsel in this case and in the EPA lawsuit, that Halliburton's counsel participated in all the discovery in the EPA lawsuit, and that Tremont did not delay in filing the record supplements when new information became available.  (*See id.* at 1, 3).

Halliburton responded that this court stayed discovery into issues other than the Gulf Nuclear Sites, that Tremont has improperly conducted one-sided discovery, and that Halliburton has been unable to pursue discovery to defend against Tremont's supplements.  (Docket Entry No. 72 at 2).  Halliburton contends that Tremont's supplements are untimely because discovery into whether liabilities associated with the Gulf

Nuclear Sites stem from NL's former petroleum services business was completed in January 2009. (*Id.*). Halliburton argues that the evidence submitted with Tremont's fourth supplement does not justify granting leave. (*See id.* at 4–9).

Tremont responded with a motion for leave to file a response to Halliburton's objections to supplementation under seal. (Docket Entry No. 74). Tremont seeks to maintain its response under seal because it refers to materials produced and designated by Halliburton as "Confidential" under the parties' confidentiality agreement. Halliburton opposes Tremont's motion, arguing that the motion improperly seeks to file Tremont's entire response and all exhibits under seal when only parts of the response are designated as "Confidential." (Docket Entry No. 77). Even though Tremont's motion seeks to protect Halliburton's claim of confidentiality, Halliburton makes no attempt in its response to identify which portions of Tremont's filing are confidential or to justify confidentiality. Instead, Halliburton asks this court to deny Tremont's motion for leave, and states that "[i]f Tremont subsequently files a narrowly tailored motion for leave, HESI will respond at that time." (*Id.* at 3–4).

Tremont has filed a reply in which it states that Halliburton has now agreed that the documents it stamped as "Confidential" need not be filed under seal. (Docket Entry No. 79). Tremont filed an unsealed version of its response to Halliburton's objections to supplementation, (Docket Entry No. 80), and agrees that its motion for leave to file under seal is moot, (Docket Entry No. 79). Tremont's motion for leave is denied as moot.

Both the local and federal rules permit this court to exercise its discretion to consider evidence filed as a supplement. *See* FED. R. CIV. P. 56(e) ("The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits."); S.D. TEX. L.R. 7.8 ("The Court may in its discretion, on its own motion or upon application, entertain and decide any motion, shorten or extend time periods, and *request or permit additional authority or supporting material*." (emphasis added)). Halliburton relies on *Bernhardt ex rel. Bernhardt v. Richardson-Merrell, Inc.*, 892 F.2d 440 (5th Cir. 1990), but that case is distinguishable because the Fifth Circuit found that it was not an abuse of discretion for the district court to refuse to consider an affidavit submitted after the court had issued its summary judgment decision. *See id.* at 442–44. Halliburton cites *Roehrs v. Conesys, Inc.*, No. 07-10801, 2009 WL 1577827 (5th Cir. Jun. 4, 2009) (unpublished), to argue that this court should not consider the evidence. But that case simply held that the district court did not abuse its discretion in striking untimely evidence. *See id.* at *4. *Roehrs* does not support the argument that a court lacks discretion to consider supplemental evidence. Here, ongoing developments in the related litigation, in which both Tremont and Halliburton are involved and represented, has provided additional evidence relevant to this matter. Tremont points out that Halliburton filed a document in March 2009 that noted that discovery related to the Gulf Nuclear Sites "has been ongoing" and that "[t]he parties continue to exchange documents relevant only to the Gulf Nuclear portion of the New Claims." (Docket Entry No. 80 at 2 (quotation marks omitted)). Halliburton's untimeliness objection is overruled.

Halliburton's objection to the supplemental evidence based on the argument that discovery has been "stayed" since January 16, 2009 is also unpersuasive. Much of the supplemental evidence was obtained in the underlying EPA lawsuit, and came from depositions and interviews at which Halliburton's counsel in this case was present. (*See* Docket Entry No. 67 at 1–2 (stating that Halliburton's attorney in this case was present at the deposition of Lynn Williams in the EPA lawsuit and that Gregory Fife was deposed by Halliburton in the EPA lawsuit); Docket Entry No. 68 at 3, 6 (stating that George Slade's declaration was reviewed and modified by Halliburton's counsel in this case, and that Halliburton's counsel in this case was present at the deposition of Michael Jaschek in the EPA lawsuit)). The declarations of Mark Morrison, Ronnie Barrett, Steve McCollum, Jon Bailey, and Theodore Rahon were obtained in the EPA lawsuit, in which both Halliburton and Tremont are involved. Halliburton is not prejudiced by the use of the declarations obtained

business, other than the petroleum services business, having any connection to the Gulf Nuclear

Sites.[51]  (*Id.*, Ex. B, ¶ 11).[52]

Tremont has also submitted the affidavit of Patrick M. Murray, who worked for NL, then Old

_____

in the EPA case because Halliburton is represented in that action as well.  It is not clear whether Frank Vavricka's declaration was obtained in the EPA lawsuit, but Halliburton waited over a month and a half before objecting to the supplemental evidence.  (*See* Docket Entry No. 69).  Whether the Vavricka declaration was obtained in this litigation or the EPA lawsuit, Halliburton is not prejudiced by having it included in the summary judgment record.

Tremont's motion to supplement, (Docket Entry No. 70), is granted.

[51]  Halliburton objects to Morrison's declaration, arguing that it lacks foundation and calls for a legal conclusion because it "provides no factual basis for any knowledge [Morrison] might have outside the alleged 'petroleum services' business group," and "[r]egarding the nature and scope of operations at the 3000 North Belt Facility, Mr. Morrison prefaces his declaration with 'to the best of my knowledge,' far from a conclusive and unequivocal statement regarding petroleum services business."  (Docket Entry No. 69 at 9).  Morrison's description of the basis for his knowledge provides an adequate foundation.  (*See* Docket Entry No. 68, Ex. B).  The fact that Morrison prefaces some of his conclusions by stating "to the best of my knowledge" does not make the declaration inadmissible.  Such a phrase can make a declaration inadmissible in some circumstances.  *See Brown v. Pattison*, No. 2:01-CV-0411, 2004 WL 1490302, at *4 (N.D. Tex. Jul. 1, 2004) (finding that a declaration that included the phrase "to the best of my knowledge" was inadmissible because "[t]he thrust of the statutory provision for unsworn declarations is to require the declarant to examine his own representations and state clearly and unequivocally that he has personal knowledge of their truth and accuracy and that they are both true and accurate," and that the "[p]laintiff's attempt to preserve room for uncertainty concerning the veracity of his statements defeats his unsworn declarations . . ."), *report and recommendation adopted*, 2004 WL 1773652 (N.D. Tex. Aug. 5, 2004), *aff'd sub nom. Brown v. Barnhill*, 191 F. App'x 281 (5th Cir. 2006).  But the phrase in Morrison's declaration simply limits the scope of his knowledge.  *See Booth v. Intertrans Corp.*, No. 94-2359, 1995 WL 324631, at *5 (E.D. La. May 26, 1995) (overruling an objection based on lack of personal knowledge and explaining that "[t]he qualifying clause 'To the best of my knowledge' limits the scope of the statement to matters within plaintiff's personal knowledge").

Halliburton also objects to Morrison's declaration by arguing that the use of the term "petroleum services" business in the declaration is inappropriate because the declaration does not show that Mr. Morrison has knowledge of the 1988 and 1990 Plans.  Morrison's declaration reflects his understanding of NL's business operations and does not contain legal conclusions about whether those operations involved "petroleum services" operations under the relevant contracts.

Halliburton's objections to Morrison's declaration are overruled.

[52]  In connection with NL's reply in support of its motion for partial summary judgment—which also appears to address Halliburton's surreply regarding supplemental evidence filed in opposition to Tremont's motion for partial summary judgment—NL submitted the affidavit of Ken Kotara, who was Assistant Corporate Controller of NL in 1987, Acting Controller of NL and Old Baroid in 1988 and 1989, Controller of Old Baroid from 1989 until the effective date of the 1990 Plan, and Controller of New Baroid in 1990.  (*See* Docket Entry No. 64, Ex. 13, ¶ 2).  Kotara states that during this period, he always worked at the North Belt facility and that the only operations at that facility were petroleum services operations.  (*Id.*, Ex. 13, ¶ 3).

Baroid, then New Baroid, then Dresser, and then Halliburton Company.  Murray's affidavit explains that the North Belt facility was used only for NL's petroleum services business:

> During the time period set forth above, I was employed at the 3000 North Belt facility located in Houston, Texas.  The operations at the 3000 North Belt facility were petroleum services business operations.  No non-petroleum services business operations of NL were conducted at the 3000 North Belt facility.  The information technology business or research and development units that were located at the 3000 North Belt facility related solely to the petroleum services business, and were considered part of the historical petroleum services business of NL, and as noted above, were consolidated and became my responsibility when I became President of Sperry-Sun.

(Docket Entry No. 65, Ex. C, ¶ 4).

Tremont also supplemented its motion with shipping records Halliburton produced on November 10, 2009.  (*See* Docket Entry No. 80, Ex. E).  Tremont contends that these additional documents show that Halliburton has the radioactive materials that were tested by Gulf Nuclear for NL MWD in the past.  (Docket Entry No. 80 at 7).  For example, Tremont points out that the same radioactive source was tested by Gulf Nuclear for NL MWD in September 1987, then for Sperry-Sun in November 1990 (after the 1988 restructuring), then for Sperry-Sun in April 1991 (after the 1990 restructuring), and then for Sperry-Sun in November 1996 (after the merger of Dresser into Halliburton).[53]  (*Id.* at 7–8).

Halliburton argues that Tremont's position "ignores the relevant inquiry—which is what former NL division the sources are linked to."  (Docket Entry No. 82 at 2–3).  Halliburton also argues that "[t]he issue raised in the Motion for Partial Summary Judgment is whether NL or HESI

---

[53] Tremont also points out that Halliburton's website lists Sperry Drilling and MWD as Halliburton entities. (*See* Docket Entry No. 80, Ex. F).

is responsible for NL McCullough liabilities after a series of restructurings, sales and purchases in the 1980s and 1990s." (*Id.* at 3). Halliburton contends that "[t]he bulk of NL's potential Gulf Nuclear liability appears to be associated with NL McCullough . . . ," that "NL McCullough was sold to Western Atlas prior to the 1988 and 1990 Plans of Restructuring," that "NL retained the liabilities associated with NL McCullough," and that "Tremont wholly fails to establish whether the sources allegedly in HESI's possession are linked to (1) Sperry Sun, a division of Baroid Corporation acquired by Dresser or (2) NL McCullough, a division HESI never acquired." (*Id.* at 3). Halliburton argues that "[b]ecause Tremont fails to establish HESI's current possession of any NL McCullough sources, the evidence attached to [Tremont's] Reply falls far short of proving that HESI must indemnify NL for McCullough's potential Site liabilities as a matter of law." (*Id.*).

As discussed in more detail below, the fact that Halliburton did not acquire the McCullough Division did not prevent it from assuming the liabilities associated with that Division if those liabilities were part of NL's former petroleum services business. Halliburton's possession of radioactive materials that were tested by Gulf Nuclear for NL's former petroleum services business supports Tremont's assertion that Halliburton succeeded to the part of NL's business that sent radioactive waste to the Gulf Nuclear Sites. In addition, the evidence that Halliburton possesses the same sources that NL sent through its MWD Division to the Gulf Nuclear Sites is contrary to Halliburton's argument that the MWD Division was not part of NL's petroleum services business and that Halliburton did not acquire liabilities associated with that Division.

c.    **Witness Statements and Testimony of Former Gulf Nuclear Employees**

Tremont has submitted witness statements obtained by the EPA in its investigation of the Gulf Nuclear Sites. As Tremont notes, none of these statements indicate that any division of NL was

76

involved in the Gulf Nuclear Sites other than the McCullough Division.  (Docket Entry No. 41 at 5–8; *see also id.*, Exs. 8–12).

One of the individuals who gave a statement, Paul Nixon, was subsequently deposed by the United States Department of Justice in the EPA lawsuit.  Nixon worked for Gulf Nuclear from 1976 to 1991.  (*Id.*, Ex. 11 at 1).  Halliburton's attorney in this case was present at the deposition.  Nixon testified that he was not aware of NL having any connection to any of the Gulf Nuclear Sites other than through its petroleum services business.  (*See* Docket Entry No. 65, Ex. D, Deposition of Paul Nixon at 156:19–23).[54]  Similarly, Lynn Williams, apparently a longtime employee of Gulf Nuclear, testified in his deposition in the EPA lawsuit that he was not aware of any connection between NL and the Gulf Nuclear Sites other than through NL's petroleum services business.  (Docket Entry No. 67, Ex. A, Deposition of Lynn Williams at 298:10–16).[55]

---

[54]  Halliburton argues that Nixon's testimony is directly contradicted by Acree's testimony, which concluded that NL's radiography operations were "not in the oil service field" and were connected with the Gulf Nuclear Sites.  (Docket Entry No. 66 at 4–5).  However, as discussed earlier, Acree's testimony does not create a disputed fact issue as to whether NL's connection to the Gulf Nuclear Sites was only through its petroleum services business.

[55]  Halliburton objects to Williams's testimony, arguing that it lacks adequate foundation and calls for a legal conclusion.  (Docket Entry No. 69 at 6).  Halliburton asserts that "[t]he testimony fails to establish: (1) the identity of Mr. Williams; (2) that he has relevant knowledge; (3) the factual basis for his testimony; or (4) that he knows anything about NL or its business practices."  (*Id.* (footnote omitted)).  Because Halliburton concedes that it is aware of Williams and his connection to the Gulf Nuclear Sites, and has not argued that Tremont's characterization of Williams's role is incorrect, it would exalt form over substance to exclude Williams's testimony on this basis.

Halliburton also objects to the use of the term "petroleum services" by Tremont's counsel in the deposition excerpt, arguing that the term has specific legal meanings under the relevant contracts and that Williams's statement that NL's connection to the Gulf Nuclear Sites only related to petroleum services is a legal conclusion.  (*See id.* at 7).  The deposition excerpt Tremont submitted reflects Williams's understanding of NL's connection to the Gulf Nuclear Sites and is not a legal conclusion about whether that connection involved "petroleum services" operations under the relevant contracts.  Halliburton's objection on this ground is overruled.

Halliburton also asserts that Williams's testimony does not eliminate a nexus between NL's non-petroleum services businesses and the Gulf Nuclear Sites.  Halliburton argues that "an equally plausible inference from the offered testimony is that Mr. Williams . . . [has] no knowledge of NL's business at

Tremont has also submitted deposition testimony of Michael Jaschek, a former Gulf Nuclear employee. Jaschek testified that he was not aware of any NL business other than the petroleum services business having any connection with the Gulf Nuclear Sites. (Docket Entry No. 68, Ex. H, Deposition of Michael Jaschek at 495:21–496:1). Jaschek also testified that he was not aware of Gulf Nuclear and NL doing any type of business together other than well logging-type businesses.[56] (*Id.*, Ex. H, Deposition of Michael Jaschek at 496:2–5).[57]

---

all—whether medical, industrial, nuclear, or oil and gas." (*Id.* at 14). Halliburton points out that Williams was only asked about a connection between NL and a single Gulf Nuclear Site. (*Id.* at 15). While Williams's testimony alone cannot establish that there is no connection between NL's non-petroleum services business and the Gulf Nuclear Sites, it does show that Williams, a Gulf Nuclear employee, had no knowledge of such a connection.

Halliburton also argues that Williams's testimony is contradicted by Acree, who testified that NL's radiography operations, which were "'not in the oil service field[,]' were connected to the Gulf Nuclear Sites." (*Id.*). However, as discussed earlier, Acree's testimony does not create a disputed fact issue about whether NL's connection to the Gulf Nuclear Sites was only through its petroleum services business. Halliburton's objections are overruled.

[56] Halliburton objects to Jaschek's deposition testimony, asserting that it lacks adequate foundation and calls for a legal conclusion because it "fails to establish: (1) the identity of Mr. Jaschek; (2) that he has relevant knowledge; (3) the factual basis for his testimony; or (4) that he knows anything about NL or its business practices." (Docket Entry No. 69 at 13 (footnote omitted)). However, Halliburton concedes that it "is aware of Mr. Jaschek's identity and his alleged connections with the Gulf Nuclear Sites," and states that it makes this objection "in order to point out Tremont's complete failure to properly prove up Mr. Jaschek's testimony for the Court." (*Id.* at 13 n.7). Tremont describes Jaschek as a long-time Gulf Nuclear employee and notes that Halliburton's counsel in this case was present at his deposition in the underlying EPA lawsuit. (Docket Entry No. 68 at 6). Halliburton has not argued that Tremont mischaracterized Jaschek's role. Halliburton also objects to the use of the term "petroleum services" by Tremont's counsel in the deposition. (*See* Docket Entry No. 69 at 13). The portion of Jaschek's testimony submitted by Tremont reflects Jaschek's understanding of NL's connection to the Gulf Nuclear Sites and does not contain a legal conclusion about whether that connection involved "petroleum services" operations under the relevant contracts. Halliburton's objection to Jaschek's testimony is overruled.

[57] In NL's reply in support of its motion for summary judgment—which also appears to address issues related to Tremont's motion for summary judgment—NL submitted the deposition testimony from the EPA lawsuit of Quinton Stokley, whom Tremont contends is a long-term Gulf Nuclear employee, stating that he was unaware of any connection between the Gulf Nuclear Sites and NL other than NL McCullough. (*See* Docket Entry No. 64, Ex. 4, Deposition of Quinton Stokley at 235:3–10). NL also submitted the deposition testimony of Michael Bodmer, whom Tremont contends was employed by Gulf Nuclear for over 20 years, stating that he was unaware of any divisions of NL connected to the Gulf Nuclear Sites other than NL McCullough and Petro-Log and that he was unaware of any business of NL not related to the petroleum

### d.     NL Annual Reports

Tremont has submitted NL's annual reports for many of the years between 1969, when the McCullough Division was acquired and integrated into the Baroid Division, through 1987, when the McCullough Division was sold to Western Atlas.  (*See* Docket Entry No. 41, Ex. 33).[58]  The annual reports show that NL considered the McCullough Division to be part of its petroleum services business.  For example, the 1969 annual report states:

> In July, certain assets of the McCullough Tool Company of Houston and Los Angeles were acquired for $7.5 million.  This company has an excellent line of *services to meet the needs of the petroleum industry*.  With the talents and skills of McCullough's people integrated into the Baroid Division, National Lead now provides one of the most complete lines of *oil field products and services*.

(*Id.*, Ex. 33, NL's 1969 Annual Report at 2 (emphasis added)).  As another example, the 1976 annual report states:

> Baroid's McCullough Services provides over 100 cased-hole wireline logging and perforating services, including operations such as *nuclear logging* and bullet and jet perforating.  These *services may be used on a well while being drilled, for completion of a well, for recompleting after a well has been in operation for some time, and during workover operations*.  For example, *McCullough Services may provide nuclear and electronic logs which provide up-to-date information about a wide range of downhole conditions*, such as formation depths and porosity, cement bonding, zone-to-zone seepage, stuck pipe, and casing wear.  McCullough also provides an efficient line of perforating guns and accessory equipment used in well completion.  These perforators are used to literally shoot holes in the hydrocarbon-bearing formations of a well, thus allowing the well to produce more oil or gas, assuring peak production.

---

services business having a connection to the Gulf Nuclear Sites.  (*See id.*, Ex. 5, Deposition of Michael Bodmer at 472:18–473:4).

[58]  The annual reports span several docket entries.  In citing the excerpts, this opinion refers to the year of the annual report followed by the page number used within the report cited, if available.  If the page number of the report is not available, this opinion refers to the litigation control number.

(*Id.*, Ex. 33, NL's 1976 Annual Report at 11 (emphasis added)).  A photograph on the same page of the 1976 annual report shows an oil rig, and contains a caption stating: "More than 100 wireline logging and perforating services are available from Baroid's McCullough Services operations. McCullough's self-contained units are for both land and offshore work."  (*Id.*, Ex. 33, NL's 1976 Annual Report at 11).

The annual reports for 1977, 1978, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986,[59] and 1987 also list or describe the McCullough Division as part of NL's "petroleum services" operations.[60]  The McCullough Division is not listed under the "chemicals" operations or the "metals" operations.[61]  The 1987 annual report notes that NL's "operations are principally in two business segments—chemicals, conducted by NLC, and petroleum services, conducted by NLPS."[62] The report describes the sale of NL McCullough as a sale of part of NL's petroleum services

---

[59] Tremont states that by 1986, NL's chemicals business had been spun off into a separate company, NLC. (Docket Entry No. 41 at 36). Tremont cites Bates page 0000-NLI-000038055, but has not identified where this page appears in the summary judgment record. This page appears to be at Docket Entry No. 41, Ex. 33, NL's 1986 Annual Report cover page at 0000-NLI-000038055. It is the cover page for the 1986 annual report, which lists both NL Petroleum Services and NL Chemicals, Inc.

[60] *See* Docket Entry No. 41, Ex. 33, NL's 1977 Annual Report at 0000-NLI-000037810; *id.*, Ex. 33, NL's 1978 Annual Report at 0000-NLI-000037846, 8; *id.*, Ex. 33, NL's 1979 Annual Report at 0000-NLI-00037885; *id.*, Ex. 33, NL's 1980 Annual Report at 6, 10, 11, 20; *id.*, Ex. 33, NL's 1981 Annual Report at 15, 21; *id.*, Ex. 33, NL's 1982 Annual Report at 7, 12–13, 15, 20, 40; Docket Entry No. 41, Ex. 33, NL's 1983 Annual Report at 5, 7, 12, 32; *id.*, Ex. 33, NL's 1984 Annual Report at 5, 31; *id.*, Ex. 33, NL's 1985 Annual Report at 5, 32; *id.*, Ex. 33, NL's 1986 Annual Report at 44; *id.*, Ex. 33, NL's 1987 Annual Report at F-18.

[61] *See id.*, Ex. 33, NL's 1977 Annual Report at 0000-NLI-000037810; Docket Entry No. 41, Ex. 33, NL's 1978 Annual Report at 0000-NLI-000037846; *id.*, Ex. 33, NL's 1979 Annual Report at 0000-NLI-000037885; *id.*, Ex. 33, NL's 1980 Annual Report at 20; *id.*, Ex. 33, NL's 1981 Annual Report at 21; *id.*, Ex. 33, NL's 1982 Annual Report at 40; *id.*, Ex. 33, NL's 1983 Annual Report at 32; Docket Entry No. 41, Ex. 33, NL's 1984 Annual Report at 31; *id.*, Ex. 33, NL's 1986 Annual Report at 32.

[62] *Id.*, Ex. 33, NL's 1987 Annual Report at F-18.

operations:

> NLPS supplies a wide range of products, services and equipment to assist the petroleum industry in discovering and producing oil and gas economically.  The *petroleum services segment* during 1987, 1986, and 1985 included five business units currently operated by NLPS — Baroid (drilling fluids and related specialized engineering services), NL Sperry-Sun (steering tools and directional drilling services), Measurement-While-Drilling, NL Shaffer (pressure control) and NL Atlas Bradford (premium connections); and four business units sold in 1987 — NL Hycalog, NL Acme Tool, NL Treating Chemicals and *NL McCullough*.

(*Id.*, Ex. 33, NL's 1987 Annual Report at F-18 (emphasis added)).

The 1979 annual report describes the McCullough Division's services as follows:

> NL McCullough provides *four primary wireline services*, cased hole logging, perforating, pipe recovery services and open hole logging. Cased hole logging, *used in oil and gas well completion* and workover, provides information about well conditions such as depth and porosity of oil and gas formations, the condition of the cementing between the casing and formation, the extent of seepage between oil and water bearing sands and the condition of the casing itself.  Data is gathered with various sensing devices and is analyzed at the well site.

> Perforating services, provided by McCullough, *promote the flow of oil and gas into the well from the formation*.  As wells remain in production, additional perforation is required to tap new petroleum-bearing formations after initial formations have been depleted.  This unit also performs pipe recovery services when the operations' normal recovery techniques are ineffective.

> To meet steadily increasing needs for more sophisticated wireline services, McCullough has expanded manufacturing capacity by more than 75% during the past two years.  During the latter part of 1979, McCullough began construction of a new 120,000 square foot manufacturing facility.  In addition, 1979 research and development expenditures increased approximately 50%.

> With the acquisition of Basin Surveys and Petrolog, NL also achieved one of its major strategic objectives, to provide open hole logging services.  Open hole logging provides information to drillers about

downhole conditions such as geological data, *the presence of oil and gas formations*, and downhole pressures. Results from NL's open hole logging units have exceeded expectations, and it is NL's intention to broaden the scope of these units both technically and geographically to meet the oil industry's future needs.

(*Id.*, Ex. 33, NL's 1979 Annual Report at 8 (emphasis added)).

The annual reports confirm that Basin Surveys and Petrolog, other potential connections to the Gulf Nuclear Sites, were part of NL's petroleum services operations.[63]  The annual reports also confirm that NL's "Measurement-While-Drilling" or "MWD" Division, which Halliburton asserts is linked to the Gulf Nuclear Sites, was part of NL's petroleum services operations.[64]  For example, the 1980 annual report, in a section labeled "NL Petroleum Services," states:

Current DST projects center on the development of three state-of-the-art Measurement-While-Drilling (MWD) systems.  The Downhole Recording System allows an evaluation of the formation and pressures whenever the drill string is removed from the hole.  Another MWD system, identified for further prototype development, is Mud Pulse Telemetry which will give NL added capability in directional drilling safety services.  The third, a Wire Telemetry System, utilizes sophisticated technology to effect a continuous high-speed data link between a bottom-hole sensor package and read-out equipment on the surface.

(Docket Entry No. 41, Ex. 33, NL's 1980 Annual Report at 14).  The 1984 annual report states:

---

[63]  (*See* Docket Entry No. 41, Ex. 33, NL's 1979 Annual Report at 8; *id.*, Ex. 33, NL's 1980 Annual Report at 10).  In addition, Basin Surveys, Inc. d/b/a NL Basin Survey, and NL Petro-Log, Inc. are listed on the schedule of subsidiaries engaged in NL's petroleum services business, attached to the Formation Agreement associated with the 1988 restructuring.  (*See* Docket Entry No. 65, Ex. B at 1, 2).  The Formation Agreement specifies that NL's subsidiaries engaged in the petroleum services business, including, without limitation, those subsidiaries listed on this schedule, would be transferred to NLPS.  (2005 Case, Docket Entry No. 247, Ex. J, § 1.1).

[64]  *See* Docket Entry No. 41, Ex. 33, NL's 1980 Annual Report at 9, 14; *id.*, Ex. 33, NL's 1981 Annual Report at 7, 16; *id.*, Ex. 33, NL's 1982 Annual Report at 7, 15; *id.*, Ex. 33, NL's 1983 Annual Report at 2, 0000-NLI-000038109, 5; *id.*, Ex. 33, NL's 1984 Annual Report at 7; *id.*, Ex. 33, NL's 1985 Annual Report at 6–7; Docket Entry No. 41, Ex. 33, NL's 1986 Annual Report at 6, 7; *id.*, Ex. 33, NL's 1987 Annual Report at 5, 7, 8, 10.

82

NL's major *petroleum service research and development effort is focused on developing measurement-while-drilling (MWD) products*, which is a generic name for products that continuously collect downhole geological and drilling information from sensors located directly above the drill bit.

Product development is aimed at the two major segments of the MWD market: directional MWD, which provides information on bit position, and multi-sensor MWD, which provides formation and drilling information in addition to directional data.

In 1984, the first of NL's MWD products, the Recorded Lithology Logging System (RLL), was fully commercialized through the Sperry-Sun/Baroid Logging Systems Division.  This product continuously gathers downhole formation measurements, which are recorded for processing when the drill bit is retrieved for bit replacement or other reasons.  This tool has been widely accepted by customers who recognize its unique capability to read formations through all different types of drilling fluids.

NL also introduced a second generation MWD tool, the NL Mud Pulse Telemetry System (MPT).  This tool adds to the sensors used in the RLL the ability to gather additional information such as temperature, pressure, and highly accurate bit location data.  It also has the capability to transmit this data continuously to the surface in a real time mode.  This system will be fully commercial by the end of 1985.

Funding levels to implement full commercialization of the RLL and MPT and to develop subsequent generations of MWD systems are continuing, despite broad weakness in the petroleum service industry. In contrast to general industry trends, MWD services are notably supply constrained, enjoying strong worldwide demand.

(*Id.*, Ex. 33, NL's 1984 Annual Report at 7 (emphasis added)).

### e.      NL Board Minutes

Tremont has submitted the minutes of NL's executive committee meeting from November 2, 1977.  The minutes state that an appropriation request of over $3 million was approved for "PETROLEUM SERVICES; NL Baroid Division; Baroid & McCullough . . . ."  (*Id.*, Ex. 34 at 1).

The minutes from a December 9, 1977 meeting of NL's executive committee note approval of
appropriation requests for "petroleum services," including a request for over $1.5 million for "NL
Baroid Division, McCullough Services; . . . ." (*Id.*, Ex. 35 at 1).  The minutes from a May 24, 1978
meeting of the executive committee of NL's board of directors state: "The Chairman said that the
first order of business was to consider an appropriation request of Petroleum Services for $1,746,450
for the construction of 18 replacement wireline trucks at NL McCullough, Houston, Texas." (*Id.*,
Ex. 36 at 1).

**f.      The Public Record**

Tremont points out that in *Fontenot v. AWI, Inc.*, 923 F.2d 1127 (5th Cir. 1981), the Fifth
Circuit referred to the McCullough Division as an "oil field service company."[65]  The *Fontenot* case
stated:

> Fontenot started with N.L. McCullough, an oil field service company,
> in 1971 . . . .  At some point between 1971 and 1988, Western Atlas
> acquired N.L. McCullough.  With the acquisition, Fontenot became
> an employee of Western Atlas, continuing his work as a wireline
> operator.  At the time of the accident in 1988, Fontenot was still
> working as a wireline operator for Western Atlas, and held the title
> "Pipe Recovery Specialist".

(Docket Entry No. 41, Ex. 37 at 2).  Tremont also points out that in another case, an entity called
McCullough-Baroid Petroleum Service NL Industries was the appellant.  *See McCullough-Baroid
Petroleum Serv. NL Indus. v. Sexton*, 618 S.W.2d 119 (Tex. Civ. App.—Corpus Christi 1981, writ
ref'd n.r.e.).

---

[65] *Fontenot* was a maritime tort case.  The opinion begins: "Joseph B. Fontenot and his wife, Ann Fontenot,
sued his employer, Western Atlas International, Inc. ('Western Atlas'), and others, under the Jones Act and
general maritime tort principles, for injuries that he sustained while off-loading his tool box from a crew boat
that was docked in navigable waters at Motto's Landing in Buras, Louisiana." (Docket Entry No. 41, Ex. 37
at 2).  The court noted that there was no dispute concerning the material facts before describing N.L.
McCullough as an oil field service company. (*Id.*, Ex. 37 at 2).

84

g.        **Halliburton's Discovery Responses**

Tremont argues that Halliburton's discovery responses do not identify a single transaction connecting anything other than the former petroleum services business of NL to the Gulf Nuclear Sites.   In its response to Tremont's Interrogatory No. 1, which asked for facts supporting Halliburton's denials of requests for admission, Halliburton stated that besides NL itself, NL MWD and NL Tech are identified in the Gulf Nuclear receiving logs.  (Docket Entry No. 41, Ex. 14 at 4). Tremont asserts that in response to Tremont's Rule 30(b)(6) deposition notice to Halliburton, which sought documents supporting the contention that a claim against NL or Tremont for liability at the Gulf Nuclear Sites arose out of a source other than NL's former petroleum services business, (*id.*, Ex. 15 at 2), Halliburton produced nothing.  (Docket Entry No. 41 at 9).  Tremont also points out that Halliburton's Rule 30(b)(6) witness, Stuart Kemp, who is an environmental attorney for Halliburton in charge of the Gulf Nuclear Sites, was asked in his deposition whether he was aware of any NL liability deriving out of anything other than NL's former petroleum services business. (*Id.* at 9–10).  Kemp testified as follows:

> Q.     So just -- I want to make sure that we're on the same pages [sic].
>
>          You think it's possible, but you can't point to any specific evidence to show that there's any connection between something other than the petroleum service business?
>
> A.     I think it's possible, but I can't show any evidence that it's anything other than McCullough based upon the documents you've shown me.

(*Id.*, Ex. 16, Deposition of Stuart Kemp at 33:1–9).  Tremont represents that in his deposition, Kemp did not identify a single transaction between NL's former chemical or metals business and the Gulf

Nuclear Sites.  (Docket Entry No. 41 at 10).

After examining excerpts from the 1977 NL annual report, Kemp gave the following testimony:

> Q.    And do you see where it's divided operations into three separate categories; petroleum services, chemicals, and metals?
>
> A.    Yes.
>
> Q.    Okay.  And do you see under the petroleum service category, the McCullough Division is listed?
>
> A.    Yes.
>
> Q.    Okay.  Are you aware as Halliburton's representative of any of the entities listed under chemicals or metals being connected to the Gulf Nuclear Sites?
>
> A.    (Examines document.)  I'm not aware of -- I -- I -- I have no knowledge necessarily that I know exactly what NL's connection to this site is.  So I -- I have not heard specifically these companies because no one's hold [sic] me what NL's connection is.
>
> Q.    But -- but you know that the McCullough Division is connected --
>
> A.    Yes.
>
> Q.    -- correct?
>
> A.    Yes.
>
> Q.    Okay.  And that's under petroleum services; correct?
>
> A.    Yes, it is under petroleum services.
>
> Q.    But sitting here today as Halliburton's lead lawyer for the --
>
> A.    Yes.

86

Q.      -- Gulf Nuclear Sites, are you aware, looking at the company's [sic] that are listed under chemicals and metals --

A.      Yes.

Q.      -- are you aware of any of those entities having any connection to the Gulf Nuclear Sites?

A.      I don't recognize any of the names of these companies.

(*Id.*, Ex. 16, Deposition of Stuart Kemp at 22:14–23:23).

###### h.      Use of Nuclear Materials in Petroleum Services Operations

Halliburton has asserted that because nuclear wastes are identified in the Gulf Nuclear shipping tickets, there is at least a fact issue as to whether a nuclear division of NL—as opposed to NL's petroleum services operations—was responsible for the wastes.  Tremont points out that the 1976 annual report explained that nuclear material is used in drilling oil and gas wells:

> Baroid's McCullough Services provides over 100 cased-hole wireline logging and perforating services, including operations *such as nuclear logging* and bullet and jet perforating.  These services may be used on a well while being drilled, for completion of a well, for recompleting after a well has been in operation for some time, and during workover operations. For example, *McCullough Services may provide nuclear and electronic logs which provide up-to-date information about a wide range of downhole conditions*, such as formation depths and porosity, cement bonding, zone-to-zone seepage, stuck pipe, and casing wear.  McCullough also provides an efficient line of perforating guns and accessory equipment used in well completion.  These perforators are used to literally shoot holes in the hydrocarbon-bearing formations of a well, thus allowing the well to produce more oil or gas, assuring peak production.

(Docket Entry No. 41, Ex. 33, 1976 Annual Report at 11 (emphasis added)).

Tremont also points out that the radioactive materials identified in the McCullough/Gulf Nuclear shipping tickets are "depleted uranium" and "americium beryllium."  Tremont argues that

87

these materials have been used routinely by wireline logging companies such as NL McCullough.[66] (Docket Entry No. 41 at 44 (citing *id.*, Ex. 38 (H. Patricia Hynes & Sardor Ibragimov, *Depleted Uranium: Questions and Answers on Its Use in War* (Boston University School of Public Health, September 2003); Stephen Prensky, *Recent Advances in Well Logging and Formation Evaluation*, WORLDOIL.COM – ONLINE MAGAZINE, Mar. 2008))). The Hynes and Ibragimov article states that "[c]ivilian [depleted uranium] is currently used in hospital irradiation shields, containers that transport radioactive substances, wide-bodied aircraft components, and *petroleum drilling equipment*." (*Id.*, Ex. 38 at 1 (emphasis added)). The Prensky article discusses "nuclear source replacement" and concerns with "sources that contain more than 1 g of highly radioactive materials. e.g., the americium-beryllium sources used in neutron-logging devices." (*Id.*, Ex. 38 at 8).

Tremont also points out that Halliburton's Rule 30(b)(6) witness, Stuart Kemp, testified in his deposition that nuclear or radioactive materials have historically been used in the oil well drilling business as tracers, and that americium beryllium is a nuclear or radioactive-type tracer used in logging oil and gas wells. (*Id.*, Ex. 39, Deposition of Stuart Kemp at 24:18–25:6). However, Kemp also testified that he did not know of a use of depleted uranium in the oil and gas business in connection with wells.[67] (*Id.*, Ex. 39, Deposition of Stuart Kemp at 25:7–16).

---

[66] Some of the annual reports refer to the use of "depleted uranium" in NL's metals business. (*See* Docket Entry No. 41, Ex. 33, NL's 1977 Annual Report at 0000-NLI-00003781 (stating that NL's metal operations encompass certain fields, including depleted uranium); *id.*, Ex. 33, NL's 1978 Annual Report at 0000-NLI-000037846 (same); *id.*, Ex. 33, NL's 1979 Annual Report at 0000-NLI-000037885 (same); *id.*, Ex. 33, NL's 1981 Annual Report at 21 (stating under the heading "Chemicals and Titanium Metals" that "NL is a contract operator for a U.S. Department of Energy uranium ore concentration plant"); *but see id.*, Ex. 33, NL's 1980 Annual Report at 20 (listing the fields encompassed in NL's metal operations, and not listing depleted uranium)).

[67] When asked if he knew that depleted uranium was not used in wells in the oil and gas business, he also answered "no." (Docket Entry No. 41, Ex. 39, Deposition of Stuart Kemp at 25:17–18).

i.      **NL's Nuclear Division**

Halliburton argues that NL "became involved in the nuclear industry in the late 1950's, when it designed and manufactured lead cask transportation systems for nuclear submarine cores on behalf of the United States Navy's nuclear submarine program. (Docket Entry No. 50 at 2 (citing *id.*, Ex. 1 (*NL Indus., Inc. v. United States*, 12 Cl. Ct. 391, 394 (1987)))). Halliburton asserts that "NL was also the first company to ship irradiated fuel from Canada to and from research reactors through this country." (*Id.* (citing *id.*, Ex. 1)). Halliburton points to NL's annual reports from 1969 through 1971, describing NL's nuclear division as part of its "Other Industries" or "Other Products," not part of its "Oil Well Drilling Services" or its "Oil Well Materials and Services."[68] In 1972 and 1973, NL considered its nuclear division to be part of its "Industrial Specialties Group," while its oil field services business was part of its "Chemicals Group."[69] From 1974 to 1979, NL considered its nuclear division to be part of its metals division.[70] Halliburton asserts that during this time, NL's

---

[68] (Docket Entry No. 50, Ex. 2, NL's 1969 Annual Report at 7; *id.*, Ex. 3, NL's 1970 Annual Report at 6, 7.) These annual reports also indicate that depleted uranium was used in the nuclear division. For example, the 1969 annual report states that "Other Industries" includes "[n]uclear-fuel elements, fabricated depleted uranium products. High temperature refractories: Zirconium oxides, and chemicals." (*Id.*, Ex. 2, NL's 1969 Annual Report at 7). NL's 1970 annual report states: "In the Nuclear Division new applications for depleted uranium, a very high density metal, were made possible by the development of a new casting method called 'Unicast.'" (*Id.*, Ex. 3, NL's 1970 Annual Report at 15). The 1971 annual report lists the nuclear division under "Other Products," as involving depleted uranium and nuclear services, and as being located in Albany, New York. (*Id.*, Ex. 4, NL's 1971 Annual Report at 7). However, the 1971 and 1972 annual reports also provide evidence that the oil well materials business involved the use of nuclear materials. (*See id.*, Ex. 4, NL's 1971 Annual Report at 7 (stating that the Baroid Division under the oil well materials and services business involved nuclear well logging and was located in Houston, Texas); Docket Entry No. 50, Ex. 5, NL's 1972 Annual Report at 10 (listing the Baroid Division in Houston under the Chemicals Group and as including nuclear well logging)).

[69] *See id.*, Ex. 5, NL's 1972 Annual Repot at 10, 12; *id.*, Ex. 6, NL's 1973 Annual Report at 5, 13.

[70] (*See id.*, Ex. 7, NL's 1974 Annual Report at 0000-NLI-000037718; *id.*, Ex. 8, NL's 1975 Annual Report at 0000-NL-000037746; *id.*, Ex. 9, NL's 1976 Annual Report at 0000-NLI-000037774, 00000-NLI-000037790; Docket Entry No. 50, Ex. 10, NL's 1977 Annual Report at 0000-NLI-000037810; *id.*, Ex. 11, NL's 1978 Annual Report at 0000-NLI-000037846; *id.*, Ex. 12, NL's 1979 Annual Report at 0000-NLI-000037885). Halliburton asserts that the nuclear division was part of NL's metals division through 1980.

nuclear division did business in Texas.  But the only evidence submitted in support of this statement is an invoice from NL's nuclear division, dated November 23, 1976, stating that lead castings and material chemical analysis were sold to Knolls Atomic Power Laboratory in Schenectady, New York and shipped to the South Research Institute in San Antonio, Texas.  (*See id.*, Ex. 22).  As Tremont points out, this document does not show the shipment of waste to the Gulf Nuclear Sites.[71]  (*See* Docket Entry No. 52 at 6).

Halliburton also points out that in October 1972, NL acquired Cambridge Nuclear Radiopharmaceutical Corp. ("Cambridge Nuclear") and Industrial Reactor Laboratories, Inc. ("Industrial Reactor Labs"), which produced radiological materials used for diagnostic nuclear medicine.[72]  (*See* Docket Entry No. 50, Ex. 5, NL's 1972 Annual Report at 13).  Halliburton argues that the fact that NL's nuclear services were much broader than NL McCullough's well-logging services creates a disputed fact issue as to whether NL's connection to the Gulf Nuclear Sites relates

---

But the excerpt Halliburton submitted from the 1980 annual report does not list the nuclear division under the metals division.  (*See id.*, Ex. 13, NL's 1980 Annual Report at 0000-NLI-000037942).  Halliburton also asserts that beginning in 1981, NL considered its nuclear division to be part of its chemicals and titanium metals operations.  The excerpt from the 1981 annual report Halliburton submitted does not list NL's nuclear division under the chemicals and titanium metals operations.  (*See id.*, Ex. 14, NL's 1981 Annual Report at 0000-NLI-000037986).

[71]  Halliburton asserts that because the Gulf Nuclear Sites are in Texas, this exhibit shows a connection between NL's nuclear division and the Gulf Nuclear Sites.  (*See* Docket Entry No. 62 at 8).  But the fact that NL's nuclear division made a shipment to a research institute in San Antonio is not evidence that NL's nuclear division was connected to the Gulf Nuclear Sites, which are not located in San Antonio.

[72]  Halliburton contends that it asked NL to produce documents related to Cambridge Nuclear and NL's products and services related to nuclear medicine, (*see* Docket Entry No. 50, Ex. 15 at 5–7), but NL produced only certificates of incorporation for Cambridge Nuclear Corporation, Cambridge Leasing Corporation, and Cambridge Nuclear Medicine Corporation, (*see id.*, Ex. 16 at 2).  Halliburton also asserts that NL has only produced nuclear records specifically requested from an index of documents that Dresser returned to NL in 1997 (the "NL Index").  (*See id.*, Ex. 16 at 1–2).  Halliburton argues that most of the documents related to NL's nuclear division would never have been provided to Dresser in the first place, and that NL has not produced any documents associated with its nuclear division that it retained after the Dresser/Baroid merger.  (Docket Entry No. 50 at 4).

90

only to its former petroleum services business.  (Docket Entry No. 50 at 4).

In response, Tremont has submitted the declaration of Frank Vavricka, a former employee of NL's nuclear division.[73]  Vavricka states that he has no knowledge of NL's nuclear division disposing of waste at the Gulf Nuclear Sites or having any connection to Gulf Nuclear:

> I was employed by NL Industries, Inc. beginning in January of 1973. I transferred to NL's Albany, New York plant[,] which was part of NL's Nuclear Division.  The Albany plant made two products: 1) counterweights for airplane wings; and 2) penetrator bullets for the United States military.  The Albany plant did not make or use depleted uranium sinker bars.  I was also involved in, and had responsibility for, the Wilmington, Delaware plant which was part of NL's Nuclear Division.  The Wilmington plant was designed to make transportation casks.  The Wilmington plant did not make or use depleted uranium sinker bars.  Neither plant had any involvement with the NL petroleum services business.  All nuclear waste[] materials from the Albany plant was [sic] disposed of in Barnwell, South Carolina.  I have never before heard of any company known as Gulf Nuclear, Inc. and I am not aware of the Albany or Wilmington plant[s] using any company called Gulf Nuclear, Inc.  I am not aware of the Albany or Wilmington plants disposing of any materials in Odessa, Texas, or Houston, Texas.

(Docket Entry No. 68, Ex. A, ¶ 2).

Tremont has also submitted the declaration of Theodore E. Rahon from the EPA lawsuit.

Rahon states that he was NL nuclear division's radiation safety officer in 1977 and 1978, that he has

---

[73]  Halliburton objects to Vavricka's declaration, arguing that it lacks foundation and calls for a legal conclusion because it "fails to establish anything beyond Mr. Vavricka's limited knowledge regarding two specific plants associated with NL's Nuclear Division," and "fails to establish the actual position and responsibilities held by Mr. Vavricka and the factual basis for his knowledge regarding the disposal of waste materials."  (Docket Entry No. 69 at 8).  In his declaration, Vavricka explains that he was employed by NL, that he transferred to NL's Albany plant, and that he was involved in and had responsibility for the Wilmington plant.  (Docket Entry No. 68, Ex. A, ¶ 2).  This is sufficient to show the basis for Vavricka's knowledge about the two plants where he worked; it is not necessary to describe specific job titles or detail job responsibilities.  The fact that Vavricka only stated his knowledge about two specific plants does not make his declaration inadmissible.  The declaration does not purport to state conclusions about any plants besides those two.  Halliburton also incorporates its earlier objections to the use of the term "petroleum services."  (Docket Entry No. 69 at 8).  That objection is overruled for the same reasons it was overruled in connection with Lynn Williams's testimony.

no recollection of NL's nuclear division having any connection to the Gulf Nuclear Sites in Texas, and that NL's nuclear division used other facilities for its radiation needs and issues.  (*Id.*, Ex. G, ¶¶ 2–3).[74]

Tremont also points out that the list of subsidiaries transferred from NL to NLPS in the 1988 restructuring includes Industrial Reactor Labs.  (Docket Entry No. 71, Ex. E at 1 (Subsidiaries Schedule from the Formation Agreement, listing Industrial Reactor Labs as a subsidiary transferred to NLPS)).  Industrial Reactor Labs was then transferred to New Baroid in the 1990 restructuring. (*See id.*, Ex. F at 3).  The Nuclear Regulatory Commission website details the history of Industrial Reactor Labs and identifies it as a subsidiary of Cambridge Nuclear.  (*See id.*, Ex. G at 1). Halliburton argues that Tremont fails to explain whether the liabilities of Industrial Reactor Labs were assumed by Halliburton through New Baroid, that NL's 1972 annual report states that Industrial Reactor Labs and Cambridge Nuclear "'produce[d] a variety of radiological materials used for diagnostic nuclear medicine,'" and that Baroid was not involved in the business of nuclear medicine.  (Docket Entry No. 73 at 16).  However, the schedules Tremont submitted show that Industrial Reactor Labs, a subsidiary of Cambridge Nuclear, was transferred to Old Baroid and then

---

[74] Halliburton objects to Rahon's declaration as lacking adequate foundation because "Mr. Rahon declares that he only worked within NL's Nuclear Division from 1977 and 1978, a small portion of the relevant time period"; he "provides no factual basis for any personal knowledge he might have regarding NL's Nuclear Division outside this very limited period of time"; he "provides no foundation or factual basis for any personal knowledge he might have about NL Nuclear Division's waste disposal activities or policies"; "[t]here is no evidence that he has dispositive knowledge about NL Nuclear Division's waste disposal activities"; and "there is no foundation for [his] statements allegedly eliminating any association between NL and the Gulf Nuclear Sites . . . ."  (Docket Entry No. 69 at 12–13).  None of these arguments make Rahon's declaration inadmissible.  First, the fact that Rahon only worked at NL's Nuclear Division for two years does not make the information he learned in that period inadmissible.  Second, he does not state any conclusions outside that period.  Third, Rahon states that he was the Radiation Safety Officer at NL's nuclear division; in combination with the statement that he has personal knowledge of the matters in his declaration, this is sufficient to show the basis for his knowledge about the waste disposal activities. Rahon's claim that he has no recollection of any connection between NL's nuclear division and the Gulf Nuclear Sites is limited to his personal knowledge.  Halliburton's objections to Rahon's declaration are overruled.

New Baroid through the restructurings.  Halliburton does not dispute that it is the successor to New Baroid.  Halliburton has not shown a connection between Industrial Reactor Labs or Cambridge Nuclear and the Gulf Nuclear Sites.  Even if these subsidiaries ultimately did not transfer to Halliburton, their use of nuclear materials does not create a fact issue sufficient to defeat summary judgment.[75]

> **j.      EPA Claims Linking NL to the Gulf Nuclear Sites**

The complaint in the EPA lawsuit alleges that "[d]uring the period from 1971 to October 1988, GNI [,defined in the complaint as corporations related to the GNI Group, Inc., which operated the Webster Site,] operations at the Webster Site included the manufacture, storage, reworking, and repair of items containing radioactive materials; the collection, storage, packing, and shipping of radioactive wastes for disposal, calibration of instruments, and preparation of radioactive tracer materials."  (Docket Entry No. 50, Ex. 17, ¶ 29).  The complaint alleges that the defendants "sent radioactive materials, including americium, cesium, radium, cobalt, zinc, plutonium, tritium, scandium, gadolinium, iridium, and/or iodine, to the Webster Site for repair, storage, and/or disposal."  (*Id.*, Ex. 17, ¶ 37).  The complaint further claims that Halliburton and NL sent sealed sources containing radioactive material to the Webster Site for reworking.  (*Id.*, Ex 17, ¶ 38).

Halliburton asserts that cesium, which the EPA claims was sent by NL to the Gulf Nuclear

---

[75]  Halliburton insists that it included evidence in the summary judgment record showing that parts of NL's business operations, other than its petroleum services business, utilized nuclear materials, and again asserts that "Tremont refuses to produce the records associated with its 'other' nuclear activities and [that] it has by no means established that HESI acquired all liabilities associated with these 'other' nuclear activities." (Docket Entry No. 82 at 3–4).  But the EPA has now stipulated that it has no evidence linking NL to the Gulf Nuclear Sites other than through NL's former petroleum services business, and the evidence in the record does not create a fact issue as to whether NL's nuclear operations were involved in the waste generated at the Gulf Nuclear Sites.  Whether NL had nuclear operations separate from its petroleum services business is irrelevant to Tremont's motion, absent evidence that those divisions had any connection to the Gulf Nuclear Sites.  The present record contains no evidence to this effect.

Sites, is used both in cancer treatments and in the oil industry for drilling fluids.  (Docket Entry No.

50 at 5).  Halliburton has submitted a letter from Spohn Hospital to the Texas Department of Health

requesting an amendment to its radioactive material license to include 1.200 mg of cesium 137 in

sealed sources for cancer treatment.[76]  (*See id.*, Ex. 23).  Halliburton has also presented shipping

slips and receiving logs[77] purportedly showing that NL and NL Systems Technology either sent

cesium to Gulf Nuclear or received cesium from Gulf Nuclear.[78]  (*See id.*, Ex. 18 at 1–5).

Halliburton also argues that the EPA has refused to admit that only the historical petroleum

services business of NL is responsible for shipments to the Gulf Nuclear Sites.  (Docket Entry No.

50 at 5).  Halliburton points to the EPA's January 12, 2009 response to an interrogatory served by

NL in the EPA lawsuit, in which the EPA stated:

> Subject to, and without waiving the foregoing general and specific
> objections, the United States responds that, based on the information
> currently available to it, the "Historic Petroleum Services Business

---

[76] Halliburton argues that this document shows that cesium is used in medicine, not just in the petroleum services business.  (Docket Entry No. 62 at 8).  Halliburton argues that NL's nuclear division—including the subsidiaries Cambridge Nuclear and Industrial Reactor Labs—was involved in the radiopharmaceutical medical field.  (*Id.* (citing *id.*, Ex. C, NL's 1972 Annual Report at 12 (listing Cambridge Nuclear and Industrial Reactor Labs as involved in radiological products for nuclear medicine))).  Although Halliburton has presented evidence that cesium is used in medicine and that the operations of some of NL's non-petroleum services divisions involved radiological products for nuclear medicine, it has not presented any evidence showing that the cesium received at the Gulf Nuclear Sites from NL entities derived from NL's nuclear division.  In addition, Tremont has presented evidence that Industrial Reactor Labs, a subsidiary of Cambridge Nuclear, was transferred to NLPS in the 1988 restructuring and then to New Baroid in the 1990 restructuring.  (*See* Docket Entry No. 71, Exs. E, F, G).

This document also shows a request by the hospital to ship cancer treatment materials to Gulf Nuclear.  But, as Tremont points out, there is no evidence that this request was approved or that NL had any relationship with this hospital.

[77]  The receiving logs submitted are illegible in some places.  It is difficult to tell from some of these documents whether cesium was included in the shipments and which entity shipped the material.  (*See* Docket Entry No. 50, Ex. 18 at 7, 9).

[78]  These are the same shipping slips discussed earlier, some of which list the shipping address as the North Belt facility now controlled by Halliburton.

> of NL"[79] are [sic] not the only NL entities that arranged for disposal
> and/or treatment of hazardous substances at the Gulf Nuclear Sites.
> These entities include NL Technology Systems, and upon
> information and belief, NL Industries, Inc., NL Systems Technology,
> NL Baroid, and NL Baroid Technology.

(*Id.*, Ex. 20 at 6).  In response to another interrogatory asking whether the EPA is claiming that any

NL division other than the "Historic Petroleum Services Business of NL" has any connection to the

Gulf Nuclear Sites, the EPA answered "yes," but then elaborated:

> The United States further responds that, depending upon the outcome
> of the ongoing litigation between NL Industries, Inc. and Halliburton
> Energy Services, Inc. regarding, among other matters, the Gulf
> Nuclear Sites, NL Industries, Inc. may be adjudged as having a
> connection to the Gulf Nuclear Sites.  In addition, NL Bariod [sic] is
> listed as one of the "Top 10 Volume Accounts" for GNI for the
> 1987/88 fiscal year.  Furthermore, counsel for the United States
> contends that, regardless of NL Industries, Inc.'s transactions to
> "spin-off" its petroleum services business in the late 1980's, NL
> Industries, Inc. remains liable as alleged in the United States'
> Complaint pursuant to CERCLA Section 107(e), 42 U.S.C. §
> 9607(e).

(*Id.*, Ex. 20 at 7).  Halliburton asserts that the EPA's discovery responses create a fact issue as to

whether NL had any involvement at the Gulf Nuclear Sites that was not attributable to NL's historic

petroleum services business.  (Docket Entry No. 50 at 5).

Tremont responds that the EPA's interrogatory responses do not create a fact issue about

NL's involvement at the Gulf Nuclear Sites.  Tremont argues that the NL entities the EPA lists as

potentially involved in the Gulf Nuclear Sites—NL Technology Systems, NL Industries, Inc., NL

Systems Technology, NL Baroid, and NL Baroid Technology—were all part of NL's historical

---

[79] The record does not show whether "Historic Petroleum Services Business of NL" was a defined term in
NL's interrogatories.  However, "Historic Petroleum Services Business of NL" was defined in NL's First Set
of Requests to Admit.  The defined term included NL McCullough, Basin Surveys, Petrolog, and the drilling
process NL marketed as "Measurement While Drilling."  (Docket Entry No. 73, Ex. 1 at 3).

petroleum services business.  (*See* Docket Entry No. 52 at 8).  Tremont asserts that Halliburton's supplemental Exhibit 18 shows that "NL Technology Systems" or "Systems Tech" was located at the address that is now the truck entrance for Halliburton's North Belt facility.[80] (*Id.*).  Tremont also asserts that Halliburton has admitted that Baroid was part of the petroleum services business that Halliburton received.  (*Id.*).  NL's 1987 annual report states that Baroid was operated by NLPS as part of NL's petroleum services operations.  (*See* Docket Entry No. 41, Ex. 33, NL's 1987 Annual Report at F-18).  Tremont points out that the EPA has not identified any hazardous substance sent from any division of NL other than NL's former petroleum services business.  (Docket Entry No. 52 at 8).

In response, Halliburton points out that the EPA's discovery responses also mentioned NL Industries, Inc. as having a possible connection to the Gulf Nuclear Sites and that NL had many divisions that were not part of its petroleum services operations.  (Docket Entry No. 62 at 9).  But there is no evidence in the record that any division of NL other than its petroleum services business shipped waste to the Gulf Nuclear Sites.  The EPA discovery response is merely a statement "based on the information currently available to" the EPA that NL Industries, Inc. has a connection to the Gulf Nuclear Sites.  Given the absence of any evidence that a division of NL other than its petroleum services business sent waste to the Gulf Nuclear Sites, and given the fact that NL had both petroleum services operations and non-petroleum services operations, the EPA discovery response does not create a fact issue as to NL's connection to the Gulf Nuclear Site outside its petroleum services business.

---

[80]  While Exhibit 18 does show the address of the truck entrance at Halliburton's North Belt facility for "Systems Tech," it is not clear from the exhibit if "Systems Tech" refers to NL Technology Systems or NL Systems Technology, which are listed as separate entities in the EPA's interrogatory response.

Tremont has submitted the affidavit of Patrick M. Murray, a former employee of NL, Old Baroid, and New Baroid who was involved in NL's former petroleum services business. Murray's affidavit explains that many of the entities identified in the EPA's interrogatory response were in fact part of NL's petroleum services business. Murray states:

> [P]art of my responsibility during the time period set forth above included responsibility for the following former NL petroleum services business divisions or subsidiaries: Sperry-Sun, NL Logging Systems, NL McCullough, NL Technology Systems, NL MWD, NL Baroid Technology (sometimes known as NL Tech), Petrolog, Inc. and Basin Surveys, Inc. Each of these divisions or subsidiaries had operational headquarters in the 3000 North Belt facility. With the possible exception of NL McCullough, which was sold to Western Atlas effective December 31, 1987, all of the divisions and subsidiaries mentioned herein were transferred to Old Baroid effective December 31, 1987. Other than NL McCullough, these same divisions and subsidiaries, including Sperry-Sun, NL Logging Systems, NL Technology Systems, NL MWD, NL Baroid Technology, Petrolog, Inc. and Basin Surveys, Inc., were subsequently transferred to New Baroid Corporation on the effective date of the 1990 Plan of Restructuring of Old Baroid.

(Docket Entry No. 65, Ex. C, ¶ 5). Murray states that to the best of his knowledge, "NL McCullough, Sperry-Sun, NL Logging Systems, NL Technology Systems, NL MWD, NL Baroid Technology, Petrolog, Inc. and Basin Surveys, Inc., were all part of the historical petroleum services business of NL, and had no non-petroleum services functions." (*Id.*, Ex. C, ¶ 6).

Tremont also submitted an excerpt from the deposition of Gregory Fife, the EPA's on-scene coordinator for one of the Gulf Nuclear Sites and the person in charge of cleanup and removal of waste. Halliburton deposed Fife in the EPA lawsuit.[81] Fife testified that he did not know of any

---

[81] Halliburton objects to Fife's testimony, arguing that it "fails to establish: (1) the identity of Mr. Fife; (2) that he has relevant knowledge; (3) the factual basis for his testimony; or (4) that he knows anything about NL or its business practices." (Docket Entry No. 69 at 7 (footnote omitted)). As with its objection to Williams's testimony, Halliburton concedes that it "is aware of Mr. Fife's identity and his alleged connections with the Gulf Nuclear Sites." (*Id.* at 7 n.6). Tremont states in its supplemental filing that Fife was the EPA's

non-petroleum business of NL involved with the Webster site:

> Q.     Okay.  In connection with -- let's take your knowledge first.
> Are you aware of there being any connection to the Gulf
> Nuclear Webster site from any business of NL other than
> through its former petroleum service business?
>
>           Mr. Godwin:  Objection.  Form.
>
> A.     I do not know -- know that information.
>
> Q.     (By Mr. Herz)  Okay.  Is it fair to say that you have no
> knowledge of any medical business of NL having any
> connection to the Gulf Nuclear sites?
>
> A.     No, no.  That's -- that's correct.
>
> Q.     You don't have knowledge?
>
> A.     I do not have knowledge.

(Docket Entry No. 67, Ex. B, Deposition of Gregory Fife at 287:4–16).  Halliburton has not

identified contrary evidence.[82]

    The EPA has stipulated that its only claim against NL for the Gulf Nuclear Sites is through

_____

on-scene coordinator for a Gulf Nuclear Site and the person in charge of all cleanup and removal of wastes.
(Docket Entry No. 67 at 2).  Halliburton has not contested this description.  Tremont has established an
adequate foundation for Fife's testimony.  Halliburton also objects to the use of the term "petroleum services"
in the question posed to Fife in his deposition.  (Docket Entry No. 69 at 8).  This objection is overruled for
the reason the same objection was overruled in connection with Williams's testimony.

[82] Halliburton asserts that Fife's testimony does not eliminate a nexus between NL's non-petroleum services
businesses and the Gulf Nuclear Sites.  Halliburton argues that "an equally plausible inference from the
offered testimony is that . . . Mr. Fife [has] no knowledge of NL's business at all—whether medical,
industrial, nuclear, or oil and gas."  (Docket Entry No. 69 at 14).  Halliburton also points out that Fife was
only asked about a connection between NL and the Webster Site.  (*Id.* at 15).  Fife's testimony alone would
not establish the absence of a connection between NL's non-petroleum services business and the Gulf Nuclear
Sites.  But the testimony does show that Fife, a government representative involved in the cleanup of the Gulf
Nuclear Sites, had no knowledge of such a connection.
    Halliburton also argues that Fife's testimony is contradicted by Acree's testimony that NL's
radiography operations, which were "'not in the oil service field[,]' were connected to the Gulf Nuclear
Sites."  (*Id.* at 15).  However, as discussed earlier, Acree's testimony does not create a fact issue about
whether NL's connection to the Gulf Nuclear Sites was only through its petroleum services business.

NL's former petroleum services business.  The stipulation provides:

> 1.    The United States stipulates and agrees that it is presently contending that the subsidiaries, divisions, and business units collectively referred to and known as the "Historic Petroleum Services Business of NL" (as defined in NL's First Set of Requests to Admit to Plaintiff dated October 13, 2008[83] and also including NL Technology Systems, NL Systems Technology, NL Baroid, and NL Baroid Technology) are the only subsidiaries, divisions, and business units of NL that generated any wastes on behalf of NL that were shipped to the Gulf Nuclear Sites . . . .

> 2.    The United States stipulates and agrees that it is presently unaware of any evidence containing any nexus between any subsidiaries, divisions, and business units of NL, other than the Historical Petroleum Services Business of NL and any of the Gulf Nuclear Sites.

> 3.    The United States stipulates and agrees that the United States' only present contention of liability against NL with respect to the Gulf Nuclear Sites is the alleged use by the Historic Petroleum Services Business of NL.

> 4.    The United States stipulates and agrees that at the present time, it is only contending with respect to NL that the Historic Petroleum Services Business of NL generated radioactive wastes that were deposited at the Gulf Nuclear Sites.

(Docket Entry No. 71, Ex. A at 1–2).  The stipulation is subject to the receipt of additional discovery showing contrary information.  (*Id.*, Ex. A at 2–3).  The stipulation confirms that the EPA is seeking to hold NL liable only for the operation of NL's former petroleum services business.[84]

---

[83]    As noted above, "Historic Petroleum Services Business of NL" was defined in NL's First Set of Requests to Admit to Plaintiff to include NL McCullough, Basin Surveys, Petrolog, and the drilling process marketed by NL as "Measurement While Drilling."  (Docket Entry No. 73, Ex. 1 at 3).

[84]    Halliburton argues that the stipulation is inconsistent with the EPA's denial of certain requests for admission.  These requested the EPA to admit: (1) that the Historic Petroleum Services Business of NL was the only part of NL that generated any wastes on behalf of NL that were shipped to the Gulf Nuclear Sites; and (2) that the EPA's only contention of liability of NL for the Gulf Nuclear Sites was the alleged use by the Historic Petroleum Services Business of NL.  (Docket Entry No. 73 at 3, 7).  Halliburton objects to the stipulation as untimely, not binding on the parties to this case, and not a binding stipulation of fact or position in the EPA lawsuit.  (*Id.* at 2, 7).  Halliburton also objects because NL and the EPA have agreed not to rely

### k. Affidavits and Declarations of Former NL Employees Stating that NL's Connection to the Gulf Nuclear Sites Was Through Its Petroleum Services Business

The affidavit of Patrick M. Murray supports the inference that NL's connection to the Gulf Nuclear Sites was only through its petroleum services business. Murray served as Acting Controller of NL beginning in November 1987, Controller of NL beginning in February 1988, Vice President of Old Baroid after the 1988 restructuring, Vice President of New Baroid beginning in 1990, and a senior executive after Dresser and then Halliburton Company acquired NL's former petroleum services business. (Docket Entry No. 65, Ex. C, ¶ 2). Beginning in mid-1988, Murray was also President of Sperry-Sun, Inc., "one of NL's key petroleum services subsidiaries involved in directional drilling products and services for the oil and gas industry." (*Id.*, Ex. C, ¶ 3).

Murray states in his affidavit that "[i]n 1987, most research and development that was being done by NL for the petroleum services industry was consolidated into Sperry-Sun, and became part

---

on the stipulation to preclude arguments in the EPA lawsuit and because the United States does not commit to a position in the stipulation. (*Id.* at 4). Finally, Halliburton objects because the definition of "Historic Petroleum Services Business of NL" used for the stipulation is just a list of companies and because "[t]he issue in this case is not whether these companies were formerly associated with NL's former 'petroleum services' business, but whether liabilities associated with any of these companies were contractually assumed by HESI." (*Id.* at 5).

The stipulation is not untimely filed in this case because it only became available recently. Halliburton's remaining objections go to the weight to be accorded to the stipulation rather than to its admissibility. Halliburton's arguments that the definition of "Historic Petroleum Services Business" used for the stipulation is not the same as that used in the restructuring documents and that the stipulation may not fully bind the EPA in the EPA lawsuit do not make the stipulation irrelevant to Tremont's motion for summary judgment. Halliburton has attempted to argue that the EPA's claims about the Gulf Nuclear Sites are not limited to NL's former petroleum services business. The fact that the EPA has stipulated that it only seeks to recover from entities that have been shown only to be involved in NL's former petroleum services business is relevant to rebut Halliburton's argument that the EPA seeks recovery with respect to NL's non-petroleum services businesses. The stipulation supports the argument that the EPA's claims are limited to NL's petroleum services business based on the evidence the EPA has collected, even if the EPA ultimately seeks not to be bound by the stipulation based on later-discovered evidence. The stipulation shows that the EPA's current evidence does not show a connection between the Gulf Nuclear Sites and NL's non-petroleum services businesses. Halliburton's objections are overruled.

of [his] responsibility." (*Id.*, Ex. C, ¶ 3). Murray states that "NL's petroleum services research and development type entities included NL Logging Systems, NL Technology Systems, NL MWD, Petrolog, Inc. and Basin Surveys, Inc."[85] (*Id.*, Ex. C, ¶ 3). According to Murray, "[t]hese divisions and subsidiaries remained part of the Sperry-Sun subsidiary through the 1988 Restructuring of NL, the 1990 Restructuring of Old Baroid, the subsequent acquisition of NL's historic petroleum services business by Dresser, and thereafter, by Halliburton." (*Id.*, Ex. C, ¶ 3). Murray further states that while he was not directly responsible for its operations, he was "aware of a research division called NL Baroid Technology (sometimes known as NL Tech)," and that "NL Baroid Technology was a research arm of Baroid Drilling Fluids, Inc., and was solely a petroleum services operation." (*Id.*, Ex. C, ¶ 3). Because Murray links the NL divisions that have been shown to be connected to the Gulf Nuclear Sites to NL's petroleum services business, his affidavit supports the inference that NL's connection to the Gulf Nuclear Sites was through its petroleum services business.

Tremont has also submitted several declarations of former NL employees filed in the EPA lawsuit. These employees confirm that NL's only connection to the Gulf Nuclear Sites was through its petroleum services business.[86] Ronnie Barrett worked for NL's petroleum services business from 1978 through 1987, and then for Western Atlas until he was laid off in 1989. (Docket Entry No. 68, Ex. D, ¶ 2). Barrett states in his declaration that he is not aware of any NL business, other than the

---

[85] Mark Morrison's declaration states the same. (*See* Docket Entry No. 68, Ex. B, ¶ 3). Morrison also states that the petroleum services research area was also referred to as "NL Tech." (*Id.*, Ex. B, ¶ 3).

[86] Tremont also asserts that both it and NL produced a Rule 30(b)(6) witness who answered Halliburton's questions about whether the Gulf Nuclear Site liabilities arise from NL's petroleum services business. Tremont states that these witnesses explained in detail the shipping tickets/waste manifests and how they derived from NL's petroleum services business, as well as why the McCullough Division produced nuclear wastes. (Docket Entry No. 41 at 45). Tremont has not filed excerpts from the Tremont and NL Rule 30(b)(6) witness depositions.

former petroleum services business, with any connection to the Gulf Nuclear Sites.  (*Id.*, Ex. D, ¶ 4).[87]  Similarly, Steven R. McCollum, who states that he was "employed by the petroleum services business of NL," worked for NL McCullough from December 1973 until approximately 1980, was hired back a year later, and worked until NL McCullough was purchased by Western Atlas, also states in his declaration that he is not aware of any NL business, other than its petroleum services business, that had any connection to the Gulf Nuclear Sites.[88]  (*Id.*, Ex. E, ¶¶ 2, 4).[89]  The declarations of Jon R. Bailey, who was employed by NL McCullough from 1981 through 1987, and Calvin P. Hopcraft, who worked in NL's former McCullough oil services business from 1951 until 1980 and then worked for Gulf Nuclear from 1981 until 1988 at the Webster facility, are similar.  (*See id.*, Ex. F, ¶¶ 2, 4;[90] Docket Entry No. 71, Ex. B, ¶¶ 2, 14).[91]  In addition, Richard Arsenault,

---

[87]  Halliburton objects to Barrett's declaration, arguing that it lacks adequate foundation and calls for a legal conclusion because it "provides no basis for any knowledge Mr. Barrett might have outside the alleged 'petroleum services' business group," and "provides no foundation for his personal knowledge to support the statement that 'I am not aware of any NL business, other than the former petroleum service business, having any connection to the Gulf Nuclear Sites." (Docket Entry No. 69 at 11).  However, Barrett's declaration notes that he had some familiarity with the relationship between NL and Gulf Nuclear when he worked at NL McCullough.  (Docket Entry No. 68, Ex. D, ¶ 2).  His statement that he is not aware of any NL business, other than its former petroleum services business, that had any connection to the Gulf Nuclear Sites is limited to his personal knowledge.  There is an adequate foundation for considering the declaration.  Halliburton also objects to the use of the term "petroleum services" in the declaration because that term has a defined legal meaning under the plans of restructuring, and argues that "Tremont fails to establish that Mr[.] Barrett has any knowledge about the Plans of Restructuring at all."  (Docket Entry No. 69 at 11).  Barrett's declaration reflects his understanding of NL's connection to the Gulf Nuclear Sites and does not contain a legal conclusion about whether that connection involved "petroleum services" operations under the relevant contracts.  Halliburton's objections to Barrett's declaration are overruled.

[88]  Halliburton objects to McCollum's declaration for the same reasons it objected to Barrett's declaration.  The objections are overruled for the same reasons the objections to Barrett's declaration were overruled.

[89]  Two paragraphs are numbered "2" in McCollum's declaration.  They are referred to as sequentially numbered in this opinion.

[90]  Halliburton objects to Bailey's declaration, as lacking adequate foundation and calling for a legal conclusion.  (Docket Entry No. 69 at 12).  Bailey states in his declaration that he had some familiarity with the relationship between NL and Gulf Nuclear when he worked at NL McCullough.  (Docket Entry No. 68, Ex. F, ¶ 2).  His statement that he is not aware of any NL business, other than its former petroleum services

Case 4:08-cv-01063   Document 92   Filed in TXSD on 03/11/10   Page 103 of 189

a former employee of NL MWD, confirms that NL MWD was part of NL's former petroleum services business and that this division was taken over by Halliburton. (*See* Docket Entry No. 71, Ex. C, ¶¶ 2, 3, 10). Arsenault also states that he first worked for NL MWD, which was then consolidated into Sperry-Sun, Inc., which was taken over by Halliburton. (*See id.*, Ex. C, ¶¶ 4, 10). Arsenault worked at the North Belt facility and continued to work at that same location for Halliburton. (*Id.*, Ex. C, ¶ 10). Arsenault states that the operations at the North Belt facility were only petroleum services operations.[92] (*See id.*, Ex. C, ¶ 10).

---

business, that had any connection to the Gulf Nuclear Sites, is limited to his personal knowledge. Bailey does not state that his knowledge is dispositive of any legal or factual issue. Halliburton also objects to the use of the term "petroleum services" in the declaration because that term has a defined legal meaning under the plans of restructuring. (Docket Entry No. 69 at 12). Bailey's declaration reflects his understanding of NL's connection to the Gulf Nuclear Sites and does not contain a legal conclusion about whether that connection involved "petroleum services" operations under the relevant contracts. Halliburton's objections to Bailey's declaration are overruled.

[91] Halliburton objects to Hopcraft's declaration, asserting that it is untimely, that Halliburton has been unable to cross-examine him, that he has not been deposed in the EPA lawsuit, and that the declaration lacks foundation and calls for a legal conclusion. (Docket Entry No. 73 at 8–9). Halliburton also objects to the use of the term "petroleum services business" because it is a defined term in certain legal documents with which Hopcraft lacks familiarity. (*Id.* at 9). Finally, Halliburton argues that Hopcraft is not familiar with NL's operations outside its petroleum services business and therefore cannot know whether those operations had connections to the Gulf Nuclear Sites. (*See id.* at 10). This court considers this supplemental declaration because it was obtained in the EPA lawsuit after Tremont filed its motion in this case. Halliburton has the same counsel in this lawsuit and the EPA lawsuit. Hopcraft's declaration establishes that he has worked both for the McCullough Division and Gulf Nuclear, which gave him a foundation to state his understanding of NL's involvement in the Gulf Nuclear Sites. In addition, Hopcraft's declaration reflects his understanding of NL's business operations and does not contain legal conclusions about whether those operations involved "petroleum services" operations under the restructuring agreements. Halliburton's objections to Hopcraft's declaration are overruled.

[92] Halliburton objects to Arsenault's declaration as untimely and complains that it has been unable to cross-examine him. (Docket Entry No. 73 at 11). Halliburton also objects to Arsenault's declaration on the bases that it lacks adequate foundation and calls for a legal conclusion, arguing that the declaration fails to establish the factual basis for Arsenault's knowledge of waste disposal or the transfer of liabilities through the corporate restructurings. (*Id.*). Halliburton argues that it is unclear what is meant by Arsenault's statement that he was employed by the MWD portion of the petroleum services business of NL. (*Id.* at 12). Finally, Halliburton objects to the use of the term "petroleum services business" and to the statement that only petroleum services business was operating at the North Belt facility. (*Id.*).

Halliburton's timeliness objection is overruled for the same reasons the same objection was overruled in connection with Hopcraft's declaration. As Tremont points out, Halliburton has had access to this witness

### B.      Halliburton's Request for a Continuance

### 1.      Background and the Parties' Arguments

Halliburton has moved for a continuance to respond to Tremont's motion for partial summary judgment. (Docket Entry No. 11; 2005 Case, Docket Entry No. 270). Halliburton asserts that before Tremont filed its counterclaim in the 2005 Case and its claims in the 2008 Case, this litigation involved only the Malvern Site. (Docket Entry No. 11 at 2). As a result, Halliburton argues that it has not had the opportunity to conduct discovery into the Gulf Nuclear Site issues.

---

because he worked for Halliburton until March 2009. (*See* Docket Entry No. 71, Ex. C, ¶ 10). Although Arsenault's employment with Halliburton ended in March 2009, six months before Arsenault executed his declaration, Halliburton is also represented by the same counsel in the EPA lawsuit and has not explained why it could not obtain an opposing affidavit in that case. Halliburton's objection to the lack of adequate foundation is also overruled. Arsenault's delcaration adequately explains his positions in NL's companies and his responsibility for radioactive material. (*See* Docket Entry No. 71, Ex. C, ¶¶ 2–6). Arsenault's declaration does not state that he has knowledge of the corporate restructurings. But the declaration does not purport to explain the transfer of liabilities through the restructurings. In addition, Arsenault's declaration reflects his understanding of NL's business operations and does not contain legal conclusions about whether those operations involved "petroleum services" operations under the restructuring agreements.

In objecting to Arsenault's statement that NL's petroleum services business was the only business that operated at the North Belt facility, Halliburton relies on evidence that it asserts shows that Baroid, NL, and Tremont all used that address. But the evidence Halliburton presents does not conflict with Arsenault's statement. Halliburton asks this court take judicial notice that 300 North Beltway is the same location as 3000 North Sam Houston Parkway East. Halliburton has not presented evidence that this fact is "one not subject to reasonable dispute," *see* FED. R. EVID. 201(b), having only presented a distribution list and a letter from Tremont Corporation using the 3000 North Sam Houston Parkway East address. However, a document previously submitted by Tremont shows that an internet map tool suggested "3000 N Sam Houston Pkwy E" as an alternative to the address searched for, "3000 N Belt." (*See* Docket Entry No. 52, Ex. A at 2). (Halliburton's reference to "300 North Beltway," (*see* Docket Entry No. 73 at 13 n.5), rather than "3000 North Beltway," is presumably a typographical error.) In any event, even assuming that the two addresses are the same, Halliburton has not presented evidence that conflicts with Arsenault's declaration. The distribution list from July 1990 that lists both Baroid and NL as using the North Belt address aligns with the fact that Baroid assumed NL's petroleum services business in the 1988 restructuring. Similarly, the fact that Tremont Corporation used that address in a letter dated December 13, 1990, aligns with the fact that the 1990 Plan had just become effective, in which Old Baroid spun off the Petroleum Services Business and changed its name to Tremont Corporation. In fact, the letter that Halliburton submits discusses Baroid Corporation's name change to Tremont Corporation. Given the complex corporate transactions involved in the 1988 and 1990 restructurings, and the closeness of the companies involved in those transactions, it is not surprising that various entities listed the North Belt facility as their address. Arsenault's statement that only NL's former petroleum services business used that address, to the best of his knowledge, does not conflict with the documents submitted by Halliburton. Halliburton's objections to Arsenault's declaration are overruled.

(*Id.*).  Halliburton has filed the affidavit of James W. Ferguson, Vice-President and Deputy General Counsel of HESI and Vice President of DII.  Ferguson asserts that Halliburton has not conducted any discovery into claims other than those related to the Malvern Site.  (*See id.*, Ex. A, ¶ 4). Ferguson explains that because of the complex corporate transactions, "[i]n order to assess the existence or non-existence of an indemnity obligation, a search must be made not only of HESI's corporate documents, but also of the corporate documents of Dresser, New Baroid, and NLPS." (*Id.*, Ex. A, ¶ 8).  Ferguson asserts that Halliburton needs to conduct formal discovery of Tremont and other parties to respond fully to Tremont's motion.  (*Id.*, Ex. A, ¶ 9).  Ferguson attaches the letter in which NL agreed to indemnify New Baroid for liabilities from the lawsuit styled *Western Atlas v. NL.*  (*Id.*, Ex. A-1 at 2).  Ferguson argues that because NL sold the McCullough Division to Western Atlas in 1987, the fact that NL agreed to indemnify New Baroid with respect to the Western Atlas lawsuit "indicates that NL may be responsible for indemnifying HESI (as the successor to New Baroid) for all or part of the claims now made by Tremont."  (Docket Entry No. 11, Ex. A, ¶ 10). Ferguson asserts that without discovery, Halliburton cannot provide evidence about the chain of indemnity obligations or about whether the McCullough Division was solely part of NL's petroleum services business.  (*Id.*, Ex. A, ¶ 11).[93]  Halliburton filed a 44-page substantive response and 18 exhibits on the same date it filed its motion for a continuance.  (*See* 2005 Case, Docket Entry No.

---

[93] Halliburton also asserts that Tremont's counterclaim in the 2005 Case seeks to hold Halliburton responsible for "'additional sites and claims that relate to NL's historical petroleum services business.'"  (Docket Entry No. 11 at 3).  Halliburton argues that "[w]hile the *Western Atlas v. NL* lawsuit is not specifically mentioned in Tremont's counterclaim, it is specifically mentioned in Tremont's letter to HESI demanding indemnification for certain properties and claims." (*Id.* (citing *id.*, Ex. A-1 at 2)).  The letter Halliburton cites, however, is the letter from Baroid to NL stating that NL is indemnifying Baroid for the *Western Atlas* lawsuit. In any event, the indemnity obligation for the *Western Atlas* lawsuit is not encompassed by Tremont's motion for partial summary judgment. If Tremont seeks indemnity for the *Western Atlas* lawsuit, that fact would not support Halliburton's request for a continuance with respect to Tremont's current motion.

274).

Tremont responds that Halliburton has not shown what additional discovery it needs or how the additional discovery will create a genuine issue of material fact.  (2005 Case, Docket Entry No. 279 at 19).  Tremont argues that the people involved in the restructurings were either deposed or examined under oath in the arbitration and that Halliburton has not identified anyone who needs to be deposed here because that person would add material information.  (*Id.*).  Tremont asserts that Halliburton has not identified individuals from whom it was unable to obtain declarations or affidavits.  (*Id.*).  Tremont argues that Halliburton's focus on NL's indemnification of New Baroid for the *Western Atlas* lawsuit is misplaced because Tremont's motion only seeks a declaration with regard to the Gulf Nuclear Sites and the position taken in that one case does not change the language in the 1990 Plan or make it ambiguous.  (*Id.* at 19 n.3).  Tremont also argues that Halliburton has not been diligent in seeking discovery, noting that at the time of Tremont's reply, Halliburton had not sought discovery of any kind.  (*Id.* at 20).

In its surreply to Tremont's motion for partial summary judgment, Halliburton states that it has served NL and Tremont with written discovery about the claims based on the additional sites and has noticed depositions of Tremont's corporate representatives.  (2005 Case, Docket Entry No. 300-1 at 2).  Halliburton asserts that in the depositions, it will seek to discover information regarding the Gulf Nuclear Sites and two lawsuits in which Tremont seeks to recover over $27 million from Halliburton.  (*Id.*).  Halliburton notes that the parties had agreed to postpone the depositions pending the exchange of documents and initial disclosures.  (*Id.*).  Halliburton argues that relevant discovery was not obtained in the arbitration because the arbitrators allowed a limited number of depositions and the testimony was limited to the Malvern Site.  (*Id.* at 3).  Halliburton asserts that besides

106

deposing Tremont's corporate representatives, it needs to depose NL's former Vice-President and General Counsel, David Garten, and the NL representatives with whom Garten worked, to understand why NL agreed to indemnify New Baroid in the past for matters it now claims to be part of NL's petroleum services business. (*Id.*). Halliburton also asserts that the parties' conduct after the execution of the 1990 Plan is relevant to understanding what the parties intended. (*Id.*).

Whether liabilities associated with the Gulf Nuclear Sites arise from NL's former petroleum services business determines whether issue preclusion applies and how to interpret the relevant contracts. If NL's liabilities associated with the Gulf Nuclear Sites did not arise from its former petroleum services business, neither issue preclusion nor contract interpretation would support granting Tremont's motion for partial summary judgment. At the hearing on Tremont's motion for partial summary judgment, this court allowed further discovery on this issue. The parties told this court that 45 days would be enough time to complete the necessary discovery into whether liabilities associated with the Gulf Nuclear Sites arose from NL's former petroleum services business. Halliburton later filed a motion to extend the deadline for this discovery. (Docket Entry No. 38). In that motion, Halliburton stated that each party had deposed the opposing party's corporate representatives, and that Tremont had produced the "NL Index," which listed 21,108 boxes of Baroid's documents that were delivered to NL on or about July 9, 1997.[94] (*Id.* at 2). This court

---

[94] A July 9, 1997 letter agreement between Dresser, Baroid, and NL indicates that Dresser would return to NL on August 30, 1997 "all of the remaining files, documents, records and materials of NL, in Dresser's possession, custody and/or control," and lists 21,108 boxes attributable to NL. (Docket Entry No. 38, Ex. A at 1). With respect to certain categories, including Atlas Bradford, Baroid, Corporate, Shaffer, and Sperry-Sun, the letter agreement indicates that only a partial inventory would be shipped back to NL, noting that with respect to those categories, the shipment would include "[a]ll Corporate files as identified as either belongs to NL Industries, Inc.'s or consisting of pre-December 22, 1988 (the 'Spin-Off Date'.)." (*Id.*, Ex. A at 1). Notably, with respect to the category "McCullough," the letter agreement indicates that the entire inventory of boxes was being shipped back to NL. (*Id.*, Ex. A at 1). The letter agreement also states that Dresser would retain 648 boxes, containing the remaining pre-Spin-Off Date records, and that it would provide NL with a database describing the files in the retained boxes. (*Id.*, Ex. A at 2). Tremont produced the NL Index—listing

granted the extension and set a hearing to discuss discovery issues and to set a final deadline for

completing discovery into whether NL's liabilities associated with the Gulf Nuclear Sites stem from

its former petroleum services business.  (Docket Entry No. 39).

In a subsequent response to the motion to extend, Tremont states that it diligently searched

for documents relating to the Gulf Nuclear Sites and has produced them to Halliburton.  (Docket

Entry No. 41 at 2–5).  Tremont points out that when NL sold the McCullough Division to Western

Atlas, operative waste records and customer documents were provided to Western Atlas, which was

then jointly owned by Litton Industries and Dresser, a Halliburton predecessor.  (*Id.* at 2–4).[95]

Tremont argues that it is not surprising that neither Tremont nor NL have been able to find shipping

records for NL McCullough, because those records were transferred to Western Atlas in 1988.  (*Id.*

at 4).  Tremont states that it asked Western Atlas to produce any documents it had connecting the

McCullough Division to the Gulf Nuclear Sites, and that Tremont produced all such documents to

Halliburton.  (*Id.* at 4).  Tremont also asked the Gulf Nuclear Sites PRP Group to produce

transactional documents relating to NL; Tremont produced the documents it received to Halliburton.

(*Id.*).  Tremont also sought discovery from the EPA of materials or information identifying any

nexus between any business of NL, other than the McCullough Division, and the Gulf Nuclear Sites.

(*Id.* at 5).  As of the date of its response, Tremont had not yet received a response from the EPA.

the documents Dresser returned to NL under this agreement—to Halliburton in this case.  (*See* Docket Entry No. 41 at 2).  Halliburton was unable to locate an index associated with the 648 boxes retained by Dresser, but ultimately produced a much larger index that it believed also contained descriptions of those 648 boxes.

[95]  Tremont cites a *New York Times* article stating that "Litton Industries, Beverly Hills, Calif., a maker of business machines and electronic components, said Western Atlas International, a company it owns jointly with Dresser Industries, had completed acquisition of NL Industries's McCullough division, a provider of wireline services," (Docket Entry No. 41, Ex. 2); a Baker Atlas history, stating that Litton Industries and Dresser formed Western Atlas as a joint venture and that acquisition of NL McCullough allowed the company to provide pipe recovery services, (*id.*, Ex. 3); and an excerpt from the Western Atlas Agreement stating that NL transferred lists, records, and files relating to the McCullough Division to Western Atlas, (*id.*, Ex. 4).

(Docket Entry No. 41 at 5).  Tremont argues that a further search of the 21,108 boxes in NL's possession would be futile because Western Atlas, which had possession of the waste records and customer documents, has already produced the documents involving the McCullough Division and the Gulf Nuclear Sites.  (*Id.*).  Tremont also asserts that it made a good-faith effort to review the 21,108 boxes, and that it has produced nearly 5,000 pages of documents it believes to be responsive.  (*Id.* at 12).

At the discovery hearing held on December 12, 2008, counsel for Tremont stated that it had the discovery it needed to supplement the record on the Gulf Nuclear Sites.  Halliburton's counsel asked for a few additional weeks to go through additional documents recently produced.  Halliburton's counsel stated that reviewing those additional boxes was all Halliburton needed to respond fully to the motion for partial summary judgment, subject to finding something unanticipated.  This court granted Halliburton the additional time to review the boxes and to supplement the summary judgment record.

In its supplemental filing, Halliburton alleges additional discovery deficiencies.  Halliburton asked NL to produce records related to Cambridge Nuclear and NL's nuclear medicine products and services, but NL only produced certificates of incorporation for Cambridge Nuclear Corporation, Cambridge Leasing Corporation, and Cambridge Nuclear Medicine Corporation.  (Docket Entry No. 50 at 3).  NL produced records Halliburton specifically requested from the NL Index of documents that Dresser purportedly returned to NL in 1997, but Halliburton asserts that the bulk of NL's documents relating to its nuclear division would not have been provided to Dresser in the first place.  (*Id.* at 4).  Halliburton notes that it had asked for the production of particular boxes of documents, but NL produced only a fraction of what was requested and completed its production only three days

before Halliburton's supplemental filing was due.  (*Id.* at 4 n.2).  Halliburton asserts that the documents produced contain thousands of pages that were not in searchable format.  (*Id.*).

In its reply to Halliburton's supplemental response, Tremont argues that it has given Halliburton all documents that remotely relate to the Gulf Nuclear Sites and has repeatedly responded to Halliburton's requests for additional documents even when those requests included documents having nothing to do with the Gulf Nuclear Sites.  (Docket Entry No. 52 at 18–20).  Tremont has submitted letters documenting its offers to produce documents and its subsequent productions.  (*See id.*, Exs. Q–W).  With respect to Cambridge Nuclear, Tremont has submitted the affidavit of Joan Lewis, a paralegal for NL.  Lewis states that she copied the entire file on Cambridge Nuclear, as requested by Halliburton's attorney.  (*See id.*, Ex. X, ¶ 3).[96]  Tremont does not specifically respond to Halliburton's contentions that the only documents produced were those on the NL Index and that documents related to the non-petroleum services divisions of NL would not be encompassed in that Index.

In its surreply, Halliburton asserts:

> [E]ven assuming *arguendo* that Tremont has produced every single "nuclear related" document on the NL Index, it has not produced any "nuclear related" documents that are not listed on the NL Index. Tremont alleges that all documents related to its "petroleum services business" were transferred to Dresser, and then to Halliburton. Tremont has not and cannot represent to this Court that all documents related to its "non-petroleum services business" were transferred to

---

[96] Halliburton objects to Lewis's affidavit as inaccurate.  (Docket Entry No. 62 at 3).  Halliburton asserts that Lewis states that NL produced all the documents Halliburton asked for relating to Cambridge Nuclear, but that on March 5, 2009, NL produced additional documents specifically relating to Cambridge Nuclear.  (*Id.*). Halliburton submits the transmittal letter and the copy of the CD associated with the March 5 production. (*Id.*, Ex. B).  It is not possible on the present record to tell whether this production contained documents relating to Cambridge Nuclear.  But even assuming that this production included documents relating to Cambridge Nuclear, that would not show that Lewis's affidavit was inaccurate when made.  Halliburton's objection to Exhibit X is overruled.

110

Dresser.  Likewise, Tremont has not and cannot claim that it has produced or made available all documents related to its nuclear division.  In fact, Tremont has only produced documents specifically referenced in the NL Index (i.e., its "petroleum services" related documents).  Because Tremont has failed to produce the very documents that would establish a connection between NL's non-petroleum services related activities and the Sites, Halliburton's request for discovery is proper and Tremont's request for summary judgment is, at best, premature.

(Docket Entry No. 62 at 3 n.2).

### 2.    Analysis of the Motion for Continuance

Rule 56(f) provides:

If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

FED. R. CIV. P. 56(f).  Rule 56(f) authorizes a district court to order a continuance to permit additional discovery if the nonmovant shows that it "'cannot for reasons stated present by affidavit facts necessary to justify the party's opposition.'"  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 162 (5th Cir. 2006) (quoting *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992)).  In asking for additional time for discovery under Rule 56(f), the nonmoving party must show why additional discovery is necessary and how that additional discovery will defeat the summary judgment motion by creating a genuine dispute as to a material fact.  *Id.* (citing *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 605 (5th Cir.2001)).  The nonmoving party "may not 'simply rely on vague assertions that additional discovery will produce needed, but unspecified

111

facts.'" *Id.* (citing *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 n.5 (5th Cir. 2002)). "'If it appears that further discovery will not produce evidence creating a genuine issue of material fact, the district court may, in the exercise of its discretion, grant summary judgment.'" *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 305 (5th Cir. 2004) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993)). "[T]he party opposing summary judgment 'must show that the additional discovery will be more than a mere 'fishing expedition.''" *Addison v. Allstate Ins. Co.*, 97 F. Supp. 2d 771, 774 (S.D. Miss. 2000) (quoting *Christmon v. Allstate Ins. Co.*, 82 F. Supp. 2d 612, 614 (S.D. Miss. 2000)); *see also Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 907 (5th Cir. 1992) ("Because [R]ule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative,' the district court's refusal to grant Robbins's request for additional discovery was not an abuse of discretion." (internal citation and quotation marks omitted)); *Paul Kadair, Inc. v. Sony Corp. of Am.*, 694 F.2d 1017, 1029 (5th Cir. 1983) ("'The intent of Rule 56(f) of the Federal Rules of Civil Procedure is not to open the discovery net to allow a fishing expedition.'" (quoting district court's opinion)).

This court effectively granted Halliburton's motion for continuance in part in granting time to conduct discovery into whether the Gulf Nuclear Site liabilities arise from NL's former petroleum services business. After that discovery, at the hearing held on December 12, 2008, Halliburton's counsel specifically stated that an additional few weeks to review the documents produced from the NL Index would allow a full response to Tremont's motion, barring the unanticipated. Without identifying anything learned in that discovery as "unanticipated," Halliburton asserts that it needs documents related to NL's nuclear division that were not on the NL Index. Halliburton argues that

documents related to the nuclear division would never have been on the Index because they do not relate to NL's former petroleum services business and therefore were never transferred to Dresser. But at the time of the hearing on the discovery issues, Halliburton and its counsel knew of the 1997 letter discussing the documents returned by Dresser to NL and the associated NL Index.  Yet Halliburton said nothing about needing documents beyond those on the NL Index.  Instead, counsel stated that Halliburton only needed some additional time to review the documents Tremont had produced from that Index.

Even beyond Halliburton's clear statements that time to review the documents on the NL Index was enough for its discovery needs, Halliburton still has not shown that an additional continuance is necessary before this court rules on Tremont's motion for partial summary judgment. Halliburton has had ample opportunity to conduct relevant discovery.  The record is large. Halliburton has not identified what additional discovery it needs to create a genuine factual dispute. The argument that additional discovery into NL's nuclear division will show that it had connections to the Gulf Nuclear Sites is purely speculative.  The argument is contradicted by ample evidence showing that the nuclear division had no connection with the Gulf Nuclear Sites.  The belated request for additional documents is properly characterized as a "fishing expedition."

Halliburton's request for a further continuance, beyond that already granted, is denied.

**C.    There Is No Dispute as to Any Fact Material to Determining Whether NL's Connection to the Gulf Nuclear Sites Was Only Through Its Former Petroleum Services Business**

The parties have submitted multiple supplements and hundreds of pages of exhibits as evidence of NL's connection with the Gulf Nuclear Sites.  The record and the numerous and lengthy briefs show no genuine factual dispute on this issue.  There is no competent evidence in the record

113

connecting NL to the Gulf Nuclear Sites other than through its former petroleum services business.

There is no evidence that any of NL's business units that have been connected to the Gulf Nuclear Sites were part of NL's non-petroleum services business. There is evidence connecting NL McCullough to disposals at the Gulf Nuclear Sites,[97] but the record shows that NL McCullough was part of NL's petroleum services operations.[98] Halliburton has not submitted evidence creating a genuine dispute of material fact on this issue. Halliburton's argument that because the Gulf Nuclear shipping records indicate that NL McCullough shipped nuclear materials, there is a fact question as to whether NL McCullough engaged in the nuclear business in addition to the petroleum services business, fails. Tremont has presented undisputed evidence that the McCullough Division's operations included nuclear logging as a cased-hole wireline logging and perforating service, and that such services may be "used on a well while being drilled, for completion of a well, for recompleting after a well has been in operation for some time, and during workover operations,"[99] and that nuclear materials are regularly used by wireline logging companies.[100] The McCullough

---

[97] *See, e.g.*, 2005 Case, Docket Entry No. 247, Ex. II (EPA documents and waste manifests showing NL McCullough shipped waste to the Gulf Nuclear Sites); *id.*, Ex JJ at 1 (EPA letter indicating that Gulf Nuclear records and witness statements show that NL McCullough was connected to the Gulf Nuclear Sites).

[98] *See, e.g.*, Docket Entry No. 41, Ex. 33 (NL annual reports showing that NL considered the McCullough Division to be part of its petroleum services operations); *id.*, Exs. 34–36 (NL Board minutes characterizing the McCullough Division as part of "petroleum services"); *id.*, Ex. 37 at 2 (Fifth Circuit case referring to the McCullough Division as an "oil field service company"); *id.*, Ex. 16, Deposition of Stuart Kemp at 23:5–12 (deposition testimony from Halliburton's Rule 30(b)(6) witness, stating that NL McCullough is connected to the Gulf Nuclear Sites and that this division was part of NL's petroleum services business); Docket Entry No. 65, Ex. C, ¶ 6 (Murray's affidavit stating that McCullough was part of NL's historical petroleum services business).

[99] *See* Docket Entry No. 41, Ex. 33, NL's 1976 Annual Report at 11.

[100] *See id.*, Ex. 38 at 1, 8 (articles discussing use of depleted uranium in petroleum drilling equipment and advances in well logging including "nuclear source replacement"); *id.* Ex. 39, Deposition of Stuart Kemp at 24:18–25:6 (deposition testimony from Halliburton's Rule 30(b)(6) witness that nuclear or radioactive materials have historically been used in oil well drilling as tracers); Docket Entry No. 50, Ex. 4, NL's 1971

Division was clearly part of NL's petroleum services business.

Nor is there evidence that any NL operations outside the petroleum services business were connected to the Gulf Nuclear Sites. Tremont has submitted several declarations by former employees of NL's petroleum services business. These employees state that they are unaware of any connection between the Gulf Nuclear Sites and any NL business other than its petroleum services business.[101] The witness statements and testimony of former Gulf Nuclear employees do not indicate that NL had any connection with the Gulf Nuclear Sites other than through its petroleum services business.[102] Halliburton's Rule 30(b)(6) witness also testified that he had no knowledge of any division besides the McCullough Division being connected to the Gulf Nuclear Sites.[103] The EPA has stipulated that the "Historic Petroleum Services Business of NL" (as defined in that stipulation) is the only NL business that the EPA asserts shipped waste to the Gulf Nuclear Sites.[104] Although some of the Gulf Nuclear records submitted show shipments from "NL Industries," "N.L. MWD," "Systems Tech," and "NL Tech" in addition to NL McCullough, Halliburton has not submitted evidence raising a factual dispute as to whether any of these entities had anything to do

---

Annual Report at 7 (stating that the Baroid Division under the oil well materials and services business was involved in nuclear well logging); Docket Entry No. 71, Ex. D (Acree patent covering "Method of Forming Encapsulated Depleted Uranium Oil Field Tubular Member"); Docket Entry No. 64, Ex. 6, Gulf Nuclear's 1983 Annual Report at 5 (describing the use of sinker bars made of depleted uranium in the oil and gas business).

[101] *See, e.g.*, Docket Entry No. 68, Ex. D, ¶ 4; *id.*, Ex. E, ¶ 4; *id.* Ex. F, ¶ 4; Docket Entry No. 71, Ex. B, ¶ 14; *id.*, Ex. C, ¶ 10.

[102] *See* Docket Entry No. 41, Exs. 8–12; Docket Entry No. 65, Ex. D, Deposition of Paul Nixon at 156:19–23; Docket Entry No. 67, Ex. A, Deposition of Lynn Williams at 298:10–16; Docket Entry No. 68, Ex. H, Deposition of Michael Jaschek at 495:21–496:5.

[103] Docket Entry No. 41, Ex. 16, Deposition of Stuart Kemp at 33:1–9, 22:14–23:23.

[104] *See* Docket Entry No. 71, Ex. A at 1–2; *see also* Docket Entry No. 67, Ex. B, Deposition of Gregory Fife at 287:4–16.

with any part of NL besides its petroleum services business.

The Gulf Nuclear records showing shipments to or from "NL Industries" do not raise a fact issue as to whether a division of NL besides its petroleum services business had a connection to the Gulf Nuclear Sites.  There is no evidence that these records referred to any NL operations other than its petroleum services businesses.  For example, page 1 of Halliburton's supplemental Exhibit 18 lists NL Industries as the shipper, and lists the North Belt address as the shipping address.[105] Tremont has submitted evidence showing that the North Belt facility was used solely for NL's petroleum services business, which was eventually transferred to Halliburton.[106]

Halliburton asserts that because a Gulf Nuclear receiving log shows that NL shipped camera castings to Gulf Nuclear, there is a factual dispute as to whether NL's non-petroleum services businesses shipped waste to the Gulf Nuclear Sites.  But the receiving log does not support a reasonable inference that NL's non-petroleum services businesses were involved with the Gulf Nuclear Sites.  The log is handwritten and abbreviates the shipper as "NL Ind."  (*See* Docket Entry No. 50, Ex. 18 at 6).  It would be unreasonable to infer that this one notation on a single receiving log refers to NL's non-petroleum services operations.

"As explained in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), '[t]he evidence of the nonmovant is to be believed, and all *justifiable* inferences are to be drawn in his favor.' . . .

---

[105]  Docket Entry No. 50, Ex. 18 at 1.

[106]  *See* Docket Entry No. 52, Ex. A (photograph showing that the North Belt facility now has a Halliburton sign); Docket Entry No. 68, Ex. B, ¶ 2 (declaration of a former employee of NL's petroleum services business stating that the North Belt facility was used only for petroleum services business operations); Docket Entry No. 65, Ex. C, ¶ 4 (affidavit of former employee of NL, Old Baroid, New Baroid, Dresser, and Halliburton, stating that the North Belt facility was used only for petroleum services business operations); Docket Entry No. 71, Ex. C, ¶ 10 (declaration of former employee of NL MWD, stating that the only operations at the North Belt facility were petroleum services operations).

. Such inferences must be reasonable . . . ." *Kolb v. Atalanta Corp.*, No. 98-50281, 1998 WL 915407, at *3 (5th Cir. Dec. 23, 1998) (unpublished) (alteration in original); *see also Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 789 (5th Cir. 1997) ("On summary judgment, we consider the totality of the facts and make only reasonable, justifiable inferences from that evidence. The factual context of a party's claim may render it implausible for purposes of creating a genuine dispute of fact." (internal citations omitted)). It is unreasonable to infer that the one receiving log referring to a shipment from "NL Ind." means a shipment from an NL division not associated with its petroleum services business, given the ample evidence that NL's petroleum services business made numerous shipments to the Gulf Nuclear Sites and the lack of evidence that any other part of NL's business made shipments to the Gulf Nuclear Sites.

In addition, the materials on this particular log are described as "camera castings." The deposition testimony that Halliburton relies on to support its argument that the camera castings came from some division of NL other than its petroleum services business does not support the argument. That testimony explained that camera castings are used in the radiography field but did not rule out their use for radiography purposes in the petroleum services business. Halliburton's argument is also contradicted by other evidence in the record that camera castings are used in the petroleum and oil field services business.

Halliburton also argues that because another Gulf Nuclear receiving log lists NL Industries as the shipper of depleted uranium, (*see* Docket Entry No. 50, Ex. 18 at 8), there is at least a factual dispute as to whether NL's non-petroleum services businesses sent waste to the Gulf Nuclear Sites. But Tremont has presented extensive evidence showing that depleted uranium is used in the

117

petroleum services business.[107]  The evidence shows that NL McCullough, which was part of NL's

petroleum services business, shipped depleted uranium for disposal.[108]  While there is also evidence

that NL's nuclear division used depleted uranium,[109] this evidence does not support an inference that

the depleted uranium listed on this receiving log came from NL's nuclear division rather than the

petroleum services business.  Such an inference would be unreasonable given the evidence that NL's

petroleum services business used depleted uranium and shipped waste to the Gulf Nuclear Sites, and

the absence of evidence that NL's nuclear division had any connection to the Gulf Nuclear Sites.

The Gulf Nuclear records listing "Systems Tech" as sending or receiving shipments to or

from Gulf Nuclear[110] show an address for Systems Tech that is the truck entrance for the North Belt

facility.[111]  There is also a receiving log showing that "NL Tech" sent radioactive material to Gulf

Nuclear.[112]  Tremont has presented evidence that Systems Tech and NL Tech were part of NL's

former petroleum services business that was transferred to Halliburton, and Halliburton has not

presented anything to the contrary.[113]  There is a Gulf Nuclear receiving log showing that "NL

---

[107]  *See* Docket Entry No. 41, Ex. 38 at 1 (article listing uses of depleted uranium, including in petroleum drilling equipment); Docket Entry No. 71, Ex. D (Acree patent entitled "Method of Forming Encapsulated Depleted Uranium Oil Field Tubular Member"); Docket Entry No. 64, Ex. 6, Gulf Nuclear's 1983 Annual Report at 5 (discussing use of depleted uranium in the petroleum services business).

[108]  *See* Docket Entry No. 67, Ex. C.

[109]  *See* Docket Entry No. 62, Ex. C, NL's 1972 Annual Report at 12 (noting that NL's nuclear division dealt with depleted uranium); *id.*, Ex. F.

[110]  *See* Docket Entry No. 50, Ex. 18 at 2–5.

[111]  Docket Entry No. 52, Ex. B.

[112]  *See* Docket Entry No. 50, Ex. 18 at 9.

[113]  *See* Docket Entry No. 65, Ex. C, ¶¶ 3, 5, 6 (affidavit of former employee of NL, Old Baroid, New Baroid, Dresser, and Halliburton describing NL Technology Systems and NL Baroid Technology (sometimes known as NL Tech) as operating out of the North Belt facility, as being involved in the petroleum services business, and as being transferred to New Baroid under the 1990 Plan); Docket Entry No. 68, Ex. B, ¶ 3 (Morrison

118

M.W.D." made a shipment to the Gulf Nuclear Sites;[114] Tremont has presented uncontested evidence that NL MWD was part of NL's petroleum services business.[115]

In addition, although there is evidence showing that NL's nuclear division was separate from its petroleum services operations,[116] there is no evidence connecting the nuclear division to the Gulf Nuclear Sites.[117]  Tremont has submitted an unrebutted affidavit and an unrebutted declaration in which former employees of NL's nuclear division state that they have no knowledge of the nuclear division using the Gulf Nuclear Sites for disposal.[118]

---

declaration stating that NL's petroleum services research area was referred to as "NL Tech"); *see also* Docket Entry No. 71, Ex. A at 1 (EPA stipulation defining NL's petroleum services business as including NL Technology Systems, NL Systems Technology, and NL Baroid Technology, among other entities).

[114]  Docket Entry No. 50, Ex. 18 at 7.

[115]  *See* Docket Entry No. 65, Ex. C, ¶¶ 5, 6 (Murray's affidavit explaining that NL MWD was part of NL's petroleum services operations and was transferred to New Baroid under the 1990 Plan); Docket Entry No. 41, Ex. 33, NL's 1980 Annual Report at 9, 14 (describing Measurement-While-Drilling or MWD as part of NL's petroleum services operations); Docket Entry No. 41, Ex. 33, NL's 1981 Annual Report at 7, 16 (same); Docket Entry No. 41, Ex. 33, NL's 1982 Annual Report at 7, 15 (same); Docket Entry No. 41, Ex. 33, NL's 1983 Annual Report at 2, 0000-NLI-000038109, 5 (same); Docket Entry No. 41, Ex. 33, NL's 1984 Annual Report at 7 (same); Docket Entry No. 41, Ex. 33, NL's 1985 Annual Report at 6–7 (same); Docket Entry No. 41, Ex. 33, NL's 1986 Annual Report at 6, 7 (same); Docket Entry No. 41, Ex. 33, NL's 1987 Annual Report at 5, 7, 8, 10 (same); Docket Entry No. 71, Ex. C, ¶ 3 (Arsenault's declaration stating that "MWD was part of NL's former petroleum services division's research and development area"); *cf.* Docket Entry No. 80, Ex. F at 2 (Halliburton's website listing MWD as a Halliburton entity).

[116]  *See* Docket Entry No. 50, Ex. 2, NL's 1969 Annual Report at 7; *id.*, Ex. 3, NL's 1970 Annual Report at 6–7; *id.*, Ex. 5, NL's 1972 Annual Report at 10, 12; *id.*, Ex. 6, NL's 1973 Annual Report at 5, 13.

[117]  As discussed in the factual background section, the letter submitted by Halliburton showing a sale of lead castings and material chemical analysis from NL's nuclear division to a New York laboratory and shipment to a research institute in San Antonio does not provide any evidence that NL's nuclear division shipped waste to the Gulf Nuclear Sites.  Halliburton also argues that NL's acquisition of Cambridge Nuclear and Industrial Reactor Labs, which produced radiological materials used for diagnostic nuclear medicine, creates a fact issue regarding whether NL's only connection to the Gulf Nuclear Sites was through its former petroleum services business, but there is no evidence connecting either of these entities to the Gulf Nuclear Sites.  In addition, Industrial Reactor Labs, which was a subsidiary of Cambridge Nuclear, was transferred from NL to NLPS in the 1988 restructuring and from Old Baroid to New Baroid in the 1990 restructuring.

[118]  *See* Docket Entry No. 68, Ex. A, ¶ 2; *id.*, Ex. G, ¶ 3.

Halliburton argues that because the complaint in the EPA lawsuit alleges that NL sent cesium to the Gulf Nuclear Sites, and because cesium is used in both the medical field and the oil industry, there is a fact issue as to whether the cesium NL sent came from its petroleum services business. But the letter Halliburton submits in support of this argument is from a hospital with no apparent relationship to NL, requesting an amendment to a license to use cesium for cancer treatment.  The Gulf Nuclear shipping slips and receiving logs only show shipments from NL entities connected to NL's petroleum services business.

The EPA's allegations and discovery responses do not create a fact issue as to whether NL's non-petroleum services business had a connection to the Gulf Nuclear Sites.  The EPA refused to admit in its interrogatory responses that the "Historic Petroleum Services Business of NL" is NL's only connection to the Gulf Nuclear Sites.  (*See* Docket Entry No. 50, Ex. 20 at 5–6).  But the only entity the EPA identified that has not been specifically shown to be independently linked to the petroleum services business is NL Industries.  Because NL had a petroleum services division, the EPA's discovery response does not indicate that it has any evidence connecting any NL business other than petroleum services to the Gulf Nuclear Sites.  The EPA later stipulated that it is not claiming that any NL business other than its "Historic Petroleum Services Business" had any connection to the Gulf Nuclear Sites.

In short, Tremont has presented overwhelming evidence that NL's only connection to the Gulf Nuclear Sites was through its former petroleum services business.  Tremont has met its burden to show that there is no genuine dispute as to this issue.  Halliburton has responded with speculation that a few receiving logs listing NL as the shipper support an inference that the non-petroleum services operations of NL was the shipping entity and that these operations were connected to the

Gulf Nuclear Sites.  Halliburton has not pointed to any evidence showing any shipment of waste from any non-petroleum services operations to the Gulf Nuclear Sites.  Based on the undisputed evidence in the summary judgment record, no jury could reasonably find that NL had any connection to the Gulf Nuclear Sites other than through NL's petroleum services operations.[119]

Issue preclusion and contract interpretation are analyzed in light of the evidence and this court's conclusion that the undisputed facts show that NL had no connection to the Gulf Nuclear Sites other than through its former petroleum services business.

### D.    Issue Preclusion[120]

#### 1.    The Parties' Contentions

Tremont argues that in the arbitration, Halliburton had a full and fair opportunity to litigate the issues raised in Tremont's motion for partial summary judgment.  (2005 Case, Docket Entry No. 252 at 48–50).  Halliburton responds that the issues raised in the motion are not identical to the

---

[119]  Tremont has repeatedly emphasized that if there is some connection between the Gulf Nuclear Sites and any NL operations that were not part of its former petroleum services business, Tremont is not seeking indemnity from Halliburton for liabilities arising out of that connection.  (*See., e.g.*, Docket Entry No. 41 at 19 ("Tremont wishes to reiterate that if there is any connection between the Gulf Nuclear Sites and something that was not part of the historical petroleum services business of NL, Tremont is not seeking indemnity from Halliburton for such claims.")).  This representation provides an additional safeguard for Halliburton.  Even though there is no evidence in the record that any NL operations besides its petroleum services business had any connection to the Gulf Nuclear Sites, should Halliburton find evidence to support its speculation that NL's nuclear division, or some other non-petroleum services related NL entity, had a connection to the Gulf Nuclear Sites, Tremont has represented that it is not seeking indemnification for any liabilities arising out of non-petroleum services related connections.

[120]  The terms "issue preclusion" and "collateral estoppel" refer to the same preclusion doctrine.  *See* 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4402, at 9 (2d ed. 2002) ("'[C]ollateral estoppel, or 'issue preclusion,' recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.'" (quoting *Kaspar Wire Works, Inc. v. Leco Eng'g Mach., Inc.*, 575 F.2d 530, 535–36 (5th Cir. 1978))); *id.* § 4416, at 386 ("Whether the label applied be the modern term of issue preclusion, the still current phrases of collateral estoppel and direct estoppel, or more antique names, the principle is simply that later courts should honor the first actual decision of a matter that has been actually litigated." (footnote omitted)).

issues resolved in the arbitration.  (2005 Case, Docket Entry No. 274 at 41–42).  Halliburton points

out that the arbitration panel examined liability for a site NL owned at the time of the 1988

restructuring, while this case requires examining liability for the McCullough Division, which NL

had sold by the time of the 1988 restructuring.  (*Id.* at 42).  Halliburton argues that "[i]t is entirely

possible that the panel considered the fact that the expired leases [at issue in the arbitration] were

directly related to and/or intertwined with property retained by NL and subsequently transferred to

Old Baroid when determining that the liabilities associated with those leases transferred to New

Baroid under the 1990 Restructuring Plan." (*Id.*).  Halliburton also argues that the issues in this case

were not litigated in the arbitration, which only involved the Malvern Site.  (*Id.* at 43).  Finally,

Halliburton argues that "[t]he overbroad language in the Allocation Award purportedly giving

Tremont indemnity for claims related to sites other than the Malvern Site was in no way critical or

necessary to the Allocation Award." (*Id.*).  Halliburton argues that the language in the Allocation

Award purporting to apply beyond the Malvern Site was dicta that exceeded the panel's jurisdiction.

(*Id.* at 43–44).

Tremont replies that Halliburton made the same arguments in the arbitration about the leases

that had expired before the 1988 restructuring that it now makes about the liabilities associated with

the McCullough Division.  (*See* 2005 Case, Docket Entry No. 279 at 15).  Halliburton argued in the

arbitration that if property was not transferred to NLPS in connection with the 1988 Plan,

Halliburton has no responsibility for historical liabilities associated with that property.  The

arbitration panel specifically rejected Halliburton's argument, concluding that "'[w]hether leases

had expired or were terminated prior to 1988 is not determinative of whether the historical liabilities

associated with the property were assumed by NLPS, and later New Baroid.'" (*Id.* at 16 (quoting

122

2005 Case, Docket Entry No. 247, Ex. D at 20)).  The panel explained that "'indemnification for

such historical liability is not dependent upon the actual transfer or assignment of a lease covering

leased property which had been used as part of the operations of the petroleum services business of

NL prior to 1988.'"  (*Id.* (quoting 2005 Case, Docket Entry No. 247, Ex. D at 19–20)).  Tremont also

points out that NL had transferred the Malvern Site property long before implementing the 1988

Plan.  (*Id.* at 17 (citing *id.*, Ex. F)).[121]

### 2.    Analysis

"Collateral estoppel precludes a party from litigating an issue already raised in an earlier

action between the same parties only if: (1) the issue at stake is identical to the one involved in the

earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the

issue in the prior action was a necessary part of the judgment in that action."[122]  *Petro-Hunt, L.L.C.*

*v. United States*, 365 F.3d 385, 397 (5th Cir. 2004) (footnotes omitted).[123]

_____

[121]  Many parts of Exhibit F are illegible.  Hollingsworth's affidavit submitting this exhibit states that it contains deeds from NL to Magnet Cove Barium Corporation.  (2005 Case, Docket Entry No. 279-1 at 2).

[122]  "Some cases . . . have recognized a fourth requirement that there be 'no special circumstance that would render preclusion inappropriate or unfair.'"  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 n.12 (5th Cir. 1995) (quoting *United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994)).  The *RecoverEdge* court found it unnecessary to determine in that case whether this fairness requirement exists but noted that it "originated as a limitation on *offensive* collateral estoppel," which "arises when a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against *another plaintiff*."  *Id.* (second emphasis added) (citations omitted).  The *RecoverEdge* case "involve[d] traditional, or mutual estoppel because the relevant parties in the conspiracy case were the same as the parties in the dischargeability proceeding."  *Id.* (citation omitted).  Similarly, the present case involves traditional mutual collateral estoppel because Halliburton and Tremont were both parties to the arbitration.

[123]  The parties have not addressed whether state or federal law on issue preclusion applies in determining the preclusive effect of an arbitration award that resolved state-law issues but that was confirmed by a federal court judgment.  The parties rely exclusively on federal case law in their briefs.  Fifth Circuit case law supports the application of federal law.  The Fifth Circuit has held that federal law on res judicata applies when a federal court determines the preclusive effect of a prior federal court judgment based on diversity jurisdiction.  In the context of claim preclusion, the Fifth Circuit explained:

Although the forum state's choice-of-law rules determine the substantive

law in diversity actions, *Day & Zimmermann v. Challoner*, 423 U.S. 3, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975) (per curiam), the Dallas Division erred in applying Texas's choice-of-law rules to determine that the Florida law of res judicata controls this issue.  Where one federal court is considering the res judicata [e]ffect of another federal court's judgment in a diversity action, the federal common law of res judicata should be applied to protect the integrity of federal judgments, even though a decision is based on state law.

*Miller v. Delta Airlines, Inc.* (*In re Air Crash at Dallas/Fort Worth Airport on Aug. 2, 1985*), 861 F.2d 814, 816 (5th Cir. 1988) (citing *Kurzweg v. Marple*, 841 F.2d 635, 639 (5th Cir. 1988); *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 337–38 (5th Cir. 1982)); *see also Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981) ("Were we concerned with the collateral estoppel effects of a prior state court determination, we would use the state's law of collateral estoppel, but where the prior determination was also a federal diversity action, federal common law principles will apply." (citations omitted)); *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 715 (5th Cir. 1975) ("Federal law clearly governs the question whether a prior federal court judgment based on federal question jurisdiction is res judicata in a case also brought, as this one was, under federal question jurisdiction. We believe the same result obtains where, as in this case, the first suit was brought only under diversity jurisdiction . . . . The fact that only questions of state law were actually pleaded and litigated in the prior federal court case cannot justify such frustration of the federal law of res judicata."); *King v. Burlington N. & Santa Fe Ry. Co.*, 445 F. Supp. 2d 964, 971 (N.D. Ill. 2006) (noting that "[t]o the extent that arbitration conducted under the [Railway Labor Act] is understood as a creature of federal law, Plaintiff[, who argued that Illinois choice-of-law rules mandated the use of the law of the jurisdiction where the judgment was entered, that the arbitration award arising out of the Railway Labor Act was governed by federal law, and that federal law was the appropriate law to determine the preclusive effect of the arbitration award,] may well have the better of this issue," but concluding that the issue did not need to be resolved because federal and state law on issue preclusion were nearly identical), *aff'd on other grounds*, 538 F.3d 814 (7th Cir. 2008); *Shaw Steel, Inc. v. Morris* (*In re Morris*), Nos. 97 B 39268, 98 A 00121, 1998 WL 355510, at *5 (Bankr. N.D. Ill. Jun. 30, 1998) ("Because the previous judgment in the present case is a federal court judgment (notwithstanding the prior arbitration award upon which it was based), federal standards, rather than state law standards for collateral estoppel, determine whether giving collateral estoppel effect to the arbitration award and the federal court confirmation of that award is appropriate." (citations omitted)).

Even if state law were to apply, *see Manion v. Nagin*, 394 F.3d 1062, 1066 (8th Cir. 2005) (applying state law of issue preclusion to determine the preclusive effect of an arbitration award confirmed by a federal court); *SMS Demag, Inc. v. ABB Transmissone & Distribuzone, S.P.A.*, No. 05-00466, 2008 WL 906530, at *8 & n.10 (W.D. Pa. Mar. 31, 2008) (applying Kentucky law on claim and issue preclusion because "the judgment at issue for purposes of claim and issue preclusion was rendered by a federal court applying the substantive law of Kentucky by way of an arbitration panel award," and noting that the contract at issue provided that the substantive law of Kentucky applied to its interpretation), the principles are the same under the potentially applicable state laws of Delaware (the law applied by the arbitrators to the contract interpretation issues) and Texas (the law of the state in which this court sits) as under federal issue preclusion principles. *See Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1082 n.3 (D. Del. 1990) ("Under Delaware law, the test for determining collateral estoppel is substantially the same as the federal standard: 'The test for applying collateral estoppel requires that (1) a question of fact essential to the judgment, (2) be litigated and (3) determined (4) by a valid and final judgment.'" (citation omitted)); *McDonald v. Houston Brokerage, Inc.*, 928 S.W.2d 633, 637 n.3 (Tex. App.—Corpus Christi 1996, writ denied) ("Even though the claim of collateral estoppel stems from a previous federal court action, a decision on which law to apply is

124

### a.    The Application of Issue Preclusion to an Arbitration Award

A threshold issue is whether and how issue preclusion applies when the previous decision was made by an arbitration panel and confirmed by a federal court judgment.  Although preclusion does not necessarily apply to arbitration awards, *see Shaw Steel*, 1998 WL 355510, at *6, there is ample authority for giving preclusive effect to issues resolved in arbitration if the requirements are met.[124]  In *Universal American Barge*, the Fifth Circuit rejected a challenge to the "application of offensive collateral estoppel because the primary determination was rendered in an arbitration proceeding, rather than in a 'court of law.'"  946 F.2d at 1136.  The court explained:

> The United States Supreme Court declined to bar the offensive use of
> collateral  estoppel  from  arbitration  in  subsequent  federal  court

---

not required because there is little difference between the Texas and federal formulations of collateral estoppel." (citation omitted)).  Therefore, this court will rely on federal rules of issue preclusion.  *Cf. Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001) (noting that "the question whether federal law or state law should govern a federal court's determination of the preclusive effect of an arbitral award . . . unfortunately 'has not been much developed,'" but finding that there was no conflict between potentially applicable state law and federal law on res judicata (quoting 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4475, at 772 (Supp. 2001))).

[124]    *See Manion*, 394 F.3d at 1066–67 (issue preclusion barred litigation of issues resolved in prior arbitration); *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 266 n.6 (2d Cir. 1997) ("Jacobson does not contest the settled rule that "res judicata is applicable to arbitration awards and may serve to bar the subsequent relitigation of a single issue or an entire claim." (citations omitted)); *id.* at 267–68 ("We therefore hold, [under New York law,] in keeping with the courts of the First and Second Departments, that res judicata and collateral estoppel apply to issues resolved by arbitration 'where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award.'" (citation omitted)); *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991) (finding that offensive collateral estoppel can apply based on a prior determination in an arbitration proceeding); *Beatus v. Gebbia*, 4 F. Supp. 2d 256, 260 (S.D.N.Y. 1998) ("Collateral estoppel can be applied to a confirmed arbitration award entered as a final judgment." (citations omitted)); *cf. IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 320 (3d Cir. 2006) (holding that a particular defense to garnishment would be precluded if the party seeking to raise it was in privity with another entity that had raised the same defense in an earlier arbitration); *Pike*, 266 F.3d at 90 ("It is well settled that [claim preclusion] serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings." (citations omitted)); *Autotrol v. J-F Equip. Co.*, 820 F. Supp. 293, 297 (N.D. Tex. 1993) ("Numerous courts have recognized that arbitration awards can have preclusive effect in subsequent litigation." (citations omitted)).

> litigation, though the Court required consideration of the "federal
> interests warranting protection."  In an arbitrable case not directly
> involving federal statutory or constitutional rights, courts should use
> a case-by-case approach to determining the collateral estoppel effects
> of arbitral findings.

*Id.* at 1136–37 (footnote and internal citation omitted).  In a footnote, the court explained that "[a]

case involving federal civil rights . . . might raise federal interests warranting the arbitral preclusion

bar."  *Id.* at 1136 n.3.  The court noted that arbitral findings might "lack the supervisory scrutiny of

authoritative review, giving rise to the argument that arbitration risks determinations based on

irrelevant or hearsay evidence, or the personal whims of arbitral panel members."  *Id.* at 1137

(citation omitted).  But the court explained that "a district court's discretion in deciding whether to

give arbitral findings preclusive effect also keeps the risk of prejudice at an acceptable level, at least

when the arbitral pleadings state issues clearly, and the arbitrators set out and explain their findings

in a detailed written memorandum."  *Id.* (citations omitted).  The Fifth Circuit described the

considerations a court might weigh in determining whether to apply issue preclusion to an arbitration

decision:

> If the first determination of an issue occurred in an arbitration which
> afforded litigants the "basic elements of adjudicatory procedure," a
> district court may find in a proper case that the arbitral award
> collaterally estops relitigation of the previously determined issues.
> A district court in exercising its discretion must carefully consider
> whether procedural differences between arbitration and the district
> court proceedings might prejudice the party challenging the use of
> offensive collateral estoppel.
>
> The district court specifically must determine whether procedural
> opportunities available to the party in the subsequent action "might
> be likely to cause a different result."

*Id.* at 1137–38 (internal citation omitted).  The Fifth Circuit noted that the party challenging

preclusion did "not point to any specific arbitral procedures that would have prevented their making

126

hearsay objections and calling their own witness, had they chosen to appear." *Universal Am. Barge*, 946 F.2d at 1138.  As a result, their complaints did not result "from any identified procedural differences between arbitration and district court."  *Id.*

In the present case, the arbitration proceedings went well beyond the "basic elements of adjudicatory procedure."  The proceedings included discovery, motions practice, and live testimony that produced an extensive record and resulted in two written awards detailing the reasons for the arbitrators' decisions.  As this court noted in confirming the awards, the panel considered "millions of pages of documents in the form of over 600 exhibits," heard ten live witnesses, read many affidavits, and viewed at least seven videotaped witnesses.  At the end of first phase of the arbitration, the arbitrators issued a lengthy award focusing on the meaning and application of the 1990 Plan.  At the end of the second phase, the arbitrators issued a second award allocating the response and remediation costs among the parties.  In confirming the awards, this court noted that both awards were "reasoned" and unanimous.

During the arbitration, Halliburton's counsel praised the arbitration and its thoroughness. (*See* 2005 Case, Docket Entry No. 247, Ex. UU, Arbitration Transcript at 157:13–16 ("[W]e've certainly had every opportunity here to be afforded as good a treatment as if we were in a court of law . . . ."); *id.*, Ex. VV, Arbitration Transcript at 1367:23–1368:4 ("There have been many, many motions . . . .  I thought he said 70 or so or 70 plus the other day.  It's required a lot of your work, a lot of your time and a lot of your attention . . . .")).[125]  Halliburton does not argue that the arbitration was unfair.  Nor does Halliburton argue that issue preclusion should not apply because

---

[125]  Halliburton objects to Exhibits UU and VV as irrelevant, without any explanation.  (2005 Case, Docket Entry No. 273 at 13).  The documents are relevant to whether Halliburton received a procedurally fair hearing in the arbitration, which is relevant to its preclusive effect.  Halliburton's evidentiary objections are overruled.

the prior decision was an arbitration award.[126]

There is less concern here about applying issue preclusion than in *Universal American Barge* because Halliburton was a party to the arbitration proceedings.  Tremont does not seek to invoke offensive collateral estoppel against parties who did not participate in the arbitration.

Preclusion analysis is appropriately applied to the arbitration awards in this case.

### b.   Identity of the Issues

Halliburton argues that different issues are involved in the Gulf Nuclear Site claims than the issues the arbitration panel considered in deciding the Malvern Site claims.  Halliburton identifies the factual issues involved in the Malvern Site claims, as follows:

> (1) the history of the mining activities at the site; (2) the mining and milling activities of the parties; (3) the multiple conveyances of multiple tracts of property in Malvern, Arkansas, (4) current operations near the site and their impact on the interpretation of the 1990 Restructuring Documents; (5) the interpretation of the term "surplus property"; (6) whether the Malvern Site constituted surplus property; and (7) the payment of ad valorem taxes.

(2005 Case, Docket Entry No. 274 at 41).  Halliburton argues that the issues involved in the Gulf Nuclear Sites claims include:

> (1) the interpretation of the term "petroleum services business"; (2) the NL McCullough Division's assets and operations and their relationship, if any, to NL's former petroleum services business and/or NL's other business units; (3) whether the specific waste allegedly transported to the Gulf Nuclear Sites was related to NL's former petroleum services business; (4) the details surrounding the physical transfer of assets, including property conveyances in Texas and other states; (5) the liabilities, if any, retained by NL under the Asset Purchase Agreements; (6) the conduct of the parties with respect to the various business units sold in 1987; and (7) post 1988 indemnification agreements related to the business units sold by NL

---

[126] Halliburton does argue that claim preclusion cannot apply because the claims at issue in this litigation are not arbitrable.  (*See* Docket Entry No. 274 at 32–36).  However, Tremont is not seeking claim preclusion.

in 1987.

(*Id.* at 41–42).

Halliburton argues that "[i]n order for the doctrine of collateral estoppel to apply, Tremont must prove that the issues in the arbitration are <u>identical</u> to the issues presented by the Gulf Nuclear Sites claims." (*Id.* at 42).  To the extent Halliburton argues that every issue in the arbitration and in this lawsuit involving the Gulf Nuclear Sites must be identical, Halliburton overstates.  Tremont must show that the issues it contends are precluded are identical.  *See RecoverEdge*, 44 F.3d at 1291 ("[T]he subject matter of the suits may be different as long as the requirements for collateral estoppel are met." (citing *Shanbaum*, 10 F.3d at 311)).  Halliburton's approach of listing the issues involved in the arbitration and the issues involved in this litigation does not resolve whether issue preclusion  applies.  Instead, the approach seems to confuse issue with claim preclusion.[127]

Tremont frames the precluded issue as the arbitration panel's determination that "Halliburton has full liability for the historical petroleum services liabilities, including liability for assets that were never transferred in connection with the 1988 Restructuring." (2005 Case, Docket Entry No. 252 at 3).  Whether the relevant contracts mean that Halliburton is responsible for historical liabilities of NL's former petroleum services business, including those associated with assets or operations that were not transferred to NLPS in the 1988 restructuring, is identical to an issue resolved in the arbitration.  *Cf.* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982) ("Preclusion ordinarily is proper if the question is one of the legal effect of a document identical in

---

[127] *See* 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4402, at 9 (2d ed. 2002) (noting that "'[u]nder the[] rules of claim preclusion, the effect of a judgment extends to the litigation of *all issues* relevant to the same claim between the same parties, whether or not raised at trial,'" and that "'issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties'" (emphasis added) (quoting *Kaspar Wire Works*, 575 F.2d at 535–36)).

all relevant respects to another document whose effect was adjudicated in a prior action.").  In this case, Tremont seeks to hold Halliburton responsible for cleanup costs at the Gulf Nuclear Sites because NL's only connection to those sites was through its former petroleum services business, which was transferred to NLPS in the 1988 restructuring.  Tremont seeks to hold Halliburton responsible for those historical liabilities even if before the 1988 restructuring, NL had sold the assets or operations that  had contributed to the waste and contamination at the Gulf Nuclear Sites. The issue of Halliburton's liability for the historical environmental liabilities of NL's petroleum services business, including liabilities associated with parts of the business NL sold before the 1988 restructuring, was litigated and decided in the arbitration as a critical issue in that proceeding.

The arbitration panel expressly held that Halliburton was responsible for all historical liabilities of NL's Petroleum Services Business—a defined term in the 1990 Plan—regardless of whether NL had transferred the assets associated with the liabilities before the 1988 restructuring. Halliburton argued in the arbitration that "Tremont's argument that Halliburton is responsible for the leased properties is dependent upon proof that such properties were actually transferred to NL Petroleum Services Inc. ('NLPS'), as part of the 1988 restructuring of NL."  (2005 Case, Docket Entry No. 247, Ex. D at 14).  Tremont responded that "the leased properties constitute 'historical liabilities' associated with the petroleum services business transferred under both the 1988 and 1990 plans of restructuring, and are therefore the responsibility of Halliburton as the successor to New Baroid."  (*Id.*, Ex. D at 13).  The panel noted that "as argued by Halliburton, such 'surplus' leased properties and licenses would not be covered under the indemnification provision of the 1988 Plan of Restructuring, as that obligation does not extend to 'any claims of liability at sites or facilities or with respect to operations not transferred to NLPS.'"  (*Id.*, Ex. D at 14 (quoting 1988 Plan, §

130

1.4(c))).  Halliburton also argued that "[e]xpired leases and license agreements would not have transferred under the terms of the 1990 Plan, as they could not be classified as 'property, assets, or rights' and thus were excluded from the definition of 'Petroleum Services Assets' and specifically excluded under Exhibit A to the Plan as 'Obligations' which did not constitute 'Petroleum Services Obligations.'"  (*Id.*, Ex. D at 14).

The arbitration panel decided Halliburton's responsibility for historical liabilities associated with properties that NL had leased at the Malvern Site and that were not transferred to NLPS in the restructuring.  In the allocation phase of the arbitration, the panel stated that during the contract phase, "[t]here were . . . extensive references concerning the disposition of historical liabilities, including environmental liability, associated with the petroleum services business in the many depositions and affidavits submitted as part of the arbitration record."  (*Id.*, Ex. D at 15).  The "issue was also the subject of live testimony during the Contract Hearing from J. Landis Martin, officers and Board members William Lindquist, Steve Watson and Ann Manix, together with the video depositions of Harold Simmons and John Karnes . . . ."  (*Id.*, Ex. D at 15).  The earlier testimony was supplemented with "four 'clarifying affidavits' from Mr. Watson, Mr. Lindquist, Mr. Simmons and Mr. Martin."  (2005 Case, Docket Entry No. 247, Ex. D at 16).  The panel stated that "[t]he affiants' testimony was consistent in explaining that *all historical liabilities of NL associated with the petroleum services business transferred to New Baroid in 1990, including those liabilities associated with the leased properties*."  (*Id.*, Ex. D at 16 (emphasis added) (citations omitted)).

The panel explained that under the Assumption Agreement executed as part of the 1988 restructuring, NLPS agreed "'[t]o perform the obligations of NL under the contracts, <u>leases</u> and other agreements or undertakings that are included among the Assets and other items referred to in

Section A above; . . . .'" (*Id.*, Ex. D at 18 (omission in original) (citation omitted)).  The panel also noted that under the Assumption Agreement, "NL agreed to sell, grant, transfer and deliver to NLPS all of NL's right, title and interest in and to all of its assets, including without limitation:  '1. All real property . . . now or hereafter used primarily in NL's petroleum services business . . . .'" (*Id.*, Ex. D at 18 (second omission in original)).  The panel concluded that "[b]y their inclusion of NL's 'leases' under the description of the 'Obligations assumed,' it is logical to conclude that the parties intended that leases associated with the real property 'used primarily in NL's petroleum services business' constituted obligations assumed by NLPS under the 1988 Plan of Restructuring," and that "[c]onsequently, all such leased property of NL would have been included as part of the petroleum services business and operations transferred to NLPS in 1988 for which NLPS assumed responsibility thereafter."  (*Id.*, Ex. D at 19).

The panel rejected Halliburton's argument that leased properties, particularly those that expired or were terminated before the 1990 Plan's implementation, were "surplus real property" excluded from the transfer to New Baroid.  The panel noted the "clear intent of both plans of restructuring to 1) spin-off the pre-existing petroleum services business of the transferors in 1988 and 1990, respectively, and 2) transfer responsibility for *all historical liabilities* associated with the operations of that business."  (*Id.*, Ex. D at 19 (emphasis added)).  The panel clearly stated that the transfers in 1988 and 1990 included all historical liabilities.

> [T]he conclusion is inescapable that the leased properties and licenses of NL, and subsequently "Old" Baroid, were indeed an integral part of the petroleum services business of NL, and the resultant liabilities and obligations were assumed by NLPS and New Baroid, respectively, as a result of the plans of restructuring.  *Those plans included not only the transfer of the assets and operations of the transferors' petroleum services business, but also the associated past and future liabilities and obligations.*

(2005 Case, Docket Entry No. 247, Ex. D at 19 (emphasis added)).

The panel emphasized that its conclusion that liabilities arising from leased properties transferred as part of the historical petroleum services business was unaffected by whether the leases had expired or terminated before the 1988 Plan:

> Whether leases had expired or terminated prior to 1988 is not determinative of whether the historical liabilities associated with the leased property were assumed by NLPS, and later New Baroid. . . . [I]ndemnification for such historical liability is not dependent upon the actual transfer or assignment of a lease covering leased property which had been used as part of the operations of the petroleum services business of NL prior to 1988.

(*Id.*, Ex. D at 20).

In the Allocation Award, the panel included a section entitled "A Finding Of Responsibility For Indemnification For Historical Liabilities Associated With Leased Properties Does Not Require Proof That Leases And License Agreements Were Actually Assigned Or Transferred To Anyone As Part Of The 1988 And 1990 Restructurings." (*Id.*, Ex. D at 20).  The panel rejected Halliburton's argument that indemnification for petroleum services obligations depended on the transfer of the related property:

> The Halliburton Parties insist that a determination of their responsibility for the leased properties is dependent upon proof that such properties were actually transferred to NL as part of the 1988 restructuring.  The Halliburton Parties rely upon the September 1988, Amended and Restated Formation Agreement, executed between the parties as part of the 1988 restructuring.  In particular, the Halliburton Parties point to the following provision of the Formation Agreement:
>
>> "1.4 <u>Liabilities Not Assumed</u>.  The parties agree that NLPS will not assume or be liable for any of the following liabilities or obligations . . . :
>>
>>> (c) Any claims of liability at sites or facilities or with respect to operations not transferred to NLPS

133

pursuant to this Agreement, . . ."

> In the absence of proof that leased properties were actually transferred or assigned to NL in 1988, the Halliburton Parties claim that any obligation of HESI, as the successor to New Baroid, to indemnify NL and Tremont does not extend to any claims of liability at sites or facilities or with respect to operations associated with the leased properties.  As stated above, the Panel disagrees.  *As assumption of indemnification obligations and successor liability for historical liabilities associated with the transferred petroleum services business is not dependent upon an actual physical transfer or assignment of an associated lease, or real estate for that matter.* This is made clear by an examination of the other relevant contract terms.

(*Id.*, Ex. D at 20–21 (emphasis added) (omissions in original) (footnote and internal citations omitted)).

With respect to the 1988 restructuring, the panel explained that in the Formation Agreement, "NL agreed to 'convey, assign, transfer and deliver to NLPS *all of its properties, assets and rights of any kind*, whether tangible or intangible, real or personal, *related to its petroleum services business* . . . '"; that in the same agreement, "NLPS assumed associated liabilities" by agreeing "'**to assume, pay, discharge or perform when due all liabilities and obligations, known or unknown, of NL, associated with its petroleum services business** . . .'"; that in the Cross-Indemnification Agreement, NLPS agreed to indemnify NL with respect to "'[c]**laims of liability at sites or facilities or with respect to the operations (i.e., petroleum services business) transferred to NLPS pursuant to the Formation, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever on such sites or Facilities**; . . .'"; and that in the Indebtedness Agreement, NLPS agreed "'to assume and unconditionally guarantee to NL[']: '(c) the performance or discharge by NLPS on behalf of NL of **any and all other indebtedness and obligations of NL which are attributable to NL's petroleum services**

134

**business**.'" (*Id.*, Ex. D at 21–22 (italics emphasis added) (omissions in original) (citations

omitted)). The panel held: "[T]here is no question that NL effectively transferred all assets and

operations, existing and historical liabilities, associated with its petroleum services business to NLPS

in 1988." (*Id.*, Ex. D at 22). The panel continued:

> *The assumption by NLPS of liabilities and obligations associated*
> *with that petroleum services business was truly comprehensive.*
> *There is nothing to suggest that such historical liabilities and*
> *obligations, even those related to expired or canceled leases on*
> *leased properties associated with the petroleum services business,*
> *were not transferred to and assumed by NLPS.* On the contrary, the
> opposite conclusion is unavoidable.

(2005 Case, Docket Entry No. 247, Ex. D at 22 (emphasis added)).

The panel reached the same conclusion for the 1990 restructuring. (*Id.*, Ex. D at 22). The

panel noted that after the 1988 restructuring, NLPS changed its name to (Old) Baroid Corporation,

and then transferred all the petroleum services business to New Baroid under the 1990 Plan. (*Id.*,

Ex. D at 22). The panel explained that under the 1990 Plan,

> Old Baroid not only assigned to, and New Baroid assumed, all of Old
> Baroid's "properties, assets and rights, of any kind, whether tangible
> or intangible, real or personal, which [were] attributable to the
> Petroleum Services Business (the 'Petroleum Services Assets') . . . ,"
> but New Baroid also assumed and agreed:
>
> > to discharge all indebtedness, liabilities, obligations,
> > claims, covenants, losses, damages, costs, penalties
> > and expenses, **of any kind of and nature**, whether
> > accrued, absolute or contingent, **asserted or**
> > **unasserted**, and whether existing as of the date of this
> > Plan **or arising thereafter** (collectively,
> > "Obligations"), of [old Baroid] arising out of, or
> > **which are otherwise attributable to, the past,**
> > **present or future ownership or operations of the**
> > **Petroleum Services Business . . . .**

(*Id.*, Ex. D at 22 (alterations and omissions in original) (additional quotation marks and citation

135

omitted)).  The panel also noted that under the 1990 Plan, BDFI agreed to discharge New Baroid's obligations arising out of the past, present or future ownership or operations of "Petroleum Services Assets"; that BDFI became part of the Baroid Division of Dresser, which merged with Halliburton N.C. Inc., with DII as the surviving company; and that DII's Baroid Division assets were contributed to HESI.  (*Id.*, Ex. D at 23).  "As a consequence of these transactions," the panel concluded, "HESI has succeed to, and is responsible for, indemnity obligations owed by New Baroid to Old Baroid and Old Baroid successors in connection with the petroleum services business, including those obligations assumed by BDFI."  (*Id.*, Ex. D at 23).

The panel later reemphasized that New Baroid's assumption of particular assets was not relevant to its assumption of related liabilities under the 1990 Plan.  "[E]ven if expired leases and license agreements did not constitute 'property, assets and rights, of any kind,' transferred under the Plan, one cannot conclude that historical liabilities and obligations associated with such instruments were not undertaken and assumed by New Baroid and BDFI, or that they did not agree to indemnify Old Baroid and its affiliates for such liabilities."  (2005 Case, Docket Entry No. 247, Ex. D at 24). The panel held that under the 1990 Plan, it was "irrefutable that New Baroid indemnified Old Baroid for historical liabilities arising out of or otherwise attributable to past, present or future ownership or operations of the petroleum services business," and that "[l]iabilities or obligations associated with expired leases or license agreements would constitute such 'Obligations,' and trigger HESI's successor indemnification obligations."  (*Id.*, Ex. D at 25).  The panel held: "[I]t is clear that all of the leased properties and license agreements, *whether expired or terminated prior to 1988*, arose out of, or were otherwise attributable to, the *past, present or future ownership or operations of the petroleum services business to which HESI is the successor*."  (*Id.*, Ex. D at 27 (emphasis added)).

136

The issue of Halliburton's contractual responsibility for historical liabilities of NL's petroleum services business—including those arising from assets that were transferred before the 1988 restructuring—was litigated and decided in the arbitration. That same issue is also critical to this case. The case law supports treating the issues as identical for the purposes of preclusion.

In *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284 (5th Cir. 1995), the court found the relevant issue to be identical under similar circumstances. In that case, an individual, Dr. David Carpenter, was involved in a real estate development project. *Id.* at 1287. He and two others formed Houston Storage, Inc. to purchase a warehouse. *Id.* Houston Storage later purchased a parcel of land from Universal Savings Association. *Id.* The transaction ultimately led to Universal Savings (later replaced by the Resolution Trust Corporation (RTC)) suing Carpenter for civil conspiracy, common-law fraud, unjust enrichment, and breach of contract. *Id.* The RTC later added to the complaint an allegation that Carpenter's debt on the underlying promissory note was nondischargeable under the Bankruptcy Code because it was obtained by fraud. *See id.* at 1288 & n.7 (quoting 11 U.S.C. § 523(a)(2)(A) (1988)). The district court directed a verdict against Carpenter on the breach of contract claim for nonpayment of the promissory note. *RecoverEdge*, 44 F.3d at 1288. The jury returned a special verdict finding that all the Houston Storage defendants except Carpenter had engaged in a conspiracy to defraud the RTC. *Id.* The court held Carpenter jointly and severally liable with the other Houston Storage defendants. *Id.* After the civil conspiracy trial ended, the district court held that Carpenter's debt was nondischargeable under § 523(a)(2)(A), even though the jury had not found that Carpenter conspired to defraud. *Id.* at 1289. The court concluded that the jury's finding on that issue had to be disregarded because Houston Storage could only have conspired though Carpenter's acts. *Id.*

137

On appeal, Carpenter argued that the jury's verdict precluded the court from determining whether his debt was dischargeable under section 523(a)(2)(A).  *Id.*  The Fifth Circuit noted that "[t]here [was] no question that the issue of whether Carpenter conspired with others to defraud Universal Savings was actually litigated in the first proceeding and necessary to the court's final judgment entered on the jury's verdict."  *Recover Edge*, 44 F.3d at 1290–91 (footnote omitted).  As a result, "the crucial issue . . . [wa]s whether the issues [we]re identical."  *Id.* at 1291 (citation omitted).    The Fifth Circuit "agree[d] with RecoverEdge that the traditional elements of nondischargeability under § 523(a)(2)(A) are not identical to the elements of a civil conspiracy to defraud."  *Id.* at 1293.  But because courts "do not compare the issues in the abstract," the court concluded that "the specific nature of RTC's nondischargeability claim against Carpenter ha[d] made what might otherwise be distinct issues identical."  *Id.*  The court explained why the issues were identical:

> [T]he RTC argued that Carpenter's debt is nondischargeable under § 523(a)(2)(A) because he participated in a conspiracy to defraud the RTC.  That issue, however, is precisely the issue decided by the jury in the RTC's conspiracy case against Carpenter.  The question put to the jury in the conspiracy case was: "Do you find from a preponderance of the evidence that [Carpenter, Pentecost, and Houston Storage] engaged in a civil conspiracy with [named and unnamed defendants] to defraud [the RTC as Receiver for Universal Savings] in connection with [the Houston Storage transaction]?"  The RTC then sought to put what amounts to the same question before the district court in the dischargeability proceeding: Do you find, by a preponderance of the evidence, that Dr. Carpenter participated in a scheme to defraud the RTC as receiver for Universal Savings?

*Id.* at 1294 (second, third, and fourth alterations in original).  The court held that "[b]ecause the issues of ultimate fact in the two proceedings [we]re identical, . . . the RTC was precluded from asserting its 'participation in a fraudulent scheme' theory of nondischargeability under §

523(a)(2)(A) . . . ." *Id.*

The *RecoverEdge* court rejected the arguments that issue preclusion did not apply because the first proceeding was legal while the bankruptcy proceeding was equitable and because the first proceeding involved a question of state law while the second proceeding involved federal bankruptcy law. *RecoverEdge*, 44 F.3d at 1294–95. The Fifth Circuit noted that there was no authority for such limits on preclusion. *Id.* at 1295.

As in *RecoverEdge*, Halliburton asks this court to redetermine an issue that was presented and decided in the previous action. In support of its argument that the fact issues are not identical, Halliburton describes several cases in which issue preclusion or claim preclusion did not apply. Halliburton does not explain how those cases apply to the facts of this case. All the cases Halliburton relies on are distinguishable.

Halliburton first cites *EEOC v. MCI Telecommunications Corp.*, 820 F. Supp. 300 (S.D. Tex. 1993). That case involved offensive collateral estoppel. The court found that the issues were not identical because in the prior case the plaintiff had to prove discrimination, while the later case required proof of retaliation. *Id.* at 307. The court explained that "[e]stablishing a *prima facie* case that an individual was discharged because of her race involves distinctly different criteria from showing a *prima facie* case that an individual was discharged because of her opposition to an unlawful employment practice." *Id.* In contrast, the present case involves only mutual collateral estoppel. And there is no difference between the factual and legal analysis in the arbitration and in this litigation for determining whether transfers of property before the 1988 restructuring would prevent the assumption by NLPS of historical liabilities associated with the transferred properties. The same contracts are involved in both the arbitration and this litigation. The fact that different

139

sites are involved in the arbitration and in this litigation does not change the analysis of the identical contractual indemnity provisions.

Halliburton also relies on *Mitsubishi Corp. v. Eagle Transport, Ltd.*, 729 F. Supp. 524 (E.D. Tex. 1989).  In that case, a cargo owner sued the owner of a vessel that sank.  *Id.* at 525.  The plaintiff sought to apply offensive collateral estoppel based on a prior personal injury action involving the same sinking.  *Id.*  In the personal injury action, the vessel owner had conceded liability based on vicarious liability for the master's negligence.  *See id.*  The jury had found that 50 percent of the negligence that "caused the 'occurrence in question' was attributable to the vessel owner."  *Id.*  The jury also found that the owner did not justifiably believe it was in compliance with shipping regulations when the ship set sail.  *Id.*  The later cargo-claim suit required the plaintiff to show that the carrier had failed to use due diligence to make the ship seaworthy.  *Mitsubishi*, 729 F. Supp. at 525.  The relevant statute provided a defense for loss resulting from an "'[a]ct, neglect, or default of the master . . . .'"  *Id.*  The court in the cargo-claim suit rejected the plaintiff's argument that the issue in both cases was the unseaworthiness of the ship.  *See id.*  The jury in the first case had only found negligence for the loss of life, not for the sinking of cargo, and the vessel owner had conceded negligence for the loss of life based on respondeat superior, not based on unseaworthiness. *Id.*  The jury had found that the vessel owner failed to comply with shipping regulations, but the court noted that the jury had merely acted in an advisory capacity and that a ship could still be seaworthy without complying with the shipping regulations.  *Id.* at 525–26.  The court held that even if the jury in the previous case had found unseaworthiness, the later case required finding a want of due diligence to make the ship seaworthy and the relevant statute did not impose liability against the carrier for actions of the captain.  *Id.* at 526.  Because the issues of lack of due diligence and the

140

carrier's liability were not submitted to the jury in the previous action, issue preclusion did not

apply.  *Mitsubishi*, 729 F. Supp. at 526.  In contrast, the present case involves mutual collateral

estoppel.  The exact issue of Halliburton's responsibility for liabilities arising from NL's historical

petroleum services business—including liabilities arising from assets not transferred to NLPS in the

1988 restructuring—was decided in the arbitration and is present in this case.

Halliburton next relies on *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385 (5th Cir. 2004).

In that case, the court found that issue preclusion did not apply.  The prior case had assumed—not

decided—the applicability of a particular state statute, analyzed that statute under state law, and

determined that the statute did not violate the federal Constitution.  *Id.* at 398 (footnote omitted).

In the later case, the defendant raised a choice-of-law issue that the previous case had not addressed.

*Id.*  The court held that even if the choice-of-law issue had been determined in the prior action,

changes in controlling legal principles also made issue preclusion inapplicable.  *Id.* at 399.  In

contrast, the issue sought to be precluded in this case was not "assumed" in the arbitration but was

extensively litigated and decided.  Halliburton has not asserted that there has been an intervening

change in law.

Halliburton also relies on *Forbo-Giubiasco S.A. v. Congoleum Corp.*, 516 F. Supp. 1210

(S.D.N.Y. 1981).  That case involved nonmutual collateral estoppel.  Congoleum owned patent

rights to floor-covering products.  *Id.* at 1211.  Congoleum granted the plaintiff a nonexclusive

license to make, use, and sell.  *Id.*  The license agreement stated that if Congoleum licensed the

products at a lower royalty rate, the plaintiff would have the option to pay the more favorable rate.

*Id.*  The agreement also contained a "Related Company Clause" stating that if the plaintiff sold the

licensed products to a related company, the net sales price would be deemed to be the price at which

the licensee would have sold the product to an independent purchaser.  *Id.*  The plaintiff sought to pay a reduced royalty rate based on Congoleum's licensing to another company.  *Id.*  When Congoleum refused to accept that rate, the plaintiff sued.  *Forbo-Giubiasco*, 516 F. Supp. at 1211–12.  Congoleum counterclaimed for additional royalties under the Related Company Clause, damages for alleged fraud for falsely representing that sales would be made in accordance with the Related Company Clause, damages for the plaintiff's own use of the licensed products to reflect the meaning of the Related Company Clause, and reformation.  *Id.* at 1212.

The plaintiff argued that the counterclaims based on the Related Company Clause were precluded by an earlier arbitration proceeding between Congoleum and the plaintiff's sister company, Forbo-Krommenie, B.V., which had entered into a similar licensing agreement with Congoleum containing a nearly identical Related Company Clause.  *Id.*  In the earlier arbitration, the panel had determined the amount of royalties Forbo-Krommenie owed to Congoleum and established a formula for calculating royalties under the Related Company Clause.  *Id.*  The district court rejected "Congoleum's argument that no identity of issues can exist unless the same transaction, act or occurrence is at issue . . . ."  *Id.* at 1214.  The court nonetheless concluded that issue preclusion did not apply.  The court explained:

> The meaning to be accorded the Related Company Clause in this case depends upon the parties' intent when they agreed to this contract. It is at least clear that the proper interpretation will depend on extrinsic evidence, since the Congoleum/Krommenie arbitration demonstrates that the words of the Related Company Clause are ambiguous.  The fact that Congoleum used the identical language in the Giubiasco Related Company Clause as it had used six years earlier in the Krommenie Related Company Clause would suggest that the two provisions should be interpreted in the same manner *only if the same negotiating context for both contracts existed.*  However, Congoleum has presented uncontradicted evidence supporting the proposition that the understanding between Congoleum and

142

> Giubiasco in 1971 was not the same as the understanding between
> Congoleum and Krommenie in 1965.

*Id.* (emphasis added).  The court concluded that "whatever the Related Company Clause may have meant in the Krommenie contract, it is entirely possible that the parties intended and understood that it would mean something different in the Giubiasco contract."  *Forbo-Giubiasco*, 516 F. Supp. at 1215.

*Forbo-Guibiasco* involved two separate contracts between different parties, and evidence that the contracting parties intended different meanings for each contract.  The issue in the present case, by contrast, depends on interpreting the same contracts, with the same contracting parties, that the arbitration panel analyzed.

Finally, Halliburton relies on *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269 (10th Cir. 2005).  In *Dominion Video Satellite*, the defendant sought to avoid confirmation of an arbitration award by arguing that the award was barred by claim preclusion.  *Id.* at 1276.  An earlier arbitration between the same parties had interpreted another provision of the agreement and had "made a single isolated reference to a limited exception" to the provision of the agreement at issue in the later arbitration.  *Id.*  The court held that claim preclusion did not apply, explaining that "even though the prior arbitration panel referenced a provision of the Agreement at issue in this case, it did not decide any issues related to that exception, nor was the reference invited by the parties or necessary to the resolution of the prior dispute."  *Id.*

In the present case, in sharp contrast, the arbitration panel did not merely refer to the interpretation of the contracts at issue or to Halliburton's argument that leased properties did not transfer to NLPS in the 1988 restructuring and that this prevented historical liabilities that arose from those properties from being included in the petroleum services business NLPS received.

143

Instead, the arbitration panel considered the identical contracts at issue here and the identical arguments about the 1988 restructuring raised here.[128]   *Dominion Video* does not support Halliburton's argument.

Halliburton also argues that the issues in the arbitration and the issues in the present case are different because the "issues underlying the expired leases in Malvern were directly associated with property retained by NL in 1988," while "NL sold 'all assets and properties, real and personal, tangible and intangible, owned by [NL] and utilized in the business and operation of the [McCullough Services] Division.'"   (2005 Case, Docket Entry No. 274 at 42 (alterations in original)).  Halliburton asserts that "[i]t is entirely possible that the panel considered the fact that the expired leases were directly related to and/or intertwined with property retained by NL and subsequently transferred to Old Baroid when determining that the liabilities associated with those leases transferred to New Baroid under the 1990 Restructuring Plan."  (*Id.*).  Halliburton argues that "[b]ecause NL had divested itself of the sites and operations associated with the Gulf Nuclear Site claims, NL retained no benefits or other interest in those sites and operations."   (*Id.*).   But Halliburton has not pointed to any evidence in the arbitration record supporting its argument.  To the contrary, the record shows that the panel concluded that "[t]here is *no question* that NL effectively transferred all assets and operations, existing and *historical liabilities*, *associated with its petroleum services* business to NLPS in 1988"; that "[t]he assumption by NLPS of liabilities and obligations associated with that petroleum services business was *truly comprehensive*"; and that "[t]here is *nothing to suggest that such historical liabilities and obligations*, *even those related to expired or canceled leases on leased properties associated with the petroleum services business*,

---

[128]   In addition, *Dominion Video* considered claim preclusion, not issue preclusion.

*were not transferred to and assumed by NLPS*." (*Id.*, Ex. D at 22 (emphasis added)).  The panel found a complete transfer of NL's historical petroleum services business to NLPS in 1988. Halliburton's argument that the panel possibly considered the leases' relationship to property retained by NL is speculative and not supported by the record.[129]  The record shows that the issue as to which preclusion is sought in this case is the same as an issue decided in the arbitration.

### c.  The Issue Was Actually Litigated in the Arbitration

Halliburton argues that issue preclusion cannot apply because the arbitration only concerned

---

[129]  Even if the issue of liability for obligations associated with NL's former petroleum services business but related to assets or operations sold by NL before the 1988 restructuring was found not precisely identical to the issues resolved in the arbitration, the factors set out in the *Restatement* nonetheless weigh heavily in favor of applying issue preclusion.  Under the *Restatement*:

> When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding?  Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?  How closely related are the claims involved in the two proceedings?

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982).  Here, there is substantial overlap between the evidence and arguments in the arbitration and in this case.  For example, Halliburton presented evidence in the arbitration as to whether historical liabilities for properties and leases not transferred were passed on to Halliburton.  Halliburton's "100-Acres brief" from the arbitration presents many of the same arguments Halliburton seeks to present in this case.  (*See* 2005 Case, Docket Entry No. 279, Ex. E at 2, 4–6).  In addition, Halliburton has not shown what new arguments or evidence it might be able to present with respect to the Gulf Nuclear Sites that would not have been relevant to its argument in the arbitration that it did not assume liabilities associated with leased property not transferred in the 1988 restructuring.  The same principles of contract interpretation apply in both the arbitration and in this case.  Although discovery in the arbitration was largely, though not entirely, about the Malvern Site, Halliburton has not explained how discovery focused on the sites at issue in this case would have any effect on the interpretation of the contracts that apply to both the Malvern Site and the sites at issue here.  Although the claims in the arbitration related only to the Malvern Site and the claims in this case involve different sites, the same contracts govern responsibility for historical liabilities arising from NL's former petroleum services business.

the Malvern Site and the parties did not agree to arbitrate issues relating to the McCullough Division. (2005 Case, Docket Entry No. 274 at 43). The claims, defenses, and issues the arbitration panel heard and decided arise in the context of the Malvern Site, not the Gulf Nuclear Sites. But issue preclusion may apply to identical issues the panel decided, if the requirements are met. The decision in *Autotrol Corp. v. J-F Equipment Co.*, 820 F. Supp. 293, 297–98 (N.D. Tex. 1993), is instructive.[130] In *Autotrol*, defendant J-F Equipment Company ("JFE") granted Autotrol a license to manufacture and sell a particular product. *Id.* at 294–95. Two disputes arose. One involved whether JFE was required to indemnify Autotrol in suits brought by third parties based on Autotrol's sales of the product. *Id.* at 295. The other involved whether Autotrol was obligated to pay JFE a guaranteed minimum royalty. *Id.* The parties arbitrated these disputes in 1990. *Id.* The arbitrators held that the agreement could not be terminated for nonpayment of minimum royalties and denied JFE's counterclaim for minimum royalties for 1989. *Id.* Despite the arbitration award and its subsequent confirmation by the district court, JFE continued to demand minimum royalties. *Autotrol*, 820 F. Supp. at 295. JFE notified Autotrol that it intended to offset the unpaid minimum royalties for 1990 and 1991 against the amount JFE owed Autotrol for equipment. *Id.* at 295–96. Autotrol sued, seeking a declaratory judgment that the arbitration award precluded JFE from obtaining any minimum royalties. *Id.* at 296. JFE filed a counterclaim for minimum royalties. *Id.* JFE argued that the arbitration award did "not preclude its claim for set-off or for 1990 and 1991 minimum royalties because the arbitrators examined only whether Autotrol was obligated to pay a minimum royalty for 1989." *Id.* at 297. JFE asserted that "because the arbitrators did not make specific factual findings as to minimum royalties, the award has no *res judicata* effect." *Id.* at

---

[130] *Autotrol* involved claim preclusion under Texas law, but its analysis is nonetheless relevant here.

297–98.

The court rejected JFE's argument.  The court explained that "[t]o conclude that Autotrol was not obligated to pay JFE minimum royalties for 1989, . . . the arbitrators necessarily had to determine that the Agreement did not require them."  *Autotrol*, 820 F. Supp. at 298 (footnote and citation omitted).  The court commented that "JFE offer[ed] no other reasonable explanation as to how the arbitrators could have denied its counterclaim for minimum royalties without reaching that conclusion."  *Id.* (citation omitted).  In applying preclusion, the court noted:

> JFE willingly consented to have the Agreement interpreted by the arbitrators.  It submitted all its evidence in a full and fair hearing and had its counterclaim denied.  Clearly, *a finding by this court that the Agreement obligates Autotrol to pay JFE minimum royalties for 1990 and 1991 would undermine the arbitrators' construction of the Agreement*.  JFE is precluded from litigating any issue pertaining to its minimum royalties claim that could have been raised in arbitration.

*Id.* (emphasis added).

In the present case, Halliburton agreed to arbitrate the responsibility for remediating the Malvern Site as between Halliburton and Tremont.  The panel necessarily determined the meaning of the restructuring contracts to determine the responsibility for remediating the Malvern Site.  These same contracts, and the same contract interpretation issues, are the basis of the dispute here.  A finding by this court that Halliburton does not have liability for the remediation of the Gulf Nuclear Sites, despite the conclusion that those historical liabilities stem from NL's former petroleum services business, would clearly undermine the arbitration panel's interpretation of the restructuring contracts and its holding that those contracts evidenced a clear intent to transfer all historical liabilities associated with NL's petroleum services business to NLPS.  It did not matter in *Autotrol* that the arbitration panel only considered minimum royalties for 1989 because its

147

decision depended on contracts that applied across the years.  Here, it does not matter that the arbitration panel did not consider the Gulf Nuclear Sites because its decision rested on a construction of the restructuring contracts that apply to both the Malvern Site and the Gulf Nuclear Sites.  The construction is binding in subsequent litigation turning on the same contract-interpretation issue.

Halliburton's "100-Acres brief" filed in the arbitration, in which Halliburton opposed Tremont's request that the panel hold Halliburton responsible for properties formerly leased by NL at the Malvern Site, shows that Halliburton presented the identical arguments it urges here about properties or assets not transferred as part of the restructurings.  In that brief, Halliburton argued that "the Leased Properties at the [Malvern] Site remain the responsibility of [NL] because the leases and license agreements National Lead entered into were never assigned or transferred to anyone as part of the 1988 and 1990 restructurings."  (2005 Case, Docket Entry No. 279, Ex. E at 2).  Halliburton further argued:

> Claimants' argument that Respondents are responsible for the Leased Properties at the Site is *dependent upon proof that the Leased Properties were actually transferred to [NLPS], later renamed Baroid Corporation, as a part of the 1988 restructuring of NL and that NLPS agreed to assume historical liabilities associated with the Leased Properties*. . . .  [T]he obligation of NLPS to indemnify NL does not extend to "any claims of liability at sites or facilities or with respect to operations not transferred to NLPS."  Therefore, *the obligation of HESI, as the successor to New Baroid, to indemnify NL and Tremont does <u>not</u> extend to any claims of liability at sites or facilities or with respect to operations not transferred to NLPS.*

(*Id.*, Ex. E at 4–5 (italics emphasis added) (internal citation omitted)).

Halliburton argued in the arbitration that the Tremont Parties had not offered evidence that any of the leases and licenses that NL entered into as part of its mining and milling operations at the Malvern Site were transferred or assigned in the 1988 restructuring, that NL had terminated one of

148

the leases in 1986, that most of the remaining leases and license agreements had likely expired by the time of the 1988 restructuring, and that there was "no evidence that NL transferred or assigned to anyone any lease or license agreement that may not have expired prior to the 1988 restructuring." (*Id.*, Ex. E at 5–6).  Halliburton argued that the arbitration panel's earlier holding that HESI was obligated to indemnify Tremont and NL "derive[d] from the Panel's conclusion regarding real property ownership at the Site," and that "[i]n the absence of proof that any of the leases and license agreements National Lead entered into at the Site were transferred to NLPS in 1988, HESI [could not] be held obligated to indemnify Tremont and NL for liabilities associated with mining and milling operations on such properties."  (*Id.*, Ex. E at 6).  Halliburton asserted that "the absence of such proof compels the conclusion that NL remains liable for the mining and milling operations associated with the Leased Properties."  (*Id.*, Ex. E at 6).

The panel expressly considered and repeatedly rejected Halliburton's arguments.[131]  The panel stated:

> [T]he conclusion is inescapable that the leased properties and licenses of NL, and subsequently "Old" Baroid, were indeed an integral part of the petroleum services business of NL, and the resultant liabilities and obligations were assumed by NLPS and New Baroid, respectively, as a result of the plans of restructuring.  Those plans included not only the transfer of the assets and operations of the transferors' petroleum services business, but also the *associated past* and future *liabilities* and obligations.

(2005 Case, Docket Entry No. 247, Ex. D at 19 (emphasis added)).  The panel further stated:

> Whether the leases had expired or were terminated prior to 1988 is not determinative of whether the historical liabilities associated with the leased property were assumed by NLPS, and later New Baroid.

---

[131]  *See* 2005 Case, Docket Entry No. 247, Ex. D at 14, 20 (listing and describing Halliburton's arguments regarding leased properties and expired leases and licenses, including that Halliburton's indemnification obligation did not extend to operations not transferred to NLPS in the 1988 restructuring).

> . . . [*I*]*ndemnification for such historical liability is not dependent upon the actual transfer or assignment* of a lease covering leased property which had been used as part of the operations of the petroleum services business of NL prior to 1988.

(*Id.*, Ex. D at 20 (emphasis added)).  The panel continued: "An assumption of indemnification obligations and successor liability for historical liabilities associated with the transferred petroleum services business is *not dependent upon an actual physical transfer or assignment of an associated lease, or real estate for that matter*."  (*Id.*, Ex. D at 20–21 (emphasis added)).  And the panel stated that "[t]here is nothing to suggest that such historical liabilities and obligations, even those related to expired or canceled leases on leased properties associated with the petroleum services business, were not transferred to and assumed by NLPS."  (*Id.*, Ex. D at 22).

The record shows that Halliburton's liability for NL's historical petroleum services business and the argument that this liability did not extend to operations not transferred to NLPS in 1988 was fully litigated and decided in the prior arbitration.

**d.   The Arbitration Panel's Findings Were Necessary to Its Award**

Halliburton argues that the arbitration panel's findings on the comprehensive transfer of NL's petroleum services business and its rejection of Halliburton's arguments to the contrary were not necessary to the panel's final award.  (2005 Case, Docket Entry No. 274 at 43).  Halliburton asserts that "[t]he issue that the arbitration panel determined was that the Halliburton Parties must indemnify Tremont for NL's former mining activities on certain tracts located within the Malvern Site that were never owned by NL."  (*Id.*).  Halliburton contends that

> the only evidence submitted to the arbitration panel related to the Malvern Site and accordingly, any reference or ruling in the Allocation Award purportedly applying to any sites or operations other than the Malvern Site, or going beyond the effect of dormant or expired leases, is unnecessary dicta, which goes far beyond the

jurisdiction of the arbitration panel and is not binding on this Court.

(*Id.* at 43–44).

As one treatise has explained:

> Courts occasionally have been tempted to speculate that a prior decision could have been rested on narrower grounds than those actually chosen, so that resolution of the broader issues was not necessary to the decision. For the most part, such speculation should be resisted. There is little reason to infer that broadly based decisions are reached with less care than narrow decisions; indeed, the opposite inference is at least as attractive. . . . It is particularly appropriate to avoid such speculation as to decisions that have justified broad equitable remedies on the basis of multiple findings. Although it is always possible that the same remedy might have been ordered on the basis of fewer findings, it is better to recognize a principle of remedial necessity that justifies preclusion as to all findings deemed appropriate in justifying the remedy ordered.

18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4421, at 548–50 (2d ed. 2002) (footnotes omitted).

There is no basis to speculate that the arbitration panel might have reached its result without finding that the transfer of NL's historical petroleum services business was "truly comprehensive" or without concluding that the transfer of liabilities did not depend on the physical transfer of real estate. To the contrary, the panel repeatedly stated the conclusions it reached on this issue in the Allocation Award. The panel could not have reached its holding that Halliburton was responsible for all liabilities at the Malvern Site without concluding that these liabilities encompassed historical liabilities, including those arising from leases that were not transferred to NLPS. The panel needed to draw the broader conclusions about the transfer of the historical petroleum services business and what that transfer encompassed in order to assess responsibility for the liabilities at the Malvern Site. The panel's conclusions were necessary to resolve the Malvern Site claims and clearly were not

dicta.

To summarize, issue preclusion applies to whether Halliburton is responsible for the historical liabilities arising from NL's former petroleum services business, including historical liabilities that arose from assets or operations not transferred to NLPS under the 1988 restructuring.

### E.     Contract Interpretation

Tremont also seeks summary judgment on the basis that this court's own interpretation of the 1988 Plan and the 1990 Plan, and ancillary documents, would require Halliburton to indemnify Tremont for the historical environmental liabilities of the former petroleum services business of NL at the Gulf Nuclear Sites.  (2005 Case, Docket Entry No. 252 at 2).  This court has determined that issue preclusion applies.  Even if issue preclusion did not apply, this court's own analysis of the contracts shows that NL's petroleum services business was transferred to NLPS in the 1988 restructuring, to New Baroid in 1990 restructuring, and eventually to Halliburton, and that this transfer included historical liabilities associated with the petroleum services business, even if the associated assets and operations were sold before the 1988 restructuring.  In short, the result reached by analyzing the contracts is consistent with the arbitrators' conclusion.

Before interpreting the relevant documents, this court must first address the law that applies in that interpretation.[132]  The parties have not briefed this issue but cited only Delaware law in their

---

[132] "'A federal court must follow the choice-of-law rules of the state in which it sits.'"  *Fina, Inc. v. ARCO*, 200 F.3d 266, 269 (5th Cir. 2000) (quoting *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996)).  "Under Texas choice of law rules, courts apply the substantive law of the state having the most significant relationship to the litigation."  *W.F. Barnes v. Forest Hills Inv., Inc.*, 11 F. Supp. 2d 699, 703 (E.D. Tex. 1998) (citations omitted).  The *W.F. Barnes* court noted that under section 188 of the *Restatement (Second) of Conflict of Laws*, the choice of law for a contract action, in the absence of an effective choice-of-law provision, involves consideration of the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicil, residence, nationality, place of incorporation and place of business of the parties.  *Id.* at 703–04 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)).

briefs.  It is not clear that Delaware law applies to all the relevant documents.[133]  While the 1990

Plan states that it should be interpreted under Delaware law, other documents do not clearly indicate

that Delaware law applies.  The 1988 Plan and the Assumption Agreement do not identify what law

applies.  The Formation Agreement, the Cross-Indemnification Agreement, and the Indebtedness

Agreement all state that they are governed by Texas law.  But this court need not select between

Texas or Delaware law because the relevant principles of contract interpretation are similar.

In Texas, the meaning of an unambiguous contract is for the court to decide as a matter of

law.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (citations omitted).  The court's primary

concern "is to ascertain and to give effect to the intentions of the parties as expressed in the

instrument."  *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980)

(citation omitted).  The court considers the contract as a whole.  *See Forbau v. Aetna Life Ins. Co.*,

876 S.W.2d 132, 133 (Tex. 1994).  When considered as a whole, a contract is ambiguous only if "its

meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."  *Coker*,

650 S.W.2d at 393 (citation omitted).  Texas courts have recognized that "not every difference in

the interpretation of a contract or an insurance policy amounts to an ambiguity."  *Forbau*, 876

S.W.2d at 134.  A court will not find a contract ambiguous if it may properly be given a certain legal

meaning or interpretation.  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907

S.W.2d 517, 520 (Tex. 1995) (citations omitted).   Under Texas law, "[c]ourts interpreting

unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic

evidence to create an ambiguity."  *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)

---

[133]  NL's later motion for summary judgment notes that "[t]he ancillary documents signed in connection with the 1988 Plan of Restructuring provide that they are governed by Texas law," and argues that the documents "should be interpreted under the normal Texas rules of contract construction."  (Docket Entry No. 56 at 13).

(citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1982); *Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 657 (5th Cir. 2002)).

Contract interpretation principles are similar under Delaware law.  This court set out the relevant principles in its opinion confirming the arbitration awards:

> Under Delaware law, contracts must be construed as a whole to give effect to the parties' intentions. *E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). If a contract is not ambiguous, "the parties' intent is ascertained by giving the language its ordinary and usual meaning." *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).  When there is ambiguity, a court may consider "testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract," but if the contract is clear and unambiguous, the court may not "consider parol evidence 'to interpret it or search for the parties' intent[ions] . . . .'" *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) (citations omitted). A contract is not ambiguous simply because there is disagreement between the parties as to its proper construction.  Rather, a contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196 (citation omitted).  "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Id.* (citation omitted).  When a contract is ambiguous, a court may consider extrinsic evidence to determine the parties' intent, and such evidence includes "'overt statements and acts of the parties, the business context [of the contract], prior dealings between the parties, business custom, and usage in the industry.'" *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch. 2007) (citation omitted), *aff'd*, 935 A.2d 255 (Del. 2007).

*Halliburton Energy Servs., Inc. v. NL Indus.*, 553 F. Supp. 2d 733, 757 (S.D. Tex. 2008) (alterations in original).

Because Delaware and Texas principles of contract interpretation are not materially different, this court need not determine which law applies to each of the restructuring agreements.  Because

the parties have relied on Delaware law in their briefs, this court relies primarily on Delaware case law in interpreting the relevant documents, but also considers similar principles in Texas law.

The principal contract interpretation dispute is whether the restructuring documents require Halliburton to indemnify Tremont for the Gulf Nuclear Site liabilities because those liabilities stem from NL's petroleum services business, or whether the restructuring documents provide that NL maintained liability for the Gulf Nuclear Sites because the transfer of the petroleum services business did not include historical liabilities associated with assets or operations that NL sold before the restructurings.

Halliburton argues that the Gulf Nuclear Site liabilities were not transferred in the 1988 restructuring because NL sold the McCullough Division—a division of NL's petroleum services business with connections to the Gulf Nuclear Sites—before that 1988 restructuring.  (*See* 2005 Case, Docket Entry No. 274 at 27).  Halliburton acknowledges that although NL sold the McCullough Division to Western Atlas, NL retained all historical liabilities associated with that Division.  (*Id.* at 7; *see also* 2005 Case, Docket Entry No. 247, Ex. HH, § 7(f), (g), (i)).  As a result, Halliburton does not contend that NL transferred the historical liabilities associated with the McCullough Division before the 1988 restructuring.  Instead, Halliburton contends that because NL transferred the assets and operations of the McCullough Division before the 1988 restructuring, NL could not have transferred the associated liabilities in the 1988 restructuring.  (*See* 2005 Case, Docket Entry No. 274 at 8–9).

Tremont responds that the Western Atlas transfer did not occur before the effective time of the 1988 restructuring.  (*See* Docket Entry No. 41 at 48).  The Formation Agreement had an effective date of December 31, 1987.  The default effective date of the Western Atlas Agreement was

155

midnight on December 31, 1987.  The Western Atlas Agreement provides:

> Consummation of the purchase and sale of the Assets and other transactions provided for in this Agreement shall take place at the office of NL located at 3000 North Belt East, Houston, Texas 77032 on December 31, 1987, commencing at 11:00 a.m., local time on such date provided such date follows expiration of the waiting period, if applicable, under the Hart-Scott Rodino Antitrust Improvement Act of 1976, or the receipt of any and all other material, requisite governmental permits, approvals and consents, or at such other date or time or other place as [Western Atlas] and the NL Parties mutually agree upon in writing (such actual date of transfer is referred to as the "Transfer Date"), and all transactions provided for in this Agreement to occur on and as of the Transfer Date shall be deemed to have occurred simultaneously and *to be effective as of midnight on the Transfer Date*.

(2005 Case, Docket Entry No. 247, Ex. HH, § 13(a)).

The summary judgment record does not include evidence that the parties agreed that the Western Atlas transfer would occur earlier or later than the default date of December 31, 1987.[134] Tremont appears to assume that "midnight" refers to the last minute of the day of the Transfer Date. Halliburton has not argued otherwise.  The relevant ancillary agreements associated with the 1988 restructuring were signed in April and September 2008, but made retroactively effective as of December 31, 1987.

This court need not, however, resolve whether the Western Atlas Agreement was effective before or after the 1988 restructuring.  Even if the Western Atlas transaction became effective before the 1988 restructuring, the relevant restructuring documents show that—as the arbitrators concluded—all NL's historical liabilities associated with its petroleum services business transferred to NLPS and then to New Baroid (Halliburton), regardless of whether the associated real estate,

---

[134] Tremont asserts that the Western Atlas transaction did not close until January 12, 1988, pointing to a *New York Times* article of that date announcing the transaction.  (Docket Entry No. 41 at 49).  The article does not state when the transaction closed.

assets, or operations transferred in the 1988 restructuring.

Construing the 1988 restructuring documents together, the contract language clearly shows the parties' intent to transfer NL's entire petroleum services business to NLPS, including all NL's historical liabilities associated with that business.  The Formation Agreement provides that NLPS was to assume all liabilities associated with NL's petroleum services business, excluding only certain listed liabilities.  (*See* 2005 Case, Docket Entry No. 247, Ex. J, § 1.3).  Among the liabilities excluded from those assumed by NLPS in the Formation Agreement are: (1) liabilities of NL specified in the Indebtedness Agreement, except as provided in that Agreement; and (2) "claims of liability at sites or facilities or with respect to operations not transferred to NLPS pursuant to [the Formation Agreement], including claims arising out of or relating to the offsite deposit, placement or disposal by NL of any materials of any character whatsoever generated at sites or operations not transferred to NLPS pursuant to [the Formation Agreement]."  (*Id.*, Ex. J, § 1.4(a), (c)).  The section of the Formation Agreement excluding liability for operations not transferred to NLPS must be read with the earlier sections of the Agreement on assets transferred and excluded from the transfer.  The section addressing assets transferred states that NL transferred to NLPS "all of its properties, assets and rights of *any kind*, whether tangible or intangible, real or personal related to its petroleum services business . . . , including, but not limited to, . . . the subsidiaries engaged in the petroleum services business of NL . . . ."  (*Id.*, Ex. J, § 1.1 (emphasis added)).  The only exclusions from the assets transferred are "any and all of the assets, properties or rights listed on the attached 'Excluded Assets Schedule'" and "all goodwill and going concern value of NL that is not associated with TMCA or the petroleum services operations of NL."  (*Id.*, Ex. J, § 1.2).  The Excluded Assets Schedule lists the shares of the capital stock of NLC, Enenco, Inc., and Schraubenfabrik Newstadt

157

Goetz & Cie. GmbH; a note receivable from NL Chemicals, Inc.; and certain surplus property.  (*See id.*, Ex. J at 6).  There is no evidence that anything on the Excluded Assets Schedule relates to the petroleum services business.[135]

The exclusion in section 1.4 for claims of liability for sites, facilities, or operations not transferred to NLPS under the Formation Agreement must refer to liabilities associated with those assets that were not transferred because they were not part of the petroleum services business or TMCA transferred in section 1.1 or because they were specifically excluded under section 1.2.  The comprehensive transfer of the petroleum services business by NL and the comprehensive assumption of the petroleum services liabilities by NLPS supports the conclusion that the parties did not intend to exclude historical petroleum services liabilities associated with assets or operations sold before the restructuring.[136]

---

[135]  Although the Excluded Assets Schedule does not refer to the McCullough Division, this does not, on its own, establish as a matter of law that the McCullough Division was transferred to NLPS.  If, as Halliburton contends, the McCullough Division was sold to Western Atlas before the 1988 restructuring, it would make sense that NL would not have included an asset it no longer owned in the list of assets excluded from the transfer to NLPS.  But analyzing the Formation Agreement as a whole shows that NL transferred its entire petroleum services business to NLPS, including all historical liabilities associated with that business.  This shows that historical liabilities associated with the McCullough Division were transferred to NLPS even if the McCullough Division's assets and operations were not.

[136]  *Cf. E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." (citations omitted)); *Stockman v. Heartland Indus. Partners, L.P.*, Nos. 4227-VCS, 4427-VCS, 2009 WL 2096213, at *6 (Del. Ch. Jul. 14, 2009) (unpublished) ("A basic principle of contract interpretation is that the court reads an agreement as a whole to give effect to each term and *to harmonize seemingly conflicting terms*." (emphasis added) (citations omitted)); *Law Debenture Trust Co. of N.Y. v. Petrohawk Energy Corp.*, No. 2422-VCS, 2007 WL 2248150, at *9 n.30 (Del. Ch. Aug. 1, 2007) (unpublished) (discussing a case that explained that "contract provisions should be interpreted in a manner that best allows all the terms of a contract to fit together in a consistent manner" (citing *Kass v. Kass*, 696 N.E.2d 174, 91 N.Y.2d 554, 566–67 (N.Y. 1998))*; Maxus Energy Corp. v. Occidental Chem. Corp.*, 244 S.W.3d 875, 879 (Tex. App.—Dallas 2008, pet. denied) ("We must 'rely on a reading of all the pertinent provisions of the [contract] as a whole, and not on any single passage in isolation.'" (alteration in original) (quoting *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001))).

Moreover, the NL subsidiaries that, together with NL, sold the McCullough Division to Western Atlas are listed among the subsidiaries transferred to NLPS in the Formation Agreement. (*See* 2005 Case, Docket Entry No. 247, Ex. J at 9). As a result, even if the Western Atlas transaction became effective before the 1988 restructuring, the NL subsidiaries that retained the liabilities associated with the McCullough Division in the Western Atlas transaction were transferred to NLPS in the 1988 restructuring. Therefore, the provision in the Formation Agreement exempting from the liabilities assumed by NLPS "claims of liability . . . with respect to operations not transferred to NLPS . . . " does not exclude claims of liability arising from the subsidiaries that retained the McCullough Division liabilities under the Western Atlas Agreement. The fact that the petroleum services subsidiaries were transferred to NLPS in the 1988 restructuring further supports the conclusion that those subsidiaries' liabilities—including liabilities associated with the McCullough Division—transferred along with the subsidiaries' operations under the Formation Agreement. Although NL was also a party to the Western Atlas Agreement, given the comprehensive nature of the transfer of the petroleum services business evidenced by the 1988 restructuring documents, there is no basis to infer that NL retained the liabilities associated with the McCullough Division after the 1988 restructuring. This interpretation is further confirmed by the other documents executed in connection with the 1988 restructuring.

The Formation Agreement states that "[t]he transfer of the Assets and the assumption of the Assumed Liabilities shall be effected by the execution and delivery of a General Assignment and Assumption Agreement and Bill of Sale," among other agreements. (2005 Case, Docket Entry No. 247, Ex. J, § 3.1). The Assumption Agreement supports the conclusion that all petroleum services liabilities were transferred to NLPS. That agreement states that NL transferred to NLPS "*all of NL's*

159

*right, title and interest in and to each of the contracts*, policies of insurance, licenses and license agreements *to which NL is a party* and all open purchase orders for materials and supplies and *related to NL's petroleum services business*." (*Id.*, Ex. L, § A(9) (emphasis added)).  NLPS agreed "*to perform the obligations of NL under the contracts*, leases and other agreements or undertakings that are included among the Assets and other items referred to in Section A . . . ." (*Id.*, Ex. L, § D(1) (emphasis added)).  The summary judgment record shows that the McCullough Division was part of NL's petroleum services business.  Assuming the Western Atlas Agreement was effective before the Assumption Agreement became effective, NL's interest in the Western Atlas contract, and NL's obligations under that contract, transferred to NLPS under the plain terms of section D(1) of the Assumption Agreement.  Although the Assumption Agreement ties in the excluded liabilities from the Formation Agreement by stating that "NLPS does not assume and shall not be liable for any of the Excluded Liabilities," (*id.*, Ex. L at 3), as discussed above, the Excluded Liabilities under the Formation Agreement do not include liabilities associated with the petroleum services business.

The Indebtedness Agreement further supports the conclusion that the 1988 restructuring resulted in a complete transfer of all historical liabilities associated with NL's petroleum services business.  In the Indebtedness Agreement, NLPS agreed to "assume and unconditionally guarantee to NL . . . the performance or discharge by NLPS on behalf of NL of *any and all other indebtedness and obligations of NL which are attributable to NL's petroleum services business*." (*Id.*, Ex. M, § 1(c) (emphasis added)).

The Cross-Indemnification Agreement further supports this conclusion.  In the Cross-Indemnification Agreement, NL and NLC (the "NL Parties") "agree[d] to indemnify and hold NLPS harmless from, against and in respect of all *indebtedness, obligations or liabilities of NLPS*, of any

kind and nature, whether accrued, absolute, contingent, asserted, unasserted, due to become due, known, unknown and whenever arising, *which are not expressly assumed by NLPS pursuant to the Formation* . . . ." (*Id.*, Ex. K, § 1.1 (emphasis added)). The NL Parties also agreed to indemnify NLPS with respect to claims and liabilities relating to "all liabilities not expressly assumed by NLPS in connection with the Formation Agreement," and "claims of liability at sites or facilities or with respect to operations not transferred to NLPS pursuant to the Formation . . . ." (2005 Case, Docket Entry No. 247, Ex. K, § 1.2(a)).  NLPS "agree[d] to indemnify and hold the NL Parties harmless from, against and in respect of, the failure of NLPS to pay or otherwise perform when due the liabilities, obligations or commitments of NL assumed by NLPS pursuant to the Formation." (*Id.*, Ex. K, § 2.1).  NLPS further agreed to indemnify the NL Parties with respect to "all liabilities of NL assumed by NLPS pursuant to the Formation Agreement," and "claims of liability at sites or facilities or with respect to operations transferred to NLPS pursuant to the Formation, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever on such sites or facilities." (*Id.*, Ex. K, § 2.2(a)–(b)).  The Cross-Indemnification Agreement ties indemnification obligations to the transfer of liabilities under the Formation Agreement.  Under the Formation Agreement, NLPS assumed all liabilities associated with NL's petroleum services business; the Cross-Indemnification Agreement requires NLPS to assume indemnification obligations with respect to all petroleum services business obligations.

The 1988 Plan, the Formation Agreement, the Assumption Agreement, the Indebtedness Agreement, and the Cross-Indemnification Agreement together[137] all show that as the arbitrators

---

[137] When multiple agreements are coordinated, they may be considered together. *See du Pont*, 498 A.2d at 1115 ("Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (citations omitted)).

concluded, NL's entire petroleum services business, including liabilities associated with assets previously sold by NL, was transferred to NLPS in the 1988 restructuring.[138]

The 1990 Plan shows that the entire petroleum services business was transferred to New Baroid in the 1990 restructuring.  The 1990 Plan states that Old Baroid (formerly NLPS) would "separate the Petroleum Services Business and the Titanium and Bentonite Businesses into two publicly-traded companies."  (2005 Case, Docket Entry No. 247, Ex. A at 1).  The 1990 Plan states that Old Baroid "ha[d] heretofore indirectly owned and operated its petroleum services operations (the 'Petroleum Services Business') principally through its subsidiaries, including without limitation, Baroid Drilling Fluids, Inc. ('BDFI') . . . . (collectively, the 'Petroleum Services Subsidiaries')." (*Id.*, Ex. A at 1).  Old Baroid agreed to "endorse[] in blank and deliver[] to New Baroid certificates representing all of the outstanding capital stock of all of its direct subsidiaries engaged in the Petroleum Services Business, including without limitation the Petroleum Services Subsidiaries." (*Id.*, Ex. A, § 1(a)).  New Baroid then agreed to assign to BDFI all of New Baroid's rights in the Petroleum Services Assets and the Bentonite Assets, and BDFI agreed to assume and discharge all of New Baroid's Obligations "arising out of, or which are otherwise attributable to, the past, present or future ownership or operations of such Petroleum Services Assets."  (*Id.*, Ex. A, § 1(b)).  BDFI

---

[138]  Halliburton argues that even if facilities associated with the McCullough Division were transferred to NLPS under the 1988 Plan, "Tremont does not address the shared facilities that were operated by divisions of NL other than McCullough."  (Docket Entry No. 50 at 8 (internal record citation omitted)).  Halliburton does not explain this argument or its relevance to resolving the summary judgment motion.  Presumably Halliburton is arguing that if the McCullough Division shared a facility with another division of NL, that shared facility could not have transferred to NLPS in the 1988 restructuring because it was essentially shared with Western Atlas after the Western Atlas Agreement, and that NL would retain any liability associated with the shared facility.  However, the Western Atlas Agreement excludes shared facilities from the assets transferred to Western Atlas, (2005 Case, Docket Entry No. 247, Ex. HH, § 3(g)), and Halliburton does not provide evidence of any shared facilities or their connection to the Gulf Nuclear Sites.  In addition, as discussed, the transfer of liabilities in the 1988 restructuring did not depend on the transfer of associated facilities.

agreed to transfer the Bentonite Business to its subsidiary Bentonite Corporation and to transfer that subsidiary to New Baroid, and New Baroid agreed to transfer that subsidiary to Old Baroid.  (*See id.*, Ex. A, § 1(c), (f), (g)).

In short, BDFI received Old Baroid's Petroleum Services Business and became a subsidiary of New Baroid; Old Baroid retained the Bentonite Business.  New Baroid agreed to indemnify Old Baroid for all Petroleum Services Obligations.  (*See id.*, Ex. A, § 12).  Petroleum Services Obligations included "all indebtedness, liabilities, obligations, claims, covenants, losses, damages, costs, penalties and expenses, of any kind and nature, whether accrued, absolute or contingent, asserted or unasserted, known or unknown, and whether existing as of the date of [the 1990] Plan or arising thereafter . . . , of [Old Baroid] arising out of, or which are otherwise attributable to, the past, present or future ownership or operations of the Petroleum Services Business."  (2005 Case, Docket Entry No. 247, Ex. A, § 1(a)).  Among the listed indemnification obligations assigned to New Baroid were "all Obligations arising out of, or which are otherwise attributable to, sites or facilities or with respect to operations attributable to the Petroleum Services Business, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever generated at such sites or by such operations."  (*Id.*, Ex. A, § 12(i)).[139]

Under the 1990 Plan, NL's entire petroleum services business that had been transferred to NLPS in the 1988 restructuring was transferred to New Baroid, with the exception of the Bentonite Business and other specific exclusions.  New Baroid assumed all Old Baroid's obligations associated with NL's former petroleum services business.  Halliburton does not appear to dispute this construction of the 1990 Plan, focusing instead on the 1988 restructuring.  Halliburton also does not

---

[139] Unlike the Malvern Site involved in the arbitration, Halliburton does not argue that the Gulf Nuclear Sites were exempted from the transfer under Exhibit A to the 1990 Plan as "surplus real property."

dispute that it is New Baroid's successor.  As a result, the relevant contracts support the arbitrators'

conclusion that, with very limited exceptions not applicable here, the entirety of NL's former

petroleum services business was transferred to NLPS in the 1988 restructuring, to New Baroid in

the 1990 restructuring, and eventually to Halliburton.[140]  This transfer included all historical

liabilities associated with NL's former petroleum services business, even if NL transferred the

underlying assets or operations before the 1988 restructuring.[141]

        Because the contract language is not ambiguous, it is not appropriate to consider extrinsic

---

[140]  Halliburton argues, without further explanation, that "there is no evidence in the summary judgment record establishing that Tremont is the successor to NL's indemnity rights under the 1988 Plan."  (Docket Entry No. 62 at 5).  But Tremont does not seek to enforce NL's indemnity rights under the 1988 Plan. Tremont seeks to enforce its indemnity rights under the 1990 Plan as Old Baroid's successor. Because the 1990 Plan spun off Old Baroid's petroleum services business, which had previously been spun off from NL as part of the 1988 restructuring, determining Tremont's indemnity rights necessarily requires examination of both the 1988 and the 1990 restructurings.  The fact that the 1988 Plan is implicated in the analysis of Tremont's indemnity rights does not mean that Tremont must establish that it is the successor to NL's indemnity rights under that Plan.

[141]  Halliburton also argues that documents created after the 1988 and 1990 restructurings create a genuine issue of material fact as to whether the parties intended that New Baroid would assume historical liabilities associated with NL's petroleum services business and/or whether the parties modified their agreement.  (2005 Case, Docket Entry No. 274 at 23).  But Halliburton has not provided legal authority or analysis to support its opaque suggestion that NL's agreement to indemnify Halliburton for certain liabilities in the past modified the restructuring agreements.  Halliburton has not submitted evidence explaining the indemnification agreement in the *Western Atlas v. NL* lawsuit on which it places so much emphasis.  Halliburton submitted documents showing only that the lawsuit involved expenses for addressing environmental conditions at oilfield service properties that NL sold to Western Atlas in the Western Atlas Agreement, and that NL indemnified New Baroid in that lawsuit.

        The parties' subsequent course of conduct can provide evidence of modification of a contract in certain circumstances.  *See Personnel Decisions, Inc. v. Bus. Planning Sys., Inc.*, No. 3213-VCS, 2008 WL 1932404, at *5 n.21 (Del. Ch. May 5, 2008) (unpublished) ("'Where it is unreasonable to interpret the contract in accordance with the course of performance, the conduct of the parties may be evidence of an agreed modification or waiver by one party.'" (quoting RESTATEMENT OF CONTRACTS (SECOND) § 202 cmt. g (2008))), *aff'd*, 970 A.2d 256 (Del. 2009) (unpublished table decision).  But a modification by conduct or words "'must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.'"  *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297, 2000 WL 307370, at *26 (Del. Ch. Mar. 13, 2000) (unpublished) (footnote and citations omitted).  The record does not raise a fact issue that the parties intended to modify their earlier restructuring contracts.  Evidence that NL later agreed to indemnify New Baroid/Halliburton in particular circumstances does not change the clear intent of the restructurings to transfer NL's entire petroleum services business to NLPS and then New Baroid.

evidence about the parties' intent. *See Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." (citations omitted)); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." (citations and footnote omitted)).[142]   The restructuring

---

[142]   Halliburton's motion for leave to supplement the record, (Docket Entry No. 86), seeks to submit an October 12, 1990 letter from Compofelice to attorneys at Kirkland and Ellis that states: "All of the liabilities assumed by New Baroid will have been incurred in the ordinary course of business and will be associated with the assets transferred." (*Id.*, Ex. A at 4). The subject of the letter is "Petroleum Services Business Spin-Off," and it appears to be in a binder about the 1990 Restructuring of Tremont Corporation behind a tab labeled "Representation letter from Tremont dated October 12, 1990." (*Id.*, Ex. A). Halliburton asserts that it discovered this document "[u]pon further review of the record of production in this matter . . . ," and also notes that the letter was presented to the arbitration panel as an exhibit. (Docket Entry No. 86 at 1–2).

Tremont responds that this same letter has been in the record since October 22, 2007, when Halliburton filed it to complete the arbitration record, but asserts that it has no objection to this court considering the letter because it actually supports granting summary judgment in favor of Tremont. (Docket Entry No. 88 at 1–2). Tremont argues that the letter was only provided to its outside tax counsel to show that the 1990 restructuring was not a sham transaction and that Tremont was complying with a particular section of the Internal Revenue Code, and that it "was not in any way intended or expected to address the division of contingent environmental liabilities, such as those for the Gulf Nuclear Sites, as between Tremont and Halliburton." (*Id.* at 2). Tremont also argues that even if the letter did constitute a representation about anything other than tax issues, it cannot change the unambiguous language in the 1990 Plan requiring Halliburton to take responsibility for all environmental liabilities relating to NL's former petroleum services business. (*Id.*). And Tremont argues that the letter is consistent with its request for summary judgment because "Tremont's Gulf Nuclear Sites' potential liability is directly associated with the assets that were transferred to Halliburton—NL's former petroleum services business." (*Id.*).

Halliburton filed a reply, noting that Tremont did not object to this court considering the letter, and asserting that Tremont's explanation of the letter is unreasonable. (Docket Entry No. 90 at 1–2). Halliburton argues that statements made for tax opinion purposes must be true and that it offers the letter to provide "a clearer and contemporaneous understanding of the 1990 Plan," not to change the language of the Plan. (*Id.* at 3–5). Halliburton then repeats the argument it made in earlier briefs that the parties' subsequent conduct shows that the only liabilities assumed by New Baroid were those associated with particular facilities transferred under the 1990 Plan, relying on the same evidence it previously submitted that it asserts shows that Tremont or NL accepted responsibility for facilities not transferred to New Baroid. (*See id.* at 6–9).

Tremont has filed a response to Halliburton's reply. (Docket Entry No. 91). In its response, Tremont argues that the cases Halliburton cites in its reply are irrelevant and that Delaware contract law has long provided that extrinsic evidence cannot be considered in the absence of an ambiguity. (*See id.* at 1–5). Tremont also argues that even if there is ambiguity in the relevant contracts, "the supposition that all of NL's former McCullough Division properties were transferred to Western Atlas prior to the 1990 Plan of Restructuring, and not transferred to Halliburton, is simply not correct." (*Id.* at 6). Tremont points to a

schedule from the Western Atlas Agreement showing properties retained by NL in that Agreement, and notes that the NL McCullough facility in Oklahoma City, Oklahoma was not transferred to Western Atlas and was retained and allocated to Sperry Sun, which is now part of Halliburton. (*Id.*). Tremont points to nexus documents showing materials for disposal sent from Oklahoma City to Gulf Nuclear, (*id.*, Ex. B), and argues that even if Halliburton is correct that it is not responsible for liabilities associated with assets not transferred in the restructurings, Halliburton still would have responsibility for the Oklahoma City property it received. (Docket Entry No. 91 at 6). Tremont also argues that the schedule from the Western Atlas Agreement shows that a McCullough-owned concrete lab and test pits at the North Belt facility remained with NL, and that this facility later became Halliburton's headquarters. (*Id.*). Tremont points to nexus documents showing shipments of waste from the North Belt facility to Gulf Nuclear. (*Id.*, Ex. C). Tremont asserts that "[t]he nexus documents with regard to Oklahoma City, Oklahoma and North Belt (Houston), Texas facilities account for the vast majority of the alleged NL McCullough Gulf Nuclear sealed source transactions," and that Halliburton is responsible for these liabilities even if Halliburton is not responsible for liabilities associated with assets not transferred. (Docket Entry No. 91 at 7). As discussed earlier, this court agrees with Tremont that the contracts are not ambiguous and that it is inappropriate to resort to extrinsic evidence, and this court has also concluded that Halliburton is responsible for liabilities arising from NL's former petroleum services business even if the associated assets or operations did not transfer to NLPS, New Baroid, and Halliburton. Tremont's new argument that waste was sent to Gulf Nuclear from certain properties that were associated with the McCullough Division but that were not transferred to Western Atlas does not need to be resolved and is not relevant to Halliburton's motion to supplement the record.

Unlike the supplemental evidence previously submitted by Tremont, Halliburton has known about the letter it seeks leave to submit for years. It is not new evidence that has only come to light recently in the related EPA lawsuit. Not only was the document produced earlier in this litigation, it was also brought to Halliburton's attention as an exhibit in the arbitration. Halliburton's motion to supplement the record is untimely. *See Carlson v. Rockwell Int'l Corp.*, 132 F.3d 1453, 1997 WL 802035, at *2 (5th Cir. 1997) (unpublished) (per curiam) ("Carlson sought the supplement the record with evidence from her own experts at a time when summary judgment motions had been pending for more than a year. The district court denied her leave to file, finding that the supplemental materials that Carlson sought leave to file were *previously available to her*. Under these circumstances, the district court acted well within its discretion." (emphasis added) (citation omitted)).

In addition to being untimely, Halliburton's supplemental evidence does not create a factual issue precluding summary judgment. Halliburton argues that "the Arbitration Panel determined that the property in Malvern, Arkansas was transferred to New Baroid (HESI) as part of the 1990 restructuring," and that "[t]he Arbitration Panel assigned liability for the Malvern Site to HESI based upon this transfer." (Docket Entry No. 86 at 2). Halliburton contends that "[i]t is undisputed that the assets of NL McCullough were sold to Western Atlas in 1987 and accordingly, those assets could not have been transferred to New Baroid in 1990." (*Id.*). Halliburton argues that the letter is submits "clearly shows that the intent of the parties to the 1990 Plan of Restructuring was that the <u>only</u> liabilities transferred to New Baroid in 1990 were those liabilities associated with the <u>assets actually transferred</u> in 1990." (*Id.*). Because this court has determined that issue preclusion and the unambiguous language of the contracts support Tremont's request for partial summary judgment, this piece of extrinsic evidence of the parties' intent in the 1990 restructuring does not preclude summary judgment. In addition, Halliburton is incorrect that the arbitration panel assigned liability to Halliburton based only on the transfer of the Malvern Site property to Halliburton. As discussed in connection with issue preclusion, the arbitration panel found that all of NL's historical liabilities arising from the petroleum services business transferred to Halliburton regardless of whether the associated assets or real estate transferred in the restructurings. As a result, considering this piece of evidence would not change this court's holding on issue preclusion.

166

agreements place liability for NL's former petroleum services business with New Baroid, Halliburton's predecessor.

Halliburton also argues that the record evidence that NL indemnified New Baroid in the *Western Atlas* lawsuit either waives the argument Tremont is making in this case or shows the parties' understanding of the contract terms that raises a fact issue as to the intended meaning of the 1988 restructuring.  The waiver argument fails; even if agreeing to accept liability for one claim waives the right to seek indemnity for that claim, it does not waive the contractual right to request indemnity for other claims under the contracts.  The fact that NL may have indemnified New Baroid in the past does not change the unambiguous indemnity language in the contracts.[143]

The argument that the parties' subsequent conduct raises a fact issue as to the intended meaning of the contracts also fails.  Extrinsic evidence of subsequent conduct to determine the meaning of a contract generally cannot be considered in the absence of an ambiguity.[144]

---

Halliburton's motion for leave to supplement is denied.

[143]  Halliburton also argues that "NL expressly assumed responsibility for any NL McCullough liabilities associated with the Gulf Nuclear Sites," relying on a letter from Highland Environmental Management, LLC on behalf of NL to Western Atlas's counsel that states that NL accepts Western Atlas's tender of the Gulf Nuclear Sites matter under the Western Atlas Agreement.  (Docket Entry No. 82 at 1–2; *id.*, Ex. 1). Halliburton asserts that "Tremont should be estopped from taking any position that is inconsistent with its express assumption of liability."  (Docket Entry No. 82 at 2).  However, this letter only shows that NL accepted Western Atlas's tender of the Gulf Nuclear Sites matter pursuant to its obligations under the Western Atlas Agreement between Western Atlas and NL.  It does not show that NL agreed not to exercise its indemnification rights under the restructuring contracts.  As Tremont points out, "[t]here is nothing inconsistent about NL stating that between itself and Western Atlas, NL has conditionally accepted the alleged NL liability for the Gulf Nuclear Site related to its former McCullough Division, and at the same time, NL and Tremont stating such liability was ultimately assumed by Halliburton through the 1988 and 1990 Restructuring[s] and subsequent Halliburton mergers."  (Docket Entry No. 85 at 2).  Halliburton's estoppel argument lacks merit.

[144]  *See Homac, Inc. v. DSA Fin. Corp.*, 661 F. Supp. 776, 786 (E.D. Mich. 1987) (analyzing Delaware law and stating that "in the absence of an ambiguity, judicial inquiries into parol evidence or subsequent conduct of the parties to determine their contractual intent should not be undertaken by the Court" (citation omitted)); *see also Doran v. ClubCorp USA, Inc.*, No. 05-06-01511-CV, 2008 WL 451879, at *2 (Tex. App.—Dallas Feb. 21, 2008, no pet.) (mem. op.) ("Because the contract is unambiguous, we must derive its meaning from

Even if this court were to consider the letter agreement by NL to indemnify New Baroid in the *Western Atlas* lawsuit and the statement in a letter (sent for settlement purposes) that NL was responsible for liabilities associated with a different facility sold to Exxon before the 1988 restructuring, the evidence does not raise a genuine dispute as to the meaning of the parties' unambiguous contracts.[145]   The letter agreement signed by representatives of NL and Baroid simply lists *Western Atlas v. NL* as a "[m]atter[] as to which NL is [i]ndemnifying Baroid." (*See* 2005 Case, Docket Entry No. 274, Ex. A-2 at 2).   The letter contains no description of the subject matter of the lawsuit,[146] no explanation as to why NL agreed to indemnify Baroid for this matter, and no analysis of the restructuring contracts.   The beginning of the letter simply states that indemnification is

its language alone, without considering extrinsic evidence such as the parties' subsequent conduct." (citation omitted)); *Hildreth v. Merle Norman Cosmetics, Inc.*, No. 08-02-00402-CV, 2004 WL 736991, at *4 (Tex. App.—El Paso Apr. 6, 2004, no pet.) (mem. op.) ("[I]f the contract is unambiguous then the conduct of the parties is immaterial to determine its meaning." (citation omitted)); *cf. AT&T Corp. v. Lillis*, 970 A.2d 166, 172 (Del. 2009) ("It is hornbook law that the contracting parties' course of conduct may be considered as evidence of their intended meaning of an *ambiguous* contractual term." (emphasis added) (citation omitted)). Other jurisdictions have found it appropriate in at least some circumstances to consider the parties' course of performance even if a contract is unambiguous. *See In re Aurora Foods Inc.*, No. 04-166 GMS, 2006 WL 3747306, at *6 (D. Del. Dec. 19, 2006) (applying New York contract law and noting that "[w]hen interpreting a contract, 'the parties' course of performance . . . is relevant to understanding the contract even if the contract is unambiguous'" (omission in original) (citing *United Fire & Cas. Co. v. Arkwright Mut. Ins.*, 53 F. Supp. 2d 632, 640–41 (S.D.N.Y. 1999))); *Relational Funding Corp. v. TCIM Servs., Inc.*, No. 01-821-SLR, 2004 WL 392875, at *4 (D. Del. Feb. 24, 2004) (noting that the Uniform Commercial Code, which has been adopted by Michigan by statute, "permits course of performance to be considered to supplement or explain the agreement, notwithstanding the existence of a writing intended to be the final expression of the parties . . . regardless of whether the terms of the contract appear unambiguous" (citations omitted)).  But because Delaware and Texas law prohibit considering subsequent conduct in the absence of an ambiguity, the fact that other jurisdictions have considered subsequent conduct in other contexts is not a persuasive reason to consider that evidence here.

[145]  As discussed earlier, this court has considered the documents submitted in camera during the hearing on Tremont's motion.  These documents do not change this court's interpretation of the contracts or lead to a different result.

[146]  Although, as discussed earlier, Tremont's request for indemnity from Halliburton describes the *Western Atlas* lawsuit as a involving expenses for addressing environmental conditions at oilfield service properties that NL sold to Western Atlas through the Western Atlas Agreement, the record does not provide further details about the lawsuit or the indemnity involved.

"pursuant to the various agreements among Baroid, NL, and Tremont Corporation." (*Id.*, Ex. A-2 at 1).[147] This letter does not raise a factual dispute about the meaning of the indemnity language in the contracts as applied to properties sold or transferred by NL before the 1988 restructuring. In addition, while "the parties' course of performance may explain, supplement, or add to an agreement, the course of performance may not be used to contradict any contract entered into." *Sears Roebuck & Co. v. Emerson Elec. Co.*, No. 01 C 8119, 2003 WL 22057251, at *7 (N.D. Ill. Sept. 3, 2003) (applying Illinois law) (citation omitted). Finding that NL's agreement to indemnify Baroid in the *Western Atlas* lawsuit shows the parties' contractual intent to make NL responsible for historical liabilities associated with facilities or operations it sold before the 1988 restructuring would contradict the terms of the 1988 restructuring contracts, which unambiguously provide that, with very limited and inapplicable exceptions, historical liabilities associated with NL's petroleum services business transferred to NLPS in the 1988 restructuring.

Similarly, the letter in which NL agreed to indemnify Halliburton for liabilities associated with a facility that NL sold to Exxon in 1987 because Halliburton did not acquire the facility—even assuming this court could consider it despite the prohibition on relying on the parties' subsequent conduct in the absence of an ambiguity and the exclusion of evidence specifically labeled as "for settlement purposes only"—does not create a genuine dispute as to a material fact. The letter does

---

[147] Halliburton notes that this letter also lists Schaffer de México, S.A. de C.V., Division of McCullough as a "matter for which NL is indemnifying New Baroid." (2005 Case, Docket Entry No. 274 at 12 n.4). Halliburton asserts that because Shaffer de México, S.A. de C.V. is identified as a wholly-owned subsidiary of the McCullough Division in the Western Atlas Agreement, NL's subsequent agreement to indemnify Baroid with respect to a liability associated with this entity "is yet another example of NL's acknowledgment of its indemnity obligations under the 1988 Restructuring Documents." (*Id.*). As with the agreement to indemnify for the *Western Atlas* lawsuit, there is no description in the letter agreement of the details of the dispute or why NL agreed to take responsibility for it. This part of the letter agreement does not create a factual dispute as to the parties' intent to allocate indemnity obligations for the historical liabilities arising from NL's petroleum services business.

not explain NL's reason for accepting liability associated with a facility that it sold to Exxon in 1987. It is not apparent from this letter that the parties interpreted the restructuring documents. And the letter is part of ongoing settlement negotiations. This letter, if it were considered, would not create a factual dispute as to the meaning of the contracts.[148]

Tremont asks that Halliburton be required to provide a defense for the claims in the EPA lawsuit because Delaware law requires an indemnitor to defend all claims until it can demonstrate which claims fall outside a contractual indemnification obligation. (Docket Entry No. 41 at 49–50). Tremont relies on *Pacific Insurance Co. v. Liberty Mutual Insurance Co.*, 956 A.2d 1246 (Del. 2008). In that case, the court explained the duty to indemnify as follows:

> "In construing an insurer's duty to indemnify and/or defend a claim asserted against its insured, a court typically looks to the allegations of the complaint to decide whether the third party's action against the insured states a claim covered by the policy, thereby triggering the duty to defend." The test is whether the underlying complaint, read as a whole, alleges a risk within the coverage of the policy. Determining whether an insurer is bound to defend an action against its insured requires adherence to the following principles: (1) where there is some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured; (2) any ambiguity in the pleadings should be resolved against the carrier; and (3) *if even one count or theory alleged in the complaint lies within the policy coverage, the duty to defend arises.*

*Id.* at 1254–55 (emphasis added) (footnotes and citations omitted). Halliburton contends that *Pacific*

---

[148] Halliburton also notes that New Baroid did not disclose liabilities associated with the NL McCullough Division or the Gulf Nuclear Sites in the merger agreement between Baroid and Dresser, which stated that, other than specified exceptions, there were no undisclosed material liabilities. (2005 Case, Docket Entry No. 274 at 13–14). Halliburton asserts that because these liabilities were not disclosed, "New Baroid did not bring the NL McCullough Division liabilities associated with the Gulf Nuclear Sites to the merger with Dresser[,] . . . [and] [a]ccordingly, HESI and DII, the successors of Dresser through a 1998 merger and subsequent restructuring, could not have assumed indemnification responsibility for those liabilities." (*Id.* at 14). Baroid's alleged failure to disclose these liabilities in the Dresser merger may bear on a claim by Halliburton against New Baroid/NL for undisclosed liabilities. But it does not change the unambiguous indemnity language in the restructuring contracts or the arbitrators' conclusions and does not create a fact issue as to whether the parties modified to the restructuring agreements.

*Insurance Co.* is inapplicable because it relates to an insurer's duty to defend under an insurance policy, not a contractual indemnity.  (Docket Entry No. 50 at 10).  Halliburton points out that there is a distinction between an indemnity agreement, which is construed in favor of the indemnitor, and an insurance agreement, which is construed in favor of coverage.  (*Id.* at 10–11).  Halliburton argues that the special relationship between the insurer and insured, the basis for the rule of construction, does not apply here.  (*Id.* at 11).

The complaint in the EPA lawsuit relates solely to the Gulf Nuclear Sites.  (*See* 2005 Case, Docket Entry No. 247, Ex. OO, ¶ 1).  The EPA has confirmed that, at least for now, its claims against NL in the EPA lawsuit relate solely to NL's former petroleum services business.  (*See* Docket Entry No. 71, Ex. A, ¶ 3).  As a result, this court need not resolve the effect of differences between an indemnity contract and an insurance contract.  Because the restructuring plans and related agreements require Halliburton to indemnify Tremont for claims arising out of NL's former petroleum services business, even construing that indemnity obligation narrowly—as Halliburton insists this court must do—results in a finding that Halliburton is required to indemnify Tremont for the EPA lawsuit.

Tremont's motion for partial summary judgment is granted.

## IV.    NL's Motion to Dismiss

Halliburton has filed a third-party complaint against NL seeking: damages for breach of contract and contractual indemnity; a declaratory judgment that NL must indemnify Halliburton for any and all costs and expenses, including attorneys' fees, arising out of or otherwise attributable to the "Divested Businesses," defined as operations and facilities transferred by NL before the 1988 restructuring; or, alternatively, contribution and cost recovery under CERCLA.  (Docket Entry No.

13).  NL has moved to dismiss the third-party complaint, arguing that the claims are barred by issue preclusion.  (Docket Entry No. 19 at 1).  Alternatively, NL asks that its motion be converted into a motion for summary judgment as to all claims in the third-party complaint.[149]  (*Id.* at 1).  Halliburton responds that it would be inappropriate to apply issue preclusion under the circumstances presented here.  (Docket Entry No. 22).

### A.   Conversion to a Motion for Summary Judgment

A threshold issue is whether NL's motion to dismiss is properly decided under Rule 12(b)(6) or whether it should be converted into a motion for summary judgment under Rule 56.  NL captioned its motion as, in the alternative, a motion for summary judgment.  Although NL has not submitted materials outside the pleadings with its motion to dismiss, it refers to evidence in the record either in this case or in the 2005 Case.  For example, NL refers to the Allocation Award and the Contract Award from the arbitration, the 2005 Cost Sharing Agreement, excerpts from closing statements from the arbitration hearings, and exhibit lists from the arbitration.  This evidence is not mentioned in Halliburton's third-party complaint and is not central to its claims.  By referring to this evidence in its motion and captioning its motion as an alternative motion for summary judgment, NL has asked this court to consider matters outside the pleadings.  In its response to NL's motion to dismiss, Halliburton has attached numerous exhibits, most of which go beyond documents referred to in Halliburton's complaint or documents central to Halliburton's claim.  NL's reply brief continues to refer to evidence outside the pleadings, submitted to this court in the 2005 Case or in this case.  NL also attaches a letter that is not referenced in Halliburton's complaint.

---

[149]  As an additional alternative, NL requests that if this court is uncomfortable applying issue preclusion during the pendency of the appeal of the judgment on the arbitration awards, that this court stay all claims against NL until the Fifth Circuit appeal is resolved.  (Docket Entry No. 19 at 1).  The Fifth Circuit has now affirmed the judgment confirming the arbitration awards.  The additional alternative request is moot.

When either the pleader or the moving party submits materials outside the pleadings in connection with a motion to dismiss, the court must convert the motion into a summary judgment motion under Rule 56 if the court chooses to accept those materials. *See Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*, No. H-05-1865, 2006 WL 1875959, at *4 (S.D. Tex. July 5, 2006). The court has discretion to accept and consider the materials but is not required to do so. *Id.* (citing *Prager v. LaFaver*, 180 F.3d 1185, 1188–89 (10th Cir. 1999); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988)). In this case, both parties ask this court to consider the evidence they previously submitted. The court agrees to treat the motion as a summary judgment motion under Rule 56.

There is no need to give additional notice at this point that the motion is treated as one for summary judgment. The key to whether the court must give such notice is whether the losing party has been given adequate notice and an opportunity to supplement the record before summary judgment is granted. *See Clark v. Tarrant County, Tex.*, 798 F.2d 736, 745–46 (5th Cir. 1986). Halliburton received notice that NL's motion could be treated as one for summary judgment when NL framed its motion as seeking summary judgment in the alternative and referred to materials outside the complaint. *See Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*, 433 F.3d 1024, 1029 (7th Cir. 2006) ("Adequate notice is provided when the moving party frames its motion in the alternative as one for summary judgment." (citations omitted)); *see also Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (finding no error in district court's failure to give notice of treatment of a motion to dismiss as a motion for summary judgment because "the district court did not act *sua sponte* in converting the motion," the defendants moved for summary judgment in the alternative, and the plaintiffs responded to the summary judgment motion by submitting

173

materials outside the pleadings); *Hilfirty v. Shipman*, 91 F.3d 573, 578–79 (3d Cir. 1996) (when a motion to dismiss sought summary judgment in the alternative, the plaintiff was on notice that the court could rule on the motion as one for summary judgment), *disapproved of on other grounds by Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782 (3d Cir. 2000)); *Madewell v. Downs*, 68 F.3d 1030, 1048 (8th Cir. 1995) ("Madewell had constructive notice that the right of all defendants to judgment as a matter of law was at issue.  That constructive notice came from the DEA defendants' alternative designation of their motion as a motion for summary judgment, and Madewell's own submission of materials outside of the pleadings for consideration by the court . . . ." (internal citation omitted)). Additional notice is particularly unnecessary here because Tremont moved for summary judgment on the same issue preclusion basis as NL, giving Halliburton a full opportunity to submit any evidence and argument in opposition.  No unfairness will result from this court deciding NL's summary judgment motion without providing Halliburton additional notice and yet more time to respond.

**B.      Analysis**

Most of the facts relevant to NL's motion have been thoroughly discussed in connection with Tremont's motion for partial summary judgment.  NL argues that the claims in Halliburton's third-party complaint "run directly contrary to the Arbitration Panel's conclusion that '**there is no question that NL effectively transferred all** assets and operations, existing and **historical liabilities, associated with its petroleum services business to NLPS in 1988**.'"  (Docket Entry No. 19 at 4).  According to NL, "[i]t simply cannot be that NL has potential liability to Halliburton if it transferred all of its historical petroleum services liabilities elsewhere."  (*Id.* at 4–5).  Essentially, NL makes the same arguments for applying issue preclusion that Tremont made in its motion for

partial summary judgment.  And Halliburton raises the same arguments it raised in opposition to Tremont's motion.  Because those issues were addressed in connection with Tremont's motion, the analysis will not be repeated here.  However, Halliburton raises a few additional arguments in response to NL's motion to dismiss that it did not raise in opposition to Tremont's motion for partial summary judgment.

First, Halliburton argues that the fourth requirement for applying issue preclusion that has been recognized in certain circumstances—a requirement that there be "'no special circumstance that would render preclusion inappropriate or unfair'"—should be applied here.  (Docket Entry No. 22 at 8 (quoting *RecoverEdge*, 44 F.3d at 1290 n.12)).  As explained earlier in this opinion, the *RecoverEdge* court noted that the fairness requirement "originated as a limitation on *offensive* collateral estoppel," which "arises when a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against *another plaintiff*."[150]  *RecoverEdge*, 44 F.3d at 1290 n.12 (second emphasis added) (citations omitted).  As in *RecoverEdge*, "[t]his case involves traditional, or mutual estoppel because the relevant parties . . . [a]re the same as the parties" in the arbitration  *Id.* (citation omitted).

Even if this court considered fairness as a separate factor, that would not prevent issue preclusion here.  Halliburton was ably represented by capable counsel in the arbitration.  The arbitration hearings were extensive and involved consideration of thousands of pages of evidence

---

[150]  The other cases Halliburton cites—*Baros v. Texas Mexican Railway Co.*, 400 F.3d 228 (5th Cir. 2005), and *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998)—also involved offensive collateral estoppel.  They do not provide support for invoking a fairness requirement here.  *Cf. Auto. Fin. Corp. v. Ray Huffines Chevrolet, Inc.* (*In re Parkway Sales & Leasing, Inc.*), 411 B.R. 337, 348 (Bankr. E.D. Tex. 2009) (listing requirements for issue preclusion and then explaining that "[o]ffensive collateral estoppel requires a fourth equitable element that there exists 'no special circumstance that would render preclusion inappropriate or unfair'" (citation omitted)).

175

and testimony from multiple witnesses.  The arbitration panel analyzed the same contracts at issue

here and issued two thorough opinions explaining its analysis.  Given the case law that provides for

application of issue preclusion to findings in arbitration awards, and given the fact that the panel

necessarily interpreted the restructuring agreements to determine the parties' respective

responsibility for the Malvern Site environmental liabilities, Halliburton can hardly claim surprise

that the panel's findings have preclusive effect in litigation involving responsibility for

environmental liabilities at other sites that were part of NL's former petroleum services business.

Halliburton argues that this court does not need to address issue preclusion because NL and

Tremont have not established that all the claims in the complaint, and therefore in the third-party

complaint, are related to historical liabilities arising from NL's former petroleum services business.

(Docket Entry No. 22 at 9).  NL responds that "Tremont has repeatedly advised Halliburton and this

Court in writing that Tremont is not seeking indemnity from Halliburton for anything that does not

relate to the former NL petroleum services business," and that "neither NL nor Tremont is seeking

any preclusive treatment for any claims that do not relate to the former NL petroleum services

business." (Docket Entry No. 25 at 5).  Tremont does not seek to have the arbitration awards applied

to preclude Halliburton from contesting the amounts paid by Tremont as unreasonable or as not

associated with the former petroleum services business of NL.  NL argues that the only issue that

is subject to preclusion is whether Halliburton has responsibility for historical liabilities arising from

assets or operations that were at one time part of the former NL petroleum services business, but that

were not transferred as part of the 1988 restructuring.  (*Id.*).  NL also points out that Tremont's

complaint seeks indemnification from Halliburton only for claims that relate to NL's former

petroleum services business.  (*Id.* at 6).  NL argues that "[a]s there is no claim against Halliburton

by Tremont for anything outside of NL's former petroleum services business, Halliburton cannot conceivably have any claim against NL unless the arbitrators' decision is not entitled to issue preclusion." (*Id.* at 7).

Tremont's complaint only raises claims that relate to NL's former petroleum services business. Granting partial summary judgment to NL on the indemnification issue does not preclude Halliburton from defending against Tremont's claims on the basis that they are not related to NL's former petroleum services business. If Halliburton succeeds in such an argument for any of the sites identified in the complaint (other than the Gulf Nuclear Sites, the liabilities of which this court has already determined arose from NL's former petroleum services business), then Tremont will lose and Halliburton will not need indemnity from NL. If Halliburton loses that argument, it will have no basis to seek indemnity from NL because, as this court determined in connection with Tremont's motion for partial summary judgment, Halliburton is responsible for historical liabilities associated with NL's former petroleum services business, including liabilities associated with assets that were part of that business but sold before the 1988 restructuring.[151] As a result, Halliburton's contractual

---

[151] Halliburton also asserts that in the arbitration, the Tremont Parties argued that the panel had to consider extrinsic evidence to determine whether the Malvern Site was part of NL's former petroleum services business. (Docket Entry No. 22 at 19). Halliburton asserts that "[a] fact specific assessment of the circumstances surrounding the various sites, which by necessity includes an opportunity for discovery, should be made to determine whether the instant claim actually relates to NL's petroleum services business." (*Id.*). The record shows that the arbitration panel considered extrinsic evidence to decide whether the Malvern Site was "surplus real property" and was included within "Mining Property, Malvern, Arkansas." (*See id.*, Ex. N at 3). These terms were part of Exhibit A to the 1990 Plan. The panel considered this extrinsic evidence because it found these terms ambiguous. (*See id.*, Ex. N at 3). The terms "surplus real property" and "Mining Property, Malvern, Arkansas" are not involved in this case. Halliburton acknowledged this fact in its response to NL's motion for summary judgment. (*See* Docket Entry No. 60 at 14 n.12 ("At arbitration, this extrinsic evidence focused almost entirely upon the site specific terms of 'Mining property, Malvern, Arkansas,' and 'surplus property,' both of which terms are irrelevant to the current dispute.")). Tremont's complaint confirms that it only seeks indemnity for liabilities associated with NL's former petroleum services business. If any of the sites involved in Tremont's claims in this case do not relate to NL's former petroleum services business, Tremont will not recover against Halliburton and Halliburton will have no need for indemnity from NL.

indemnity claims fail.

Halliburton argues that arbitration is a matter of contract and that the parties never agreed to submit anything other than the Malvern Site dispute to arbitration.  (*See* Docket Entry No. 22 at 10–12).  Halliburton points out that in the arbitration, the Tremont Parties, which included both Tremont and NL, argued that discovery should be limited to the Malvern Site and that the panel denied Halliburton discovery with respect to other mining property.  (*Id.* at 10).  Halliburton asserts that the claims raised in Tremont's complaint, and therefore in Halliburton's third-party complaint, are not within the scope of the parties' arbitration agreement.  (*Id.* at 11).  Noticeably absent from Halliburton's brief are citations to any cases that would support requiring the claims raised in Halliburton's third-party complaint to be arbitrable in order to apply issue preclusion to the specific issues that were decided in the arbitration.[152]  Tellingly, Halliburton included its argument on this

---

Halliburton's argument that NL and Tremont's definition of "petroleum services business" has changed over time also fails.  The fact that the parties may have used different definitions of "petroleum services business" in the 1988 and 1990 restructuring documents does not mean that the transfer of liabilities associated with that business is ambiguous.  It is irrelevant that the same term is defined differently in separate agreements, as long as the definition is clear in each agreement.

[152] Halliburton cites *Wolf v. Gruntal & Co.*, 45 F.3d 524 (1st Cir. 1995), which Halliburton asserts states that "'[b]ecause arbitration awards are not 'judgments' *per se*, it cannot be presumed . . . that an arbitral tribunal acquired competent authority over the putative 'precluded' claim for res judicata or issue preclusion purposes.'"  (Docket Entry No. 22 at 11 (quoting *Wolf,* 45 F.3d at 528–29)).  The actual quotation refers only to res judicata, not issue preclusion.  *See Wolf*, 45 F.3d at 528 ("Because arbitral awards are not 'judgments' *per se*, it cannot be presumed, as the district court did, that an arbitral tribunal acquired competent authority over the putative "precluded" claim for *res judicata* purposes.").  The *Wolf* court was discussing claim preclusion.  The next sentence stated: "Unlike federal courts of limited jurisdiction and state courts of general jurisdiction, wherein a litigant, with standing, *unilaterally* may invoke the appropriate judicial tribunal's jurisdiction based on extrinsic constitutional, statutory, or common law authority, arbitral tribunals' authority over particular '*claims*' is for the most part *predetermined by contract*; that is, by *written agreement of the parties*."  *Wolf*, 45 F.3d at 528 (second emphasis added) (internal citation omitted).  The court had previously differentiated issue preclusion and claim preclusion: "Unlike collateral estoppel (issue preclusion), *res judicata* (claim preclusion) normally bars (i) relitigation of claims actually asserted in a tribunal of competent jurisdiction, and (ii) litigation of claims that arose from the same set of operative facts and *could have been raised* in the prior proceeding."  *Id.* at 527 (internal citation and footnote omitted).  The court noted: "Among the circumstances *in which claim preclusion does not obtain* are those in which '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action *because*

issue in its opposition to Tremont's motion for summary judgment in the section on claim

preclusion, not issue preclusion.  (*See* 2005 Case, Docket Entry No. 274 at 32–36).

In addition, the fact that the parties did not agree to arbitrate the new claims does not prevent

the application of issue preclusion to issues that were resolved in the arbitration.  The Tenth Circuit

rejected a similar argument in *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653 (10th

Cir. 2006).  In that case, the court held:

> B-S Steel's final argument opposing collateral estoppel concerns the
> nature of arbitration agreements.  According to B-S Steel, "the
> contractual nature of the arbitrators' jurisdiction" should prevent the
> arbitrators' award from having preclusive effect on "issues and
> claims outside the Arbitration Period" when such an effect was not
> intended by the contracting parties.  It also contends that because an
> arbitration is a private rather than a judicial process, the application
> of doctrines of preclusion does not serve the same interests in judicial
> economy and avoidance of piecemeal litigation.  We do not believe,
> however, that parties to an arbitration agreement could reasonably
> intend to allow the losing party to have a second chance to win in
> court on the very issue that he lost in arbitration.  Such a result would
> undermine the legitimacy of the arbitration award itself, and of the
> arbitration process.  Where, as here, the parties have invested
> considerable time and resources arbitrating an issue identical to that
> before a court, and the arbitration panel clearly articulates its findings
> on that issue, the court may consider this evidence that the parties
> intended the arbitration to have preclusive effect.

*Id.* at 665–66 (internal record citation and footnote omitted).  Similarly, the fact that the parties here

---

*of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain
multiple theories* or demands for multiple remedies or forms of relief in a single action, and the plaintiff
desires in the second action to rely on that theory or to seek that remedy or form of relief . . . .'"  *Id.* at 527
n.4 (first emphasis added) (omission in original) (quoting RESTATEMENT (SECOND) OF JUDGMENTS §
26(1)(c)).  The First Circuit held that the district court had erred by applying res judicata to bar a securities
law claim based on its conclusion that the claim could have been brought in an earlier arbitration because the
parties did not agree to arbitrate the securities law claim.  *See id.* at 529.  The court did not address the
application of issue preclusion.  The *Wolf* holding does not support Halliburton's argument that issue
preclusion cannot apply to prevent relitigation of issues decided by the arbitration panel in a later,
nonarbitrable, case involving the same issues.

did not agree to arbitrate the claims in the 2008 Case does not prevent the application of issue preclusion to determining whether Halliburton or NL is responsible for the historical liabilities associated with NL's former petroleum services business, which was fully litigated in the arbitration and decided by the arbitrators in detailed, unanimous opinions.

Halliburton also notes that this court found that the arbitration resolved only responsibility for the Malvern Site by entering a final judgment under Rule 54(b) on the claims resolved in the arbitration. (Docket Entry No. 22 at 11–12). The conclusion that the claims resolved in arbitration were different enough from the remaining claims in the 2005 Case—which at the time included the claims raised in Tremont's complaint in the 2008 Case—to enter a Rule 54(b) judgment is irrelevant to the application of preclusion to issues resolved in that arbitration and raised again here.

Halliburton also argues that NL is judicially estopped from arguing that the arbitration awards have preclusive effect. (*See id.* at 12–14). Halliburton asserts that "[t]o the extent NL admitted the scope of the Arbitration Agreement was limited only to the Malvern Site, such a statement also constitutes a judicial admission and is conclusively binding . . . ." (*Id.* at 14 n.7). Halliburton notes that in the arbitration, NL sought to limit discovery to the Malvern Site, and that NL took the position that it had not agreed to arbitrate issues related to former NL sites. (*Id.* at 13). Halliburton asserts that these arguments are judicial admissions. (*Id.*).

NL responds that its current argument is consistent with its position in the arbitration. (Docket Entry No. 25 at 13–14). NL argues that while the Tremont Parties argued in the arbitration that discovery should be limited to the Malvern Site, they never argued that the arbitrators' findings could not later be used for issue preclusion if all the requirements were met. (*Id.* at 13). NL also points out that the Tremont Parties never asked the arbitrators to limit discovery into the contractual

180

issues decided in the arbitration and that Halliburton could have presented the arbitrators with any of the documents it is now submitting to this court.  (*Id.* at 14).  NL argues that the Tremont Parties' statements in the arbitration were not contrary to a fact essential to a theory of recovery, and therefore not judicial admissions.  (*See id.*).  Finally, NL contends that the fact that the arbitration was limited to the Malvern Site should "in no way . . . limit the preclusive effect of the unanimous decisions made by the arbitrators about the operative contracts, which are identical to those at issue now."  (*Id.*).

"[J]udicial estoppel is an equitable doctrine, and the decision whether to invoke it [is] within the court's discretion . . . ."  *Browning Mfg. v. Mims* (*In re Coastal Plains, Inc.*), 179 F.3d 197, 205 (5th Cir. 1999) (citation omitted).  The Fifth Circuit has explained that "[j]udicial estoppel is 'a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.'"  *Id.* (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)).  "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest.'"  *Id.* (alteration in original) (quoting *Brandon*, 858 F.2d at 268).  "The doctrine is generally applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'"  *Id.* at 206 (quoting *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953)).

The court in *Coastal Plains* recognized "two limitations on the application of the [judicial estoppel] doctrine: (1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position."  *Id.* (citations omitted).  The Fifth Circuit noted that other courts have

181

imposed additional requirements, such as requiring that the position be one of fact rather than law and that the party must have acted intentionally rather than inadvertently. *Id.* (citations omitted). The position NL asserts here is not clearly inconsistent with the Tremont Parties' position in the arbitration. Judicial estoppel does not apply for that reason. The fact that the Tremont Parties sought and succeeded in limiting discovery in the arbitration to the Malvern Site is not inconsistent with the current request that issue preclusion be applied to prevent relitigation of the contract interpretation issues raised in both proceedings. The arbitration and this litigation involve the same contracts and the same contract interpretation issues. The fact that the Tremont Parties sought to limit discovery into former NL mines is irrelevant to NL's request that this court preclude relitigation of the meaning of the restructuring contracts.

Halliburton's argument that NL "judicially admitted" that every issue addressed in the arbitration was limited to the Malvern Site is also unpersuasive. "To qualify as a judicial admission, the statement must be (1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based." *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) (citing *Griffin v. Superior Ins. Co.*, 338 S.W.2d 415, 419 (Tex. 1960)). "'[J]udicial admissions are not conclusive and binding in a separate case from the one in which the admissions are made.'" *Id.* (quoting *Universal Am. Barge*, 946 F.2d at 1142). Even assuming the elements of a judicial admission are met, the fact that NL admitted that the arbitration was limited to the Malvern Site does not prevent applying issue preclusion to the contract interpretation issues necessarily decided in the Malvern Site arbitration.

Halliburton also argues that NL's position in its motion to dismiss was not foreseeable during

182

the arbitration. (Docket Entry No. 22 at 14–15). Halliburton contends that "[b]ecause the parties restricted the scope of the Arbitration Agreement to a final allocation related to the Malvern Site, any application beyond the Malvern Site is unforeseeable and inappropriate." (*Id.* at 14). Halliburton relies on the *Restatement (Second) of Judgments*, which provides an exception to issue preclusion when "'[t]here is a clear and convincing need for a new determination of the issue . . . (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action.'" (*Id.* (quoting RESTATEMENT (SECOND) JUDGMENTS § 28(5)(a))). Halliburton argues that the lack of foreseeability has special force here because Tremont's complaint and Halliburton's third-party complaint in this case assert claims for which NL has already admitted responsibility and that are subject to limitations. (*Id.* at 14–15). Halliburton notes that the claims in Tremont's complaint predate the filing of its complaint in the 2005 Case, and that Tremont could have proposed including them in the arbitration agreement but did not. (*Id.* at 15 n.9). NL responds that the idea that Halliburton could not foresee the applicability of issue preclusion is "hard to fathom" because of long-standing case law and the fact that at the time of the arbitration, Tremont was sending tender letters to Halliburton for some of the claims at issue in this case. (Docket Entry No. 25 at 4–5, 9).

This court agrees with Tremont that it is difficult to understand how Halliburton could be surprised by application of issue preclusion. Although the arbitration specifically addressed claims related to the Malvern Site, the arbitrators' decisions on issues necessary to resolve those claims clearly had broader effects. The case law clearly established that the decisions could be given preclusive effect in later cases. Halliburton knew that it had acquired other sites and potential environmental liabilities under the same restructurings contracts at issue in the arbitration.

183

Halliburton had notice of the Gulf Nuclear Sites remediation claims before the allocation phase of the arbitration; Tremont sent a demand letter with respect to those Sites in July 2007.  (*See* Docket Entry No. 25, Ex. A).

The comment to the *Restatement* section that Halliburton relies on states that "preclusion should not operate to foreclose redetermination of an issue if it was unforeseeable when the first action was litigated that the issue would arise in the context of the second action, *and if that lack of foreseeability may have contributed to the losing party's failure to litigate the issue fully*." RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. i (emphasis added).  As discussed earlier in this opinion, Halliburton fully litigated the issue of whether it assumed historical liabilities associated with properties and facilities that were part of NL's former petroleum services business but that did not transfer to NLPS in the 1988 restructuring.

The *Restatement* notes that unforeseeability is  "rare," but that it

> may arise, for example, between institutional litigants as a result of a change in the governing law.  Thus, a determination in an action between the taxing authorities and a corporate taxpayer that a transfer of property has not occurred may become relevant to a wholly different question of tax liability under an amendment to the tax law passed after the initial judgment was rendered.  Another example of a case in which a determination may have unforeseeable consequences is one in which that determination is relevant to a claim involving property acquired after the first judgment has become final.

*Id.*  The facts here are quite different from the examples in the *Restatement*.  There has been no change in governing law.  Halliburton knew before the arbitration ended that there were other sites with historical environmental liabilities potentially arising from NL's former petroleum services business.   Halliburton contends that the fact that NL had previously agreed to indemnify Baroid/Halliburton for certain claims arising out of its former petroleum services business made the

application of issue preclusion unforeseeable.  But NL did not agree to indemnify Halliburton with respect to the Malvern Site, which involved leases that expired before the 1988 restructuring.  That made it unreasonable for Halliburton to believe that NL would assume all historical liabilities arising from its former petroleum services business assets or operations not transferred to NLPS in the 1988 restructuring.

Halliburton also notes, without full explanation, that issue preclusion was not foreseeable because Tremont's complaint asserts claims that may be barred by limitations.  At least with respect to the Gulf Nuclear Sites, it appears that Tremont asserted its claim for indemnity shortly after it discovered its potential liability through the EPA lawsuit.  Halliburton does not elaborate as to what other claims might be barred by limitations.

Finally, Halliburton's argument that Tremont could have proposed including the claims involved in this case in the arbitration does not support withholding issue preclusion.  It is unclear that the claims in this case were ripe for inclusion in the arbitration.  But assuming that the claims were ripe, it is claim preclusion, not issue preclusion, that requires bringing all claims based on the same operative facts in the first action.[153]  Halliburton has not shown a clear and convincing need to relitigate the issue of interpretation of the restructuring agreements, as required by the *Restatement* provision it invokes.

---

[153] *See Wolf*, 45 F.3d at 527 ("*Unlike collateral estoppel* (issue preclusion), *res judicata* (claim preclusion) normally bars (i) relitigation of claims actually asserted in a tribunal of competent jurisdiction, and (ii) litigation of claims that arose from the same set of operative facts and *could have been raised* in the prior proceeding." (first emphasis added) (internal citation and footnote omitted)); *see also B-S Steel of Kan.*, 439 F.3d at 661 (rejecting the argument that "'the traditional 'jurisdictional competence' limitation on' preclusion doctrine" barred application of issue preclusion because the arbitration panel had no jurisdiction over the claims, noting that "the cases cited by B-S Steel in support of this argument apply this limitation to the doctrine of res judicata, or claim preclusion, which normally bars not only claims that were actually raised in a prior proceeding but also claims that '*could have been raised*' but were not" (citing *Wolf*, 45 F.3d at 527)).

In sum, NL has shown that it is entitled to judgment as a matter of law with respect to Halliburton's claims in the third-party complaint against NL for contractual indemnity.

In addition to its indemnity claims, Halliburton has also filed an alternative claim for contribution under CERCLA. Because the parties have not briefed Halliburton's alternative claim for CERCLA contribution, that claim is not dismissed. NL's alternative motion for summary judgment based on issue preclusion is granted in part and denied in part. NL's motion to dismiss is moot.

## V.    NL's Motion for Partial Summary Judgment

NL has moved for a partial summary judgment dismissing the claims raised in Halliburton's third-party complaint. (Docket Entry No. 56). NL argues that the 1988 restructuring documents entitle it to judgment as a matter of law because Halliburton has no contractual claims against NL. (*See id.* at 13–14). NL relies on the same documents and arguments Tremont used in the portion of its summary judgment motion based on contractual indemnities. Halliburton has filed objections to the evidence NL uses to support its summary judgment motion, nearly all of which track the objections Halliburton made to the same documents in response to Tremont's motion for partial summary judgment. (*See* Docket Entry No. 59). Halliburton has also filed a motion for continuance, arguing that it needs additional discovery to respond fully to NL's motion. (Docket Entry No. 58). At the same time that it filed its motion for a continuance, Halliburton filed a substantive response to NL's motion. (Docket Entry No. 60).

Given that this court has granted summary judgment in favor of NL with respect to all of the claims in the third-party complaint except Halliburton's CERCLA contribution claim, NL's separate request for summary judgment based on contract interpretation is moot. NL's motion for partial

summary judgment, and Halliburton's request for a continuance, are denied as moot.  Halliburton's

contract claims have been dismissed in connection with NL's motion for summary judgment based

on issue preclusion.  Halliburton's CERCLA contribution claim remains pending.  NL's motion for

partial summary judgment and Halliburton's opposition do not address Halliburton's contribution

claim.

## VI.    NL's Motion to Stay Discovery

NL filed a motion to stay discovery pending resolution of its motion to dismiss.  (Docket

Entry No. 26).  Halliburton opposed the motion.  (Docket Entry No. 29).  This court allowed the

parties to conduct discovery into the Gulf Nuclear Sites but deferred deciding whether the parties

could conduct discovery into additional sites until the parties completed discovery and briefing on

whether the Gulf Nuclear Sites were part of NL's former petroleum services business.  (Docket

Entry No. 44).  To the extent that NL's motion to stay discovery was not resolved by this court's

prior order deferring additional discovery, the motion is now moot because Tremont's motion

related to the Gulf Nuclear Sites has been resolved and NL's alternative motion for summary

judgment has been granted in part.

One argument Halliburton makes in opposing the motion to stay discovery warrants

discussion.  Halliburton argues that the discovery it requests is relevant to its "arguments that it was

not foreseeable that either Tremont or NL would be seeking contribution or indemnity from

[Halliburton] because NL had undertaken the obligation itself, and that it is unclear which of the

obligations are related to NL's former petroleum services operations, as well as the 'fairness'

consideration of issue preclusion, among others."  (Docket Entry No. 29 at 7).  This court addressed

these arguments in resolving NL's alternate motion for summary judgment based on issue

187

preclusion.  There is no basis in the record to believe that the additional discovery Halliburton seeks would change the resolution of those issues.  Even assuming NL has previously agreed to indemnify Halliburton with respect to certain claims, that would not make applying issue preclusion to the contract interpretation issue fully litigated and necessarily decided in the arbitration unforeseeable. Whether *all* the claims in the third-party complaint relate to NL's former petroleum services business need not be resolved.  Issue preclusion bars relitigating the *contract indemnity* issue resolved in the arbitration and raised again here.  Finally, the unfairness exception does not apply because NL seeks only to apply mutual collateral estoppel; there is no unfairness in applying issue preclusion; and Halliburton does not explain how additional discovery is necessary to resolve the fairness question.[154]

---

[154] Halliburton's response to NL's argument that the exceptions to issue preclusion on which Halliburton seeks discovery apply only in the context of nonmutual collateral estoppel is only that the exceptions do not need to be addressed because NL has not shown that the initial requirements for applying issue preclusion have been met.  This response confirms the conclusion that additional discovery is not necessary before resolving NL's motion to dismiss.  Halliburton itself argues that the exceptions on which it seeks discovery need not be addressed.

Halliburton also argues that "NL's presence is required to allow [Halliburton] to properly present their defense and, given that NL is requesting indemnification from Tremont, NL could seek indemnification from [Halliburton] at a later date as the successors of Baroid."  (Docket Entry No. 29 at 8).  Halliburton contends that "[t]his places Defendants [sic] squarely within the scope of Federal Rule of Civil Procedure 19," and that "[i]f a judgment were to come down in favor of Tremont in this matter, NL could potentially sue [Halliburton] for contribution on the same theory that [it] assert[s] against Tremont, creating a potential that [Halliburton] could incur multiple obligations."  (*Id.*).  Based on this argument, Halliburton asserts that "[s]ignificant prejudice exists for [Halliburton] if NL is dismissed," and that "[t]hat same prejudice exists if discovery is stayed with regard to NL in this case."  (*Id.*).  Although Halliburton's argument purports to be a reason not to dismiss NL from the case, Halliburton did not raise Rule 19 in connection with NL's motion to dismiss and Halliburton does not explain how the alleged potential for Halliburton to incur multiple obligations has any bearing on staying discovery pending resolution of the motion.  In any event, it is not clear that Rule 19 applies to bar dismissal.  Under Rule 19, a person must be joined as a party if that person claims an interest relating to the subject of the litigation and disposing of the action in the absence of that person may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations . . . ."  *See* FED. R. CIV. P. 19(a)(1)(B)(ii).  In addition to not raising this issue in response to NL's motion to dismiss, Halliburton has not presented any evidence that NL will seek recovery against Halliburton if it successfully recovers from Tremont in this action.  In addition, NL remains a party to this action because of the CERCLA contribution claim.

In sum, additional discovery is not warranted before resolving NL's motion to dismiss, as converted to a motion for summary judgment.  NL's motion for a stay of discovery pending resolution of the motion to dismiss is denied as moot.

## VII.    Conclusion

Tremont's motion for partial summary judgment, (Docket Entry No. 8), is granted. Halliburton's request for a continuance to respond to Tremont's motion for partial summary judgment, (Docket Entry No. 11), is denied.  NL's alternate motion for summary judgment based on issue preclusion, (Docket Entry No. 19), is granted in part and denied in part; NL's motion to dismiss is denied as moot.  NL's motion for partial summary judgment, (Docket Entry No. 56), and NL's motion to stay discovery, (Docket Entry No. 26), are denied as moot.  Halliburton's request for a continuance to respond to NL's motion for partial summary judgment, (Docket Entry No. 58), is denied as moot;  Halliburton's motion for leave to file certain exhibits under seal, (Docket Entry No. 63), is granted.  Tremont's motion to supplement the summary judgment record, (Docket Entry No. 70), is granted.  Tremont's motion for leave to file under seal its response to Halliburton's objection to Tremont's supplemental evidence and its memorandum in further support of its motion to supplement the record, (Docket Entry No. 74), is denied as moot.  Halliburton's motion for leave to supplement the record, (Docket Entry No. 86), is denied.  A status conference is set for **March 30, 2010, at 2:00 p.m.**, to discuss a schedule for resolving the remaining issues in this case.

SIGNED on March 11, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

189